1

2

3

4

5

6

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

7

8    ADEL HASSAN HAMAD

                            Plaintiff,

9    v.

10    ROBERT M. GATES,

                          Defendant.

11

12

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  **2:10-cv-00591 MJP**

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIFTH AMENDMENT
CLAIM**

**Noted for September 2, 2011**

13

14    <u>**I.  INTRODUCTION**</u>

15          Adel Hamad, a fifty-three year old husband and father, was an innocent humanitarian aid

16    worker when he was unlawfully seized from his apartment in Pakistan in 2002.  Am. Compl.

17    (Dkt. 96) ¶ 2.  U.S. officials, including Defendant Gates, subjected him to torture, and held him

18    in inhuman conditions (all without any due process) at Guantanamo Bay, without charging him

19    with any violation of law and finding that he did not pose a threat to the Unites States.  *Id.* ¶¶ 3,

20    4, 15, 16, 79.  In fact, officials had actually cleared him for return home in November of 2005,

21    but failed to inform him or his counsel of this decision for over on year and a half (*id.* ¶¶ 15)

22    even when his counsel made inquiries (*id.*  ¶ 77), and they continued to unlawfully detain him in

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    horrendous conditions for *another two years*. *Id*. ¶¶ 15, 77. This included being held for a year

2    under the direction of Defendant Gates as Secretary of Defense. *Id*. ¶24.  Moreover, Defendant

3    Gates knew or should have known, or believed, that many, if not most of the men officials had

4    seized and were holding were innocent. *Id*. ¶¶ 7, 8, 80.  Moreover, he knew that there was no

5    meaningful way to determine who was an enemy combatant and who was not, regarding both

6    those taken abroad and those being held. *Id*. ¶81.  He also knew that the Combatant Status

7    Review Tribunals (CRSTs) were horribly flawed. *Id*.  ¶56.[1]

8         Only five to seven percent of the men held at Guantanamo Bay were actually

9    apprehended during actual military engagement or "on the battlefield;" many were taken by

10   Pakistanis and Afghans who received a bounty, or did it for reasons of revenge or retribution.  *Id*.

11   ¶82. Yet, there was no credible effort to determine whether there was any suspicion or belief –

12   let alone reasonable suspicion or belief – that the men apprehended had actually engaged in or

13   supported hostilities toward or against the United States. *Id*. ¶82.  Many U.S. officials, including

14   Defendant Gates, knew this. *Id*. ¶¶80-81.

15        One reason Defendant Gates and others refused to acknowledge these things publicly and

16   hold adequate hearings and release the men, was out of fear of political repercussions. *Id*. ¶¶ 7,

17   8, 81.  By continuing to hold innocent men such as Plaintiff and subjecting them to isolation and

18   horrendous treatment, Defendant Gates, who was in charge of all military forces and responsible

19   for overseeing detainee detention, interrogation, and conditions, ordered, authorized, condoned,

20   created methods and procedures for the abuses which Plaintiff suffered (*id*.  ¶24), and thus

21   personally participated in such abuses.  This was so even though, as Defendant acknowledges,

22

---

[1] In fact, as Defendant points out, the United States has since discontinued the CRSTs.  Def.'s Mot. to Dismiss Plaintiff's Fifth Amendment Claim, Dkt. 112, at 5, n. 5.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   the United States has repudiated torture and CIDT "in the strongest terms."  Dkt. 112 at 3, n. 2.

2   Additionally, such acts violate Article III of the Geneva Conventions, customary international

3   law, as well as the Army Field Manual.  Dkt. 96 ¶5.  Such also violate the Code of Military

4   Justice, 10 U.S.C.A. § 801, *et seq.*, which specifically sets forth the responsibilities of the

5   Secretary of Defense to ensure that prohibitions of torture and CIDT are maintained.

6          The Military Commissions Act does not preclude this Court from hearing Plaintiff's

7   claims.  The Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), struck down in its

8   entirety the portion of the Act which sought to divest federal courts of jurisdiction of hearing

9   claims related to Guantanamo Bay, MCA § 7, codified at 28 U.S.C. §2241(e).  Even if this Court

10  does not find the Act struck down in its entirety, the Court should find that the statute is

11  otherwise unconstitutional.

12          In addition, Plaintiff should be allowed to sue Defendant Gates in his individual capacity

13  for violation of his Fifth Amendment rights (*Bivens'* claim).  No other scheme of relief is

14  available to him, and there are no factors in his case counseling this Court to hesitate to

15  recognize such claims.  Moreover, Defendant Gates is not entitled to qualified immunity because

16  he should have known that his acts were unlawful and unconstitutional.  This is so even though

17  the acts took place at Guantanamo Bay, because by the time Defendant Gates took office, the

18  Court had already recognized in *Rasul v. Bush*, 542 U.S. 466 (2004), that Guantanamo Bay was

19  within the "territorial jurisdiction" of the United States, at a minimum for consideration of the

20  right to not be arbitrarily detained for a prolonged length of time, and subjected to torture or

21  cruel, inhuman and degrading treatment (CIDT).

22

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

The Honorable Marsha J. Pechman

## II. ARGUMENT AND AUTHORITY

**A.   THE MCA DOES NOT PRECLUDE THIS COURT FROM HEARING PLAINTIFF'S CLAIM.**

In light of the United States Supreme Court's ruling in *Boumediene v. Bush*, 553 U.S. 723 (2008), in which it struck down §2241(e) in its entirety, this Court is not stripped from jurisdiction to hear Plaintiff's claim.  Moreover, even if this Court finds that the Supreme Court did not strike down §2241(e) in its entirety, this Court should find § 2241(e) is unconstitutional based on numerous grounds outlined below.  In the event that this Court find § 2241(e) is constitutional, it does not apply to Plaintiff because he was not adequately determined to be properly detained as an enemy combatant.

**1.     The U.S. Supreme Court Struck Down §2241(e) in *Boumediene.***

In *Boumediene v. Bush*, 553 U.S. 723 (2008), the Supreme Court invalidated Section 7 of the Military Commissions Act, codified at 28 U.S.C. § 2241(e).  The Court struck down § 2241(e) in full, without making any distinction between subsections (e)(1) and (e)(2). *See id*. at 733 ("Therefore § 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C.A. § 2241(e) (Supp. 2007), operates as an unconstitutional suspension of the writ."); *id*. at 795 ("The only law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007).").  The Supreme Court stated plainly—and repeatedly—its intent to invalidate all of § 2241(e).  It could have held that only § 2241 (e)(1) was unconstitutional, but it did not.  Considering that the Court discussed both sections separately on several occasions in its analysis (s*ee e.g., id.* at 736, 737, 776), the failure to make a distinction between the two sections when holding that § 2241(e) was unconstitutional makes its intent in this regard crystal clear.

In addition, if its unambiguous language was not enough, the Court clearly explained

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**        Page 4 of 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   why § 2241(e) must be read in its entirety (and thus struck down in its entirety) rather than

2   reading § 2241(e)(1) and (e)(2) separately (and striking them down separately).  *Id.* at 737-38.

3   While analyzing the effective date provision of the Act, the Court noted that the structure of the

4   two paragraphs implies that habeas actions in §2241(e)1) "are a type of action 'relating to any

5   aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien…'"

6   contemplated in § 2241(e)(2).   *Id.* at 737.   Section § 2241(e)(1) is, by its own terms, not

7   severable from § 2241(e)(2), because "[t]he phrase 'other action in §2241(e)(2) … cannot be

8   understood without referring back to the paragraph that precedes it, § 2241(e)(1), which

9   explicitly mentions the term 'writ of habeas corpus.'" *Id.*  Moreover, severability of the two

10  provisions poses two problems.  First, if § 2241(e) stands alone, it would still contain the term

11  "other action," which would not make any sense.  Second, the language of §2241(e)(2), "relating

12  to any aspect of the detention," could include habeas actions.  *Id.*  Thus, the Court struck down

13  the entire section.

14      Additionally, whether § 2241(e)(2) could be severed from the first portion of the statute

15  is a question of whether the remaining portion "is fully operative as a law." *Alaska Airlines v.*

16  *Brock*, 480 U.S. 678, 684 (1987) (internal citations omitted). As a simple textual matter, §

17  2241(e)(2), standing alone, is not fully operative as law.  Even if the text of § 2241(e)(2) were

18  comprehensible standing alone, the provision would no longer fully serve as a bar to conditions

19  actions—and thus would not function in the "*manner* consistent with the intent of Congress,"

20  *Alaska Airlines*, 480 U.S. at 685—given that in at least some jurisdictions, existing law allowed

21

22

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**   PAGE 5 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   conditions claims—the same actions which Congress sought to bar with section (e)(2)—to be

2   brought under habeas.[2]

3          Moreover, not only does neither the DTA nor the MCA includes a severability clause

4   specifying the intent of Congress in the event a portion of the statute was found unconstitutional,

5   the legislative history of the MCA offers further evidence that § 2241(e)(1) is not severable from

6   § 2241(e)(2).  Indeed, in passing the MCA, Congress considered, and rejected, a section that

7   would have made provisions of the statute expressly severable.[3]  In view of the fact that

8   Congress saw § 2241(e) as a whole, this Court may not "use its remedial powers to circumvent

9   the intent of the legislature" and preserve a statutory fragment that Congress itself intended to be

10  inseverable. *Ayotte v. Planned Parenthood*, 546 U.S. 320, 330 (2006) (quoting *Califano v.*

11  *Westcott*, 443 U.S. 76, 94, (1979) (Powell, J., concurring in part and dissenting in part)).

12          **2.        Even if this Court Finds That § 2241(e) Survived *Boumediene*, §2241(e) is Unconstitutional on Other Grounds.**

13                  **a.  §2241(e) is Unconstitutional Under Article III of the U.S. Constitution.**

14

15

16

---

17  [2] For example, at the time of the passage of the MCA, habeas petitions on behalf of aliens claimed to be enemy combatants by the executive were pending in courts in two circuits—the 4th and the D.C. circuits—in which the law differed as to whether

18  conditions claims were cognizable in habeas. *Cf. Lee v. Winston*, 717 F.2d 888, 893 (4th Cir. 1983) (action contesting only conditions of confinement may not be brought by way of habeas corpus) and *Blair-Bey v. Quick*, 151 F.3d 1036, 1042 (D.C. Cir. 1998) ("habeas corpus might be available to challenge prison conditions in at least some situations."). In Plaintiff's view,

19  conditions and treatment claims *are* clearly cognizable in habeas and to the extent (e)(2) reaches such claims, it constitutes an unlawful suspension of the writ and is void for that reason as well.

20  [3] When S. 3930, 109th Cong. (2006), the bill that became the Military Commissions Act, was first introduced into the Senate, it included a proposed Section 10 providing for the severability of any provision of the Act. *See* 152 Cong. Rec. S10,033-44 (daily ed. Sept. 22, 2006). That provision was stricken from the bill by S. Amendment 5085, *see* 152 Cong. Rec. S10320-31 (daily

21  ed. Sept. 27, 2006), which was adopted by unanimous consent. *See* 152 Cong. Rec. S10,242-43 (daily ed. Sept. 27, 2006). Not only did the Senate strike the severability clause from the bill, it also rejected, by roll call vote, a later amendment,

22  S. Amendment 5086, *see* 152 Cong. Rec. S10,331-41 (daily ed. Sept. 27, 2006), that would have restored language including a severability clause. *See* 152 Cong. Rec. S10,246-63 (daily ed. Sept. 27, 2006). The House of Representatives then adopted S. 3930—shorn of the severability language—without amendment. *See* 152 Cong. Rec. H7959 (daily ed. Sept. 29, 2006).

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**   PAGE 6 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    Even assuming that this Court does not find that *Boumediene* struck down § 2241(e), this

2    Court should find that the attempt to completely strip of federal courts of all jurisdiction over

3    such matters – original and appellate - is unconstitutional under Article III of the U.S.

4    Constitution.  While Congress has authority to "ordain and establish" federal courts, there are

5    certain restrictions as to what is permissible, based on the "shall" requirements throughout

6    Article III.  First, Article III explicitly requires that federal judicial power, either with the

7    Supreme Court or a lower federal court, extends to "all Cases, in Law and Equity, arising under

8    this Constitution, the Laws of the United States, and Treaties made, or which shall be made

9    under their Authority."   Article III, § 2.  In other words, such matters must have a forum in a

10   federal court.  Even where a lower federal court might be stripped of jurisdiction over some

11   matter, the United States Supreme Court has appellate jurisdiction over all cases in which it does

12   not have original jurisdiction.  *Id.* at § 2 ("In all the other Cases before mentioned, the supreme

13   Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under

14   such Regulations as the Congress shall make.").  Article III demands some federal court

15   review—whether original or appellate—over all federal question claims.

16   Second, the Supreme Court never upheld a complete preclusion of all federal judicial fora

17   for constitutional claims, and has applied the strongest of presumptions against preclusion of

18   such claims.  *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n.12

19   (1986); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) (interpreting jurisdiction review

20   preclusion provision of National Security Act of 1947 to preserve constitutional challenges to

21   employment decisions, as "serious constitutional question[s] would arise if a federal statute were

22   construed to deny any judicial forum for a colorable constitutional claim"); *Johnson v. Robison*,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   415 U.S. 361, 366-67 (1974).

2   Finally, because the statute could also be read to preclude state courts from hearing

3   claims based on either state or federal law, the statute violates constitutional principles of

4   federalism.  In addition, the Constitutionally-mandated system of federalism necessarily requires

5   that state courts retain the right to exercise jurisdiction over claims of violations of

6   constitutionally and federally protected rights.  *See* Hart, *The Power of Congress to Limit the*

7   *Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. at 1364 .  Therefore,

8   to the degree that § 2241(e) attempts to illegally preclude state courts of jurisdiction, it must be

9   struck down as unconstitutional.

10          **b.   § 2241(e) is Unconstitutional Because It Violates the Doctrine of**
                   **Separation of Powers.**

11

12   Similarly, "a congressional enactment" that "seeks to limit the jurisdiction of all *federal*

13   courts" and eliminate access to any "independent judicial forum … would be flatly inconsistent

14   with the doctrine of separation of powers implicit in our constitutional scheme."  *Bartlett v.*

15   *Bowen*, 816 F.2d 695,706 (D.C. 1987).  The delicate balance implicit in the doctrine of

16   separation of powers would be destroyed if Congress were allowed not only to legislate, but also

17   to judge the constitutionality of its own actions.  An attempt to restrict a federal court's

18   jurisdiction over constitutional rights creates a separation of powers problem, implicating both

19   article III and the Fifth Amendment. *See, e.g., Bartlett,*, 816 F.2d at 703-06.  As that court noted,

20   "[M]ost scholars agree that 'under the due process clause of the fifth amendment Congress may

21   not exercise Article III power over the jurisdiction of the [federal] courts in order to deprive a

22   party of a right created by the Constitution.'"  Thus, at a minimum, Congress is prohibited from

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**   PAGE 8 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    eliminating jurisdiction over constitutional claims—here, on grounds of constitutional structure

2    rather than due process.

3           Moreover, the Supreme Court nearly 150 years ago held that Congress may not use

4    jurisdictional statutes to direct the substantive outcome of litigation. In *United States v. Klein*, 80

5    U.S. 128 (1871), Congress had passed a law withdrawing jurisdiction in cases where a

6    presidential pardon to a Confederate had been used as the proof of loyalty required to win a

7    recovery in the Court of Claims. *See* 80 U.S. at 145-46 (statutory text "shows plainly that

8    [Congress] does not intend to withhold appellate jurisdiction except as a means to an

9    end….[thereby] allowing one party to a controversy to decide it in its own favor"). *Klein* holds

10   that Congress may not intrude on the pardon power committed to the President, but it also stands

11   for the proposition that Congress may not direct the outcome of cases—even over a group of

12   claims (in the Court of Claims, thus involving waivers of sovereign immunity) that Congress

13   would have been entitled to manage extra-judicially had it so chosen. Section 7 of the MCA

14   nominally forecloses claims for a tiny subset of individuals, identified by executive whim; the

15   jurisdictional limitation was clearly a "means to an end" designed to foreclose independent

16   judicial scrutiny of specific past executive actions that were unconstitutional and illegal. As such,

17   even more so than the statute in *Klein*, it violates the structural principle of separation of powers.

18   (This argument is also related to the bill of attainder argument, set forth).

19                   c.  **§ 2241(e) is Unconstitutional Because it is an Invalid Bill of
                           Attainder**

20           Related to the concept of separation of powers violations is the restriction on bills of

21   attainder.  Thus, similar to the argument above, § 2241(e)(2) is also is invalid because it violates

22   the prohibition on bills of attainder.  U.S. Const. Art. I, § 9, cl. 3 ("No Bill of Attainder…shall be

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 9 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    passed."). Laws violate the attainder clause when they constitute "legislative punishment, of any

2    form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S.

3    437, 447 (1965); *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). *See also U.S.*

4    *v. Lujan*, 504 F.3d 1003, 1006 (9th Cir. 2007) (A law is an unconstitutional bill of attainder if it

5    legislatively determines guilt and inflicts punishment upon an identifiable individual without

6    provision of the protections of a judicial trial.)

7            By prohibiting the punishment of disfavored persons or groups identified by past acts or

8    other criteria beyond the control of the targets of the legislation, the attainder clause acts as a

9    bulwark against congressional interference with the prerogatives of the judiciary. The Clause

10   was thus "intended not as a narrow … prohibition, but rather as an implementation of the

11   separation of powers, a general safeguard against legislative exercise of the judicial function."

12   *Brown*, 381 U.S. at 442. The prohibition against bills of attainder was prompted by "the fear that

13   the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient

14   openly to assume the mantle of judge—or, worse still, lynch mob." *Nixon v. Adm'r of Gen.*

15   *Servs.*, 433 U.S. 425, 480 (1977). § 2241(e) violates the constitutional prohibition on attainders

16   because it (1) singles out non-citizens whom the Government may unilaterally and

17   extrajudicially label "enemy combatants," and then (2) punishes them by stripping them of any

18   right of access to the Courts.

19           An attainder need not apply to individuals by name. See *Brown*, 381 U.S. at 461 ("It was

20   not uncommon for English acts of attainder to inflict their deprivations upon relatively large

21   groups of people, sometimes by description rather than [name]."). "[L]egislative acts, no matter

22   what their form, that apply either to named individuals or to easily ascertainable members of a

**Plaintiff's Opposition to Defendant's Motion to**
**Dismiss Fifth Amendment Claim**
**2:10-cv-00591**        PAGE 10 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   group in such a way as to inflict punishment on them without a judicial trial are bills of

2   attainder."  *United States v. Lovett*, 328 U.S. 303, 315 (1946) (emphasis added).  The Combatant

3   Status Review Tribunal (CSRT) process in no way resembles a judicial trial, lacking as it does

4   the most elementary aspects of due process.

5          The second prong of the Attainder Clause analysis requires the Court to examine whether

6   the law in question imposes punishment on the identified group.  Because of the creativity with

7   which Congress may devise punishment, criminal sanctions are not the only punishments that

8   qualify as attainders.  Courts look to a three part inquiry to evaluate whether a law imposes

9   punishment and so is unconstitutional:

10  (1) whether the challenged statute falls within the historical meaning of legislative punishment;
    (2) whether the statute, "viewed in terms of the type and severity of the burdens imposed,
11  reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the
    legislative record "evinces a congressional intent to punish."
12
    *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 852 (1984) (citing *Nixon*, 433 U.S. at 473,
13
    475-76, 478); *Lujan*, 504 F.3d 1006
14
           The Supreme Court has opined that "deprivation of any rights, civil or political,
15
    previously enjoyed, may be punishment" and constitute a bill of attainder.  *Cummings v.
16
    Missouri*, 71 U.S. (4 Wall.) 277, 320 (1867).  More specifically, for at least the past 140 years
17
    the Supreme Court has recognized that the deprivation of full and complete access to the courts
18
    qualifies as "punishment."  In *Pierce v. Carskadon*, 83 U.S. 234, 238-39 (1873), the Supreme
19
    Court held that it was an unlawful attainder for the West Virginia legislature to limit access to
20
    the courts by refusing to allow petitioners to reopen a judgment in state courts solely because the
21
    petitioners refused to swear an oath disavowing allegiance to the Confederacy.  *Id.* at 237-38.  In
22
    *Pierce*, non-residents of West Virginia were required to swear the loyalty oath, but no such

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1 restriction applied to residents.  *Id.* at 236.  The petitioners were denied review of a judgment

2 attaching their property, based solely on their non-resident status and inability to take the loyalty

3 oath.  *Id.*  Relying on *Cummings* and *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1867), the Court

4 summarily declared this lack of access to the courts an unlawful attainder.  Id. at 239.  Since that

5 time, the Supreme Court has continued to read *Pierce* for the proposition that denying complete

6 access to the courts qualifies as an attainder.

7      There simply is no "non-punitive legislative purpose," *Selective Serv. Sys.*, 468 U.S. at

8 852, to the civil jurisdiction-stripping provisions of § 2241(e).  The legislative history of the

9 MCA makes clear that Congress created it based on a desire to punish individuals that Congress

10 viewed—without a basis in law or fact—as terrorists.  No other rational motivation is evident

11 other than the desire to further attaint a small, unpopular group of individuals already arbitrarily

12 tarred with the "enemy combatant" label.

13      **3.**     **Even if This Court Finds § 2241(e) to be Constitutional, Plaintiff was**
                     **Not Fairly Determined to be Properly Detained as an "Enemy**

14                      **Combatant."**

15      28 U.S.C. § 2241(e) applies only to an individual "determined by the United States to

16 have been properly detained as an enemy combatant or [who] is awaiting such determination."

17 28 U.S.C. § 2241(e). Because the CSRT process lacked even the most rudimentary elements of

18 due process, it cannot form the basis for application of § 2241(e), as such tribunals cannot be

19 relied upon to have fairly determined who was properly detained.  To rely on the conclusions of

20 these sham tribunals to preclude all further claims in the federal courts would violate the Due

21 Process clause of the Fifth Amendment.

22      The Supreme Court amply documented the failings of the CSRT process in the

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**     PAGE 12 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   *Boumediene* decision.  See, 553 U.S. 723, 783-787 (2008).  The Court found that the CSRTs

2   provided no "means to [allow a detainee to] find or present evidence to challenge the

3   government's case against him," *id.* at 783; provided no right to see and respond to "the most

4   critical allegations" against him (classified evidence constituting the bulk of the case against

5   most of the detainees), *id.*; does not allow detainee the right to confront witnesses, *id.* at 784; that

6   detainees were denied access to counsel, *id.*; and that the right of confrontation was effectively

7   minimal given the extensive reliance on hearsay, *id.*

8        The CSRTs also were missing a fundamental component of due process under the

9   Constitution: the right to an appeal.  No right of direct appeal from the CSRT panel's

10   conclusions existed at the time of the initial "determinations" by Plaintiff's CSRT.

11        Congress did not specify that CSRT determinations would be conclusive for purposes of

12   application of § 2241(e).  Even assuming that was Congress' intent, it is evident that Congress

13   did not know or intend that the CSRT process would be found to be so inadequate.  *Cf.*

14   *Bismullah-V*, 551 F.3d at 1072 ("Congress would not in the DTA have given this court

15   jurisdiction to review CSRT determinations" had it known that would not constitute an adequate

16   substitute for habeas); 152 Cong. Rec. S.10, 405 (daily ed. Sep. 28, 2006) (statement of Sen.

17   Sessions) ("most of the guarantees embodied in the CSRT parallel and even surpass the rights

18   guaranteed to American citizens who wish to challenge their classification as enemy

19   combatants").  Nor, it is clear, did Congress anticipate that federal court review of CSRT

20   proceedings would not be available.  *Id.* at S.10, 404 (statement of Sen. Sessions) ("The

21   Government has provided a CSRT hearing to every detainee held at Guantanamo … all of those

22   detainees will now be allowed to seek DTA review in the DC Circuit.").  This Court must assume

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**    PAGE 13 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   that Congress did not intend to violate the Due Process Clause in interpreting § 2241(e).  Doing

2   so here means that this Court cannot accept the application of CSRT panel decisions as the

3   trigger for preclusion of jurisdiction under § 2241(e).  Thus, this Court should find that Plaintiff

4   was not fairly determined to be properly detained as a enemy combatant, and thus, §2241(2) does

5   not apply to Plaintiff.

6   **B.  A BIVEN'S REMEDY IS APPROPRIATE IN THIS CASE.**

7   Assuming that Plaintiff has Constitutional rights – something Defendant did not dispute

8   in his Motion to Dismiss Plaintiff's Fifth Amendment Claims - the Defendant asks this Court to

9   refrain from using its well-established powers to provide a remedy under *Bivens*, arguing that

10  there are special factors counseling hesitation to provide such remedy.  Defendant's Mot. to Dis.

11  Plaintiff's Fifth Amendment Claims, Dkt. 112, at 6-17.  Defendant makes this argument even

12  though Plaintiff was a civilian, taken not from the battlefield, but from his private residence and

13  held by Defendant in what is effectively part of the Unites States, and subjected to treatment and

14  conditions that the United States – the executive, Congress and our courts - has repeatedly

15  denounced as a matter of policy and practice.

16  **1.  No Alternative Remedy Exists for Plaintiff.**

17  An implied right of action to compensate plaintiffs for violations of their constitutional

18  rights exists, and courts should provide such remedies where no alternative, existing remedy

19  exists. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388,

20  396 (1971); *Western Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1120 (9th Cir. 2009),

21  *citing Wilkie v. Robbins,* 551 U.S. 550 (2007).  "*Bivens* from its inception has been based ... on

22  the deterrence of individual officers who commit unconstitutional acts." *Correctional Services*

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 14 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   *Corp. v. Malesko,* 534 U.S. 61, 71, (2001). The secondary purpose of extending a *Bivens* remedy

2   to a person who has been subjected to the deprivation of constitutionally-guaranteed rights by an

3   individual officer is to "provide a cause of action for a plaintiff who lack[s] any alternative

4   remedy for harms caused by an individual officer's unconstitutional conduct." *Id.* at 70.

5        No alternative, existing remedy exists here, and thus Plaintiff should be allowed to

6   pursue his *Bivens* action against Defendant Gates for violation of his Fifth Amendment Rights

7   while held at Guantanamo Bay.[4]  The Supreme Court has recognized such claims in similar

8   situations where no alternative remedy existed.  *See Davis v. Passman*, 442 U.S. 228 (1979), and

9   *Carlson v. Green*, 446 U.S. 14 (1980).  In *Davis*, the Supreme Court held that a damage remedy

10   was appropriate for a congressional aid whose government employer terminated her employment

11   based on her gender. The plaintiff properly brought suit directly under the Due Process Clause of

12   the Fifth Amendment, where she had "no effective means other than the judiciary to vindicate

13   these rights." *Davis*, 442 U.S. at 243. While Congress was competent to legislate in this area,

14   they specifically chose not to do so in this situation – a similar argument Defendant makes here.

15   Def. Mot. to Dis. Plaintiff's Fifth Amendment Claims, at 8, 15. However, in *Davis*, this did not

16   limit the plaintiff's right of recovery, however, because the judiciary is equally competent to

17   enforce "justiciable constitutional rights".  *Davis*, 442 U.S. at 242 (Concluding that "in the

18   absence of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate

19   political department,' *Baker v. Carr,* 369 U.S. 186, 217 (1962), we presume that justiciable

20   constitutional rights are to be enforced through the courts").

21

22

---

[4] Plaintiff's Fifth Amendment Claims Against Defendant Gates are limited to Guantanamo Bay, and do not include his holding at Bagram Air Base in Afghanistan.

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 15 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    In nearly all the cases Defendant cites where a court has refused to extend a *Biven*'s

2    remedy, some alternative scheme typically has existed. *See, e.g., Bush v. Lucas*, 462 U.S. 367,

3    389 (1983) (elaborate civil service system already existed to provide remedies to plaintiff);

4    *Schwieker v. Chilicky*, 487 U.S. 412, 417 (1988) (administrative scheme already existed where

5    social security benefits were denied); *Wilkie v. Robbins,* 551 U.S. 537, 553 (2007) (plaintiff had

6    administrative, and ultimately a judicial, process for vindicating virtually all of his complaints).

7        Thus, given that no adequate remedy exists for Plaintiff, the Court should recognize this

8    implied right of action, unless there are "special factors counseling hesitation" to do so.

9    *Chappell v. Wallace*, 462 U.S. 296, 298 (1983); *Western Radio Servs. Co.,* 578 F.3d at 1120.

10       **2.    There are No Special Factors Counseling Hesitation that Should Preclude
             Recognition of a *Biven*'s Remedy in this Case.**

11

12   First, it is important to note that although some "special factors" might exist, such does not

13   automatically preclude a recognition of a *Biven*'s remedy; such only counsels courts to *hesitate*

14   doing so, *i.e.,* use caution. The doctrine is not one of special factors precluding recognition of a

15   claim; only counseling "hesitation." Here, the Court will clearly proceed with caution before

16   recognizing a *Biven*'s implied right of action, but there is nothing that should prevent the Court

17   from recognizing the right of action in this case, for the following reasons. *See, e.g., Vance v.*

18   *Rumsfeld*, 694 F.Supp.2d 957 (N.D.Ill.,2010).

19       In recognizing a *Biven*'s claim here, even in a military context, the Court is not usurping

20   the role of the military when it simply exercises its "time-honored and constitutionally mandated

21   roles of reviewing and resolving claims…" *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004).

22   Simply because this case touches upon the military's judgment in its treatment of Plaintiff does

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim
2:10-cv-00591**          PAGE 16 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   not mean that the courts are prohibited from exercising their respective power.  Although the

2   Supreme Court has acknowledged that "core strategic matters of warmaking," deserve deference

3   to the "coordinate branches of the government" – something *not* at issue here - the Constitution

4   "most assuredly envisions a role for all three branches when individual liberties are at stake*." Id.*

5   at 537, 553.

6         The Supreme Court cases Defendant cites to support its "special factors" argument are

7   distinguishable.  In *Chappell v. Wallace*, the court refused to extend a *Bivens* remedy to an

8   enlisted military officer who sued for actions of a superior officer.  462 U.S. 296 (1983).  The

9   special factors at issue in that case was the unique area of military disciplinary structure and

10   ensuring that subordinates obeyed orders, something the Court found was within the competency

11   of Congress.  *Chappell*, 462 U.S. at 304.  Similarly, in *U.S. v. Stanley*, the Court declined to

12   extend a Bivens remedy for injuries that "arise out of or are in the course of activity incident to

13   service." 483 U.S. 669, 684 (1987). Military officers give up certain rights while serving their

14   country, and thus may not be entitled to the same relief afforded those outside the military, but

15   they are also life-long beneficiaries of comprehensive programs, including the Military Health

16   Defendants' argument that they should be immune from suit because their conduct occurred as

17   part of the exercise of the Executive's powers to wage war, protect national security, and conduct

18   foreign policy comes perilously close to being an apologia for the torture and degradation

19   experienced by Decedents. *Id.*  Neither of these situations applies to this case.

20         Defendant first argues that the context of Plaintiff's claim counsels against recognition of

21   a *Biven's* action because his apprehensive occurred "in the course of armed conflict and "in a

22   active war zone." Def. Mot. to Dis. Plaintiff's Fifth Amend. Claim, Dkt. 112, at 12.  The problem

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**     PAGE 17 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    is that neither of these things is true. As an initial matter, it should be noted that Plaintiff's claims

2    against Def. Gates involve not his initial apprehensive, but his unconstitutional prolonged

3    arbitrary detention at Guantanamo Bay of over five years, and his treatment while there.

4    Guantanamo Bay, of course, was not in an active war zone.  In any event, Plaintiff was taken in

5    Pakistan from his home, which was not in an active war zone.  Neither was he taken from the

6    battlefield doing while engaging in combat.  He was minding his own business and engaging in

7    humanitarian work.

8         Defendant next argues that recognizing the *Biven*'s claim would implicate discovery or

9    inquiry into sensitive communications, and could implicate classified information, affect national

10   security, and impact foreign policy. *Id.* at 12-13.  First, this is wholly speculative, and the court

11   should not entertain this argument until discovery proves that such is the case.  Moreover, there

12   are tools and procedures available to the Court to prevent sensitive information from being

13   brought to the public's attention and potentially the enemy's attention, such as protective order,

14   "in camera" review, or by simply denying Plaintiff's access to certain discovery.  It should not be

15   a reason by itself to refuse a remedy.

16        Next, Defendant argues that judicial consideration of his claim would infringe upon areas

17   constitutionally committed to coordinate branches of government.  *Id.* at 14.  As discussed

18   above, the cases Defendant relies on, *Stanley* and *Chappell*, are distinguishable.

19        Defendant also argues that a creation of a remedy would be potentially damage to

20   military effectiveness primarily because enemies could then use the federal courts to hinder

21   "military officials engaged in an active war," and obstruct their ability to act decisively in

22   defense of the country.  *Id.* at 14.  Again, this argument is not applicable here, where Plaintiff

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  was not an enemy engage in hostilities against the United States, but an innocent civilian

2  humanitarian worker taken from his home in Pakistan.  Moreover, the claim here is for his

3  prolonged arbitrary detention in Guantanamo Bay and the treatment he received there.  There is

4  nothing about a claim for such prolonged arbitrary detention and his treatment that would impact

5  the military's need to act decisively.

6      In summary, all of Defendant's arguments might apply to the questioning of military

7  actions on the battlefield, but not to Plaintiff's case.  It is also important to note that Plaintiff's

8  claims are consistent to what the United States has already condemned, and consistent with

9  current U.S. foreign policy (as opposed to being in conflict with such policy).  The United States

10  has condemned torture.  *See, e.g.,* U.N. Torture Convention, Part I, Article 2, Sec. 2; see also

11  Department of State, Initial Report of the United States of America to the U.N. Committee at ¶

12  100, Ex. 3 ("Torture cannot be justified by exceptional circumstances, nor can it be excused on

13  the basis of an order from a superior officer.").  The President of the United States has issued an

14  executive order to close Guantanamo Bay, stating that this move was necessary to "restore the

15  standards of due process and the core constitutional values…"  See Exec. Order No. 13, 492, 74

16  Fed. Reg. 4,897 (Jan. 27, 2009) (ordering the detention facilities in Guantanamo Bay closed by

17  January 22, 2010).  This executive order stated "in view of the significant concerns raised by

18  these detentions…closure of the facilities in which [detainees] are detained would further the

19  national security and foreign policy interests of the United States and the interests of justice."  *Id.*

20      Similarly, the legislative branch has enacted measure to ensure that detainees are not

21  mistreated.  The Detainee Treatment Act of 2005 §1003(a), codified in 42 U.S.C. §2000dd(a),

22  declared, "No individual in the custody or under the physical control of the United States

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**      PAGE 19 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or

2  degrading treatment or punishment."  Senator McCain stated that this Act merely codifies the

3  existing law, both domestic and international.   Emma Broomfield, "A Failed Attempt to

4  Circumvent the International Law on Torture: The Insignificance of Presidential Signing

5  Statements Under the *Paquete Habana*," 75 Geo. Wash. L.Rev. 105, 110 (2006).

6  **C.   DEFENDANT GATES IS NOT ENTITLED TO IMMUNITY.**

7       **1.   For Qualified Immunity Purposes, Plaintiff Is Not Required To Allege Defendants Personally Participated in Violating Plaintiff's Rights; But**

8       **Plaintiff Did Sufficiently Allege Personal Participation.**

9       Defendant cites to *Ashcroft v. Iqbal,* __ U.S. __, 129 S. Ct. 1937 (2009) for his argument

10  that a plaintiff must allege personal participation by the defendant in order to overcome qualified

11  immunity.  Def. Mot. to Dis. Plaintiff's Fifth Am. Claim, Dkt. 112 at 18.  While Defendants are

12  correct that Plaintiff must assert personal participation the Defendant, their argument is

13  improperly placed in the context of a qualified immunity analysis.  The *Iqbal* Court discussed the

14  requirement in a *Bivens* suit that a plaintiff plead within the complaint that each defendant

15  personally participated in violating the plaintiff's constitutional rights, yet this requirement

16  relates to the pleading standard rather than qualified immunity.  *Iqbal,* 129 S. Ct. at 1948.

17       In any event, Plaintiff does sufficiently allege personal participation by Defendant Gates

18  sufficient to meet *Iqbal*.  In *Iqbal*, but the Supreme Court found that the complaint was

19  improperly brought against former Attorney General Ashcroft where the wrongful acts took

20  place at a lower level; the complaint did not satisfy or even allege a connection between Ashcroft

21  and the discrimination, and thus the suit was dismissed. *Id.* 129 S. Ct. at 1944, 1952. Defendant

22  here was more involved with the Plaintiff's detention than the analogous situation in *Iqbal,* and

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 20 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   Plaintiff alleged a significant connection between the Defendants' actions and his illegal

2   confinement.

3         For example, the Complaint alleges, *inter alia*, that as Secretary of Defense, Defendant

4   Gates committed, directed and ordered the acts about which Plaintiff complains – the prolonged

5   arbitrary detention and the conditions of his treatment.  See Am. Comp., Dkt. 96, at ¶¶ 5, 18, 24,

6   It also alleges that Defendant Gates, among others, knew he was ordering the holding of innocent

7   men, but refused to release them out of fear of political repercussions.  *Id*. at 8.  This is sufficient

8   to allege his personal involvement.

9                    **2.    Defendant Gates Violated Clearly Established Rights of Which a
                              Reasonable Person Would Have Known.**

10

11        Qualified immunity shields government officials from being liable for civil damages as

long as their "conduct does not violate clearly established statutory or constitutional rights of

12
which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

13
Qualified immunity balances the importance of the ability to seek damages as a remedy for the

14
violation of rights against the need to protect officials who should be given discretion in

15
performing their responsibilities.  *Id*. at 807.  It provides protection to all officers except those

16
who are plainly incompetent or those, like here, who knowingly violate the law.  *Malley v.*

17
*Briggs*, 475 U.S. 335, 341 (1985).   However, qualified immunity is not "a license for lawless

18
conduct and its purpose is to force officials to hesitate in situations where they should know that

19
certain conduct will violate clearly established statutory or constitutional rights."  *Harlow,* 457

20
U.S. at 819.  In addition, it is not required that the action in question has been previously

21
determined to be unlawful.  *Hope v. Pelzer*, 536 U.S. 730, 739.   Indeed, "officials can still be on

22
notice that their conduct violates established law even in novel factual circumstances."  *Id.* at

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   741.[5]  In this case, Defendant Gates should have been aware both that the Court considered

2   Guantanamo Bay to be within the jurisdiction of the United States, and that prolonged arbitrary

3   detention, torture, and CIDT were wrongful, both as a matter of international law and under the

4   United States Constitution.

5           Defendant Gates caused Plaintiff to be held for over year at the military base at

6   Guantanamo Bay, Cuba.  Yet, as early as 2004, the U.S. Supreme Court was clear that

7   Guantanamo Bay is within the "territorial jurisdiction" of the United States. *Rasul v. Bush*, 542

8   U.S. 466 (applying 28 U.S.C. § 2241, the habeas statute, to Guantanamo Bay detainees). The

9   Court stated, "By the express terms of its agreements with Cuba, the United States exercise

10  "complete jurisdiction and control" over the Guantánamo Bay Naval Base, and may continue to

11  exercise such control permanently if it so chooses." *Rasul*, 542 U.S. at 480-81 (citing 1903

12  Lease Agreement, Art. III)(emphasis added).  In Justice Kennedy's concurrence in *Rasu*l, he

13  clarifies that Guantánamo is in "every practical respect a United States territory." *Rasul*, 542

14  U.S. 466, 487 (Kennedy, J., concurring). What matters to Justice Kennedy is the "unchallenged

15  and indefinite control over Guantánamo Bay. From a practical perspective, the indefinite lease of

16  Guantánamo Bay has produced a place that belongs to the United States, extending the implied

17  protection of the United States to it." *Id.* (*quoting Eisentrager*, 339 U.S. at 777-778).

18          In addition, plenty of case law existed to establish that indefinite detention and other

19  constitutional violations against aliens within U.S. jurisdiction was illegal.  Specifically, the

20

21  _____
    [5] In *Hope,* a prison inmate was handcuffed to a hitching post twice, one time for seven hours, which inevitably
    caused him pain and discomfort.  *Hope*, 536 U.S. at 733-735.  In its defense, the prison relied on an Alabama
22  Department of Corrections regulation which allowed the use of the hitching post.  *Id.* at 744.  Despite the regulation,
    the Supreme Court held that the officers' conduct violated "clearly established statutory or constitutional rights of
    which a reasonable person would have known." *Id.* at 742.

**Plaintiff's Opposition to Defendant's Motion to**
**Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 22 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   Supreme Court in 2001 acknowledged that a statute which permits indefinite detention of an

2   alien – even one who was considered not to have officially been admitted to the United States -

3   would raise "serious constitutional problems." *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001).   In

4   the "pioneer case" *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886), the Supreme Court asserted

5   that the Fourteenth Amendment provisions "are universal in their application, to all persons

6   within the territorial jurisdiction, without regard to any differences of race, of color, or of

7   nationality." *See also, Eisentrager v. Johnson*, 339 U.S. 763, 771 (1950).  The Court in

8   *Eisentrager* emphasized that in extending constitutional protections beyond the citizenry, "it was

9   the alien's presence within [U.S.] territorial jurisdiction that gave the Judiciary the power to act."

10  *Id.* Furthermore, for non-citizens, it is not only Fourteenth Amendment rights that turn on the

11  presence within territorial jurisdiction. In *Zadvydas*, the case mentioned above, the Supreme

12  Court stated that "once an alien enters the country, the legal circumstance changes, for the Due

13  Process Clause applies to all "persons" within the United States, including aliens, whether their

14  presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis,* 533 U.S. 678

15  (2001), 693 (citing *Plyler v. Doe,* 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77

16  (1976); *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886).

17      Simply put, Defendant Gates should have known that holding a detainee indefinitely at

18  Guantanamo Bay, especially one he knew had no due process, was a violation of the

19  Constitution.  However, even if there are questions concerning exactly what rights Guantanamo

20  Bay detainees possessed, this should not result in a finding of immunity.  Rather, the inquiry

21  should be whether the official knew that the act was simply wrong and unlawful.  "The relevant,

22  dispositive inquiry is whether it would be clear to a reasonable [officer] that his conduct was

**Plaintiff's Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 23 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1  unlawful." *Saucier v. Katz*, 553 U.S. 194, 202 (2001).  For a right to be clearly established, it is

2  enough that the "contours of the right" are "sufficiently clear that a reasonable official would

3  understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640

4  (1987).  A court ruling is not necessary "to know that even an excludable alien may not be

5  denied the fundamental liberty interest to be free of gross physical abuse in the absence

6  of…rational public interest." *Lynch v. Cannatella*, 810 F.2d 1363, 1375 (5th Cir. 1987). This line

7  of reasoning can be logically extended to Plaintiff's case.

8          In addition, Defendant Gates knew that U.S. law had specifically prohibited torture and

9  CIDT of detainees, even those at Guantanamo Bay, in 2005. The Detainee Treatment Act of

10  2005 §1003(a), codified in 42 U.S.C. § 2000dd(a), has emphasized that no one who is in the

11  "custody or under the physical control of the United States government, regardless of …physical

12  location, shall be subject to cruel, inhuman, or degrading treatment or punishment." Section

13  1003(a) specifically states that physical location is not a factor to consider.  Thus, even if the

14  Defendants claim that they did not know detainees have constitutional rights in Guantanamo, no

15  one should be subjected to cruel, inhuman, and degrading treatment and arbitrary detention,

16  which was the treatment Plaintiff had to endure.  Simply put,  reasonable U.S. Government

17  official in Defendant's shoes would have known that keeping a human being detained without a

18  fair trial—no matter the location of detention or the accused's status—is fundamentally wrong,

19  and in direct conflict with basic notions of democratic justice.

20          For the foregoing reasons, the Defendant's motion to dismiss Plaintiff's Fifth

21  Amendment claims should be denied.

22           Respectfully submitted this 29th day of August, 2011.

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          Page 24 of 26

WILLAMETTE UNIVERSITY
Law Clinic
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1

WILLAMETTE UNIVERSITY SCHOOL OF LAW
2      INTERNATIONAL HUMAN RIGHTS CLINIC

3

_____ /s/ GWYNNE L. SKINNER _____
4      Gwynne L. Skinner, OSB No. 022235
Attorney for Plaintiff
5

6      PUBLIC INTEREST LAW GROUP, PLLC
705 Second Avenue, Suite 1000
7      Seattle, WA  98104
(206) 838-1800
8

Hank Balson, WSBA No. 29250
9      Nancy S. Chupp, WSBA No. 33740
Attorneys for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

**Plaintiff's Opposition to Defendant's Motion to**
**Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 25 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1          **CERTIFICATE OF SERVICE**

2          I hereby certify that on August 29, 2011, I electronically filed the foregoing with the

3     Clerk of Court using the CM/ECF system, which will send notification of this filing, and a copy

4     of the brief, to:

5

6     Paul E. Werner
      Trial Attorney
7     United States Department of Justice
      Torts Branch, Civil Division
8     P.O Box 7146
      Ben Franklin Station
9     Washington, D.C. 20044

10
      _____ /S/ GWYNNE L. SKINNER _____
11    Gwynne L. Skinner, OSB No. 022235
      Attorney for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

**Plaintiff's Opposition to Defendant's Motion to
Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 26 OF 26

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433