|    |                                                                                      |                                          |
|----|--------------------------------------------------------------------------------------|------------------------------------------|
|    | UNITED STATES DISTRICT COURT<br>WESTERN DISTRICT OF WASHINGTON<br>AT SEATTLE         |                                          |
|    | ADEL HASSAN HAMAD,                                                                   | CASE NO. C10-591 MJP                     |
|    | Plaintiff,                                                                           | ORDER GRANTING<br>DEFENDANTS' MOTIONS TO |
|    | v.                                                                                   | DISMISS                                  |
|    | ROBERT M. GATES, in his individual<br>capacity, and the UNITED STATES OF<br>AMERICA, |                                          |
|    | Defendants.                                                                          |                                          |

This matter comes before the Court on Defendants' motion to dismiss Plaintiff's Fifth Amendment claims and Defendants' motion to dismiss the remaining claims for lack of subject matter jurisdiction. (Dkt. Nos. 112 and 111.) Having reviewed the motions, the responses (Dkt. Nos. 114 and 113), the replies (Dkt. Nos. 116 and 115), and Defendant's notice of supplemental authority (Dkt. No. 117), the Court GRANTS both motions to dismiss. The Court grants Plaintiffs leave to file an amended complaint within thirty (30) days of entry of this Order.

\\

\\

## Background

Plaintiff Adel Hassan Hamad ("Hamad") is suing Defendant Robert Gates ("Gates") for violations of customary international law, the Geneva Conventions, state common law, and the Fifth Amendment. Gates is the United States Secretary of Defense and owns property in Washington. (Am. Compl. ¶ 24.) Hamad is a fifty-two year old Sudanese citizen who was first seized while working as a humanitarian worker in Pakistan and detained in Guantanamo Bay for five years. (Id. at ¶ 4.) For the purposes of the pending motion to dismiss, the Court accepts as true the following allegations made in Hamad's Amended Complaint.

Hamad was living in Pakistan when he was seized in July 2002 and taken to a Pakistani jail. (Id. at ¶ 59.) Hamad was interrogated for two days before he was transferred to either another Pakistani prison or a U.S.-controlled detention facility. (Id.) For six months, Hamad was given contaminated water, rotten food, and one set of clothes. (Id. at ¶ 60.) Hamad lost approximately sixty-five pounds. (Id.) He was not told the reason for his detention and was deprived of any outside contact. (Id.) In January 2003, Hamad was transferred to the United States Air Base in Bagram, Afghanistan. (Id. at ¶ 63.) Upon arrival, U.S. officials tortured him and forced him to stand for three days without sleep or food. (Id. at ¶ 64.) Hamad ultimately collapsed from malnourishment and dehydration. (Id. at ¶ 65.)

On March 15, 2003, Hamad was transferred to Guantanamo Bay, Cuba where he was detained for five years. (Id. at ¶ 69.) During the first couple of weeks, Hamad was held in isolation and interrogated daily. (Id. at ¶ 71.) He was later moved to another camp; although, at one point during his detention, he spent an additional month in isolation. (Id.)

In November 2004, a year and a half after Hamad's arrival in Guantanamo Bay, a Combatant Status Review Tribunal ("CSRT") was convened and, in March 2005, a divided panel

determined Hamad was an enemy combatant based on Hamad's employment with two humanitarian organizations. (Id. at ¶¶ 72-74.)

Three to five months later, the military Administrative Review Board ("ARB") reviewed the CSRT decision. (Id. at ¶ 77.) The purpose of the ARB is to provide annual review of CSRT procedures. (Id.) In November 2005, the ARB issued its decision. The ARB found Hamad eligible for release back to the Sudan. Hamad, however, was not notified of the determination until February 2007, approximately fifteen months later. (Id. at ¶ 78.) Following negotiations between the United States and the Sudan, Hamad was detained ten more months before being transferred to the Sudan on December 12, 2007.

Hamad alleges Gates is liable under the Alien Tort Statute and the Fifth Amendment for his personal involvement in Hamad's five and a half year detention. Gates was Secretary of Defense beginning December 18, 2006. This includes the time Hamad remained detained despite the ARB's determination. Hamad alleges Gates ordered, authorized, condoned, created methods and procedures for the abuses he suffered from the date of his seizure until his release in December 2007.

**Analysis**

1. Motion to Dismiss Fifth Amendment Claim

Gates seeks to dismiss Hamad's claim for Due Process violations. Gates argues (1) the Military Commissions Act ("MCA") bars the claim, (2) national security concerns counsel hesitation in recognizing a Bivens remedy, (3) Hamad fails to allege Gates's personal involvement in violating his constitutional rights, and (4) Hamad's due process rights were not clearly established when Hamad was in custody.

   a. Military Commissions Act

1  Defendant argues § 7 of the MCA bars Hamad's claim. In relevant part, the § 7 of the MCA provides:

(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination

(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005, no court, justice or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

§ 7 of the MCA, codified as 28 U.S.C. § 2241(e)(1) and (2). Defendant argues Boumedienne v. Bush only struck down Section 7's first subsection, i.e., Congress's attempt to repeal the writ of habeas corpus, and believes the second subsection, stripping federal courts of jurisdiction over "any other action" relating to an alien's detention, still stands. The Court disagrees.

First, Boumedienne did not distinguish between subsections when holding § 7 of the MCA unconstitutional. The Supreme Court's discussion begins with a full recitation of both subsections and the holding simply states, "§ 7 of the Military Commissions Act of 2006, operates as an unconstitutional suspension of the writ." 553 U.S. 723, 733 (2009). The Court declines to read beyond the plain language and speculate that, when stating "§ 7," the Supreme Court actually meant "the first provision of § 7." If the Supreme Court meant "the first provision of § 7" only, then it would have said so.

Second, Boumedienne specifically rejected attempts to distinguish between § 7's subsections. In Boumedienne, the government argued the MCA's effective date provision only applied to the second subsection of cases and not the first subsection. Id. at 736. The Supreme Court rejected the argument stating, "[defendant's] textual argument would have more force

were it not for the phrase 'other action' in § 2241(e)(2), which explicitly mentions the term 'writ of habeas corpus.' Id. As the Supreme Court reasoned, the structure of the two paragraphs implied habeas actions are a subset of actions under § 2241(e)(2), i.e., actions relating to the detention of an enemy combatant. Id. Following the reasoning in Boumedienne, the Court reads § 7 as a cohesive statute and rejects Defendant's attempt to split the subsections.

Third, 28 U.S.C. § 2241(e)(2) of the MCA makes little sense if read to stand on its own. When stating, "no court shall have jurisdiction to consider 'any other action,' § 2241(e)(2) refers back to actions other than § 2241(e)(1), i.e., habeas relief. Furthermore, given that the subsections are textually dependent, § 2241(e)(2) is not fully operative as law. If read alone, § 2241(e)(2) would strip federal jurisdiction over all actions relating to an alien's detention as an enemy combatant—i.e., both habeas and non-habeas actions. However, after Boumedienne, § 2241(e)(2) does not bar all actions "relating to the detention . . . of [ ] alien[s] who is or was detained as enemy combatant[s]" because Boumedienne held Congress cannot bar judicial review over habeas actions. 28 U.S.C. § 2241(e)(2). While courts do not invalidate more of a statute than is necessary, Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320, 330 (2006), the language of § 7's second subsection precludes it from being severable and, therefore, the Supreme Court struck MCA § 7 down in its entirety.

To the extent Defendant relies on D.C. case law, the Court is not persuaded. In Kiyemba, the D.C. Circuit stated in a footnote, "The [Boumedienne] Court actually referred to § 7 without specifying a particularly subsection [], but its discussion of the Suspension Clause clearly indicates it was referring only to [§7's first subsection.]" 561 F.3d at 512. The Court finds Kiyemba's footnote lacks a thorough analysis of the issue. Boumedienne's focus on habeas matters does not mean the Supreme Court only struck down the first provision given that, as

1 enacted under public law, both subsections of MCA § 7 were considered "Habeas Corpus

2 Matters." See Military Commissions Act of 2006, Pub. L. 109-366, § 7, 120 Stat. 2636

3 (2006)(codified as 28 U.S.C. § 2241(e)). Likewise, in Al-Zahrani v. Rumsfeld, the D.C. district

4 court's reasoning assumes too much from Boumedienne's decision not to reach claims of

5 unlawful conditions. 684 F. Supp.2d 103, 109 (D.D.C. 2010)(collecting cases). The Supreme

6 Court explicitly stated that it did not reach the unlawful conditions claims because it already

7 determined as a whole "§ 7 [ ] effects an unconstitutional suspension of the writ." Id.

8   In sum, the MCA does not bar Hamad's claim because (1) the plain language in

9 Boumedienne struck down § 7 as unconstitutional, (2) Boumedienne rejected attempts to

10 distinguish between § 7's subsections, and (3) §7(a)(2) textually cannot stand on its own. While

11 the Boumedienne Court was undoubtedly about the habeas petitioner's right to the writ, the

12 statute's structure necessarily required § 7 be stricken in its entirety. The Court need not

13 consider Plaintiff's alternative argument that § 7(a)(2) is unconstitutional.

14   b. Bivens -- Special Factors

15  Gates argues the Court should not create a Bivens remedy because special factors counsel

16 hesitation. The Court disagrees.

17   In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, the United

18 States Supreme Court established that victims of a constitutional violation by a federal official

19 have a right to recover damages against the official in federal court. 403 U.S. 388, 396 (1971).

20 While no statute authorizes suits against federal officials, the Supreme Court created a Bivens

21 remedy to prevent constitutional rights from becoming "merely precatory." Davis v. Passman,

22 442 U.S. 228, 242 (1979). More recently, the Supreme Court has cautioned courts not to

23 recognize Bivens remedies in new contexts. Wilkie v. Robbins, 551 U.S. 537 (2007)("[A]ny

24

freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee, it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest.") Courts generally decline to recognize a Bivens remedy when: (1) an alternative, existing process exists protecting the interest, and/or (2) special factors exist counseling hesitation. Wilkie, 551 U.S. at 550.

Here, the Court finds the alleged constitutional violation warrants a Bivens remedy. First, a Bivens action in Hamad's case does not extend the remedy to a new context; Bivens actions are routinely recognized under the Fifth Amendment. "[I]ncarceration without cause, mistreatment while so incarcerated, denial of access to counsel and the courts while so incarcerated and the facilitation of torture by others . . . are hardly novel claims, nor do they present [the Court] with a 'new context' in any legally significant sense." Arar v. Ashcroft, 585 F.3d 559, 597 (2nd Cir. 2009)(Sack, J., dissenting); see, e.g., Davis v. Passman, 442 U.S. 228 (1979)(recognizing a Bivens remedy under the Due Process Clause). Since Hamad is suing for his unlawful seizure and prolonged detention in Guantanamo Bay, essentially a claim of "incarceration without cause," the Court finds Hamad's claim squarely fits as a Bivens action.

Second, national security and secrecy issues do not preclude the Court from inferring a Bivens remedy. While the government argues inquiry into how Hamad was seized in Pakistan may "implicate…sensitive communications between United States and foreign officials," Hamad also alleges he was detained for two years after the ARB deemed him eligible for release. Setting aside Hamad's allegations of torture and unlawful seizure in Pakistan, Hamad's claims post-ARB decision do not necessarily touch on "core strategic matters of war-making" that call more forcefully for deference to the political branches. See, e.g., Doe v. Rumsfeld, 2011 WL 3319439 (D.D.C. Aug. 2, 2011); Padilla v. Yoo, 633 F.Supp.2d 1005, 1027-28 (N.D. Cal.

2009)(finding no core strategic war-making power implicated where "[t]here is no allegation that [the plaintiff] was engaged in armed conflict with the United States at the time of his capture or that he was detained as 'a simple war measure' to prevent him from actively serving the enemy."). But see Rasul v. Myers, 563 F.3d at 532 n.5 (barring the plaintiffs' claims on the alternative basis that "the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials"). Since Hamad's allegations include a period of time when the military itself determined Hamad was not a threat, the Court is unwilling to accept the government's assertion of national security at face-value.

To the extent national security issues arise, the Court finds they are more appropriately addressed under the state-secret privilege. Under the state-secret privilege, the government is permitted to withhold information from discovery when disclosure would be inimical to national security and the action is dismissed if the action cannot proceed without disclosure. Kasza v. Browner, 133 F.3d 1159 (9th Cir. 1998). The state-secret privilege is preferable because it allows courts to scrutinize the government's unilateral assertions of security and secrecy. In some cases, the government's assertions of secrecy have been overblown. See New York Times Co., 403 U.S. 713 (1971)(where the government argued to the Supreme Court that publication posed a "grave and immediate danger to the security of the United States," yet, the solicitor general later acknowledged that the executive's primary concern was "not with national security, but rather with governmental embarrassment," Erwin N. Griswold, Secrets Not Worth Keeping, Wash. Post, Feb. 15, 1989 at A 25). Despite Gates's belief that national security concerns counsel hesitation, the Court finds a review of the validity of the government's claims are prudent before dismissing Hamad's claim.

1   Third, separation of powers does not preclude the judiciary from considering Hamad's claims. In establishing due process procedures for designating enemy combatants, courts have "reject[ed] the Government's assertion[s] that separation of powers principles mandate a heavily circumscribed role for the courts." Hamdi v. Rumsfeld, 542 U.S. 507, 535 (2004); see also New York Times Co. v. United States, 403 U.S. 713 (1971)(holding that asserted military interests could not justify prior restraint of the press). While courts accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion is necessarily wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims. This is particularly true when, as alleged, Hamad was detained for two years after the military deemed him eligible for release. Like other claims conflicting with the asserted constitutional rights of the individual, "the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled." Korematsu v. United States, 323 U.S. 214, 233–234 (1944) (Murphy, J., dissenting).

Fourth, the potential for Hamad's claim to affect government policy in Guantanamo is not a special factor counseling hesitation. While Defendants warn courts will be misused as a weapon to interfere with the war effort, Hamad's action does not implicate government policies any more than Bivens itself. In Bivens, the court faced the potential for graymail, just as Defendant warns is likely here, yet the Bivens court recognized a remedy because the Constitution required it. As the Arar dissent stated, "Bivens actions always influence policy: they make it more costly for executive officers to violate the Constitution." Arar v. Ashcroft, 585 F.3d at 603 (Sack, J. in dissent). The Bill of Rights is "intended to vindicate the interests of

ORDER GRANTING DEFENDANTS' MOTIONS
TO DISMISS- 9

the individual in the face of the popular will as expressed in legislative majorities." Bivens, 403 U.S. at 407 (Harlan, J. concurring). "[E]ven the war power does not remove constitutional imitations safeguarding essential liberties." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398 (1934). In this case, Hamad alleges he was detained without due process and remained detained for two years after the military determined he was eligible for release. Since Hamad seeks a remedy for an alleged constitutional violation, not a condemnation of the government's policy in Guantanamo itself, the Court rejects Defendant's argument that Hamad's claim is merely a broad challenge to executive branch policies. Although Bivens is an infrequent remedy, the Court finds it is a necessary one.

Fifth, Hamad's claim is distinguishable from cases that declined to recognize a Bivens action. In United States v. Stanley, 483 U.S. 669 (1987), and Chappell v. Wallace, 462 U.S. 296 (1983), plaintiffs were military personnel who brought constitutional claims against their commanding officers. The Supreme Court declined to infer a Bivens action because Congress had already established a system of military discipline. Since Hamad is not a military officer suing his commanding officer, the concerns articulated by the Supreme Court in Stanley and Chappell do not apply. Hamad's case is equally distinguishable from Mirmehdi v. United States, Case No. 09-55846, 2011 WL 5222884 (9th Cir. 2011). In Mirmehdi, the Ninth Circuit barred a Bivens action where immigrants unlawfully in the United States were detained and subject to deportation proceedings based on faulty evidence that the immigrants were part of a terrorist group. Id. The Ninth Circuit reasoned a Bivens action was not needed given the existence of habeas relief and a substantial, comprehensive, and intricate remedial scheme in the immigration context. Id. at *4. Since no such alternative scheme exists in Hamad's case and

1  Hamad's detention was not within the immigration context, Defendant's reliance on <u>Mirmehdi</u> is
2  misplaced.

3  Finally, the Court observes, inferring a <u>Bivens</u> action within the context of the war on
4  terror is not new.  In <u>Vance v. Rumsfeld</u>, the Northern District of Illinois recognized a <u>Bivens</u>
5  remedy for two U.S. citizens working for private security firms who were detained and tortured
6  by U.S. military personnel in Iraq.  694 F.Supp.2d 957 (N.D. Ill. 2010); <u>see also</u> <u>Vance v.</u>
7  <u>Rumsfeld</u>, 653 F.3d 591 (7th Cir. 2011), <u>rehear'g en banc granted, opinion vacated</u> (Oct. 28,
8  2011), (affirming the district court decision).  The government argued military affairs and
9  national security concerns counseled hesitation, but the court reasoned, "a state of war is not a
10 blank check" for the government to violate the constitution.  <u>Id.</u> at 974 (citing <u>Hamdi</u>, 542 U.S. at
11 535).  Likewise, in <u>Padilla v. Yoo</u>, the Northern District of California recognized a <u>Bivens</u> action
12 against John Yoo, the Deputy Attorney General in the Office of Legal Counsel who formulated
13 policies that plaintiff alleged subjected him to torture in a South Carolina military brig.  633
14 F.Supp.2d 1005 (N.D. Cal. 2009).  As in <u>Vance</u>, the <u>Padilla</u> court rejected the government's
15 concerns about national security stating, "[s]hould a privilege surface on behalf of the
16 government, the [c]ourt can and will address those concerns in due time in the management of
17 this case." <u>Id.</u> at 1028; <u>see also</u> <u>Doe v. Rumsfeld</u>, 2011 WL 3319439 (D.D.C. Aug. 2,
18 2011)(recognizing a <u>Bivens</u> action by a U.S. citizen defense contractor working in Iraq who was
19 detained for more than nine months in Iraq).

20 To the extent the <u>Vance</u>, <u>Padilla</u>, and <u>Doe</u> courts involved U.S. citizen plaintiffs, the
21 Court finds Plaintiff's Sudanese citizenship does not preclude a <u>Bivens</u> claim.  <u>Cf.</u> <u>Vance</u>, 653
22 F.3d at 619.  In <u>Boumedienne</u>, the Supreme Court recognized a detainee's constitutional right to
23 habeas relief even though the detainee was an alien, held in Guantanamo, and Congress had
24

recently enacted a statute stripping federal courts of jurisdiction to hear habeas claims. 553 U.S. 723 (2009). In addition, the Ninth Circuit specifically recognizes Fifth Amendment protections extend to aliens. Wang v. Reno, 81 F.3d 808, 817 (9th Cir. 1996)(finding the Fifth Amendment protects aliens, especially those who became an alien through the purposeful actions of the United States government).

In sum, the Court finds a Bivens remedy is necessary. Hamad alleges he was detained for five years, including two years of which the U.S. military had already determined him eligible to be free. A Bivens remedy is appropriate because Hamad's claim would not expand Bivens into new contexts, vague references to "sensitive intelligence information" can be dealt with through the state secrets privilege, and the separation of powers does not prevent the judiciary from fulfilling its constitutionally-mandated role of resolving claims.

    c. Qualified Immunity

Having determined that neither the MCA nor special factors preclude Hamad's Bivens action, the Court now reaches the issue of qualified immunity. The Court finds qualified immunity precludes Hamad's claim because Hamad fails to allege Gates violated his constitutional rights.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (quotation omitted). To determine whether qualified immunity applies, the Court has discretion in applying

one or both steps of a two-step inquiry set out in Saucier v. Katz, 533 U.S. 194, 201 (2001). Pearson, 129 S. Ct. at 818. The two-step inquiry considers whether the plaintiff has alleged defendant violated a constitutional right and/or whether the right at issue was "clearly established" at the time of the alleged misconduct. Id. at 815-16. To be considered "clearly established" for the purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

      a. Personal Involvement

At the first step, Plaintiff fails to allege Gates was personally involved in violating Hamad's constitutional rights.

To proceed with his Bivens claim, Hamad must allege facts indicating that Secretary Gates was personally involved in and responsible for the alleged constitutional violations. Iqbal v. Ashcroft, 129 S.Ct. 1937, 1948-49 (2009). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead a plausible claim that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S.Ct. 1948. While Iqbal was litigated in the context of a discrimination case and required plaintiff plead discriminatory intent, the plausibility standard, nevertheless, applies. The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully but is not akin to a "probability requirement." Iqbal, 129 S.Ct. at 1949, quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Here, Hamad has not identified sufficient facts to raise a reasonable expectation that Gates was personally involved in violating his constitutional rights. Hamad alleges Gates "exercised command responsibility over, conspired with, aided and abetted subordinates, and/or

directly or indirectly participated in the commission of abusive and illegal practices . . ., including [Hamad's] prolonged arbitrary detention. (Am. Compl. ¶ 18.) The Court finds the assertion is a conclusory statement rather than a factual allegation. It falls short of the factually-detailed complaint in Vance v. Rumsfeld. In Vance, plaintiffs alleged Rumsfeld convened a working group to evaluate the status of interrogation policy, sent a military officer to review the U.S. prison in Iraq, and approved a list of torture techniques used on Plaintiffs. 694 F.Supp.2d at 963. Hamad's complaint, in contrast, provides no such details and fails to meet the plausibility standard. Since Hamad's allegations are not enough to show Gates personally authorized or was deliberately indifferent to detainee status hearings in Guantanamo, the Court dismisses Hamad's claim for failure to allege Gates violated his constitutional right.

The Court GRANTS Defendant's motion to dismiss the Fifth Amendment claim because Hamad's claim fails at the first step of the qualified immunity analysis.

        b.   Clearly Established Right

Defendants also argue Gates is protected by qualified immunity because the due process rights of Guantanamo detainees were not clearly established when Hamad was in custody. More specifically, Gates contends Hamad was detained outside of the United States and it was unclear whether U.S. constitutional protections applied abroad before Boumedienne. Since Hamad's claim does not sufficiently set forth how Gates violated his constitutional rights, let alone where Gates's actions took place, the Court declines to reach the issue.

2. Motion to Dismiss Non-Constitutional Claims for Lack of Subject Matter Jurisdiction

The United States substitutes itself as Defendant and seeks to dismiss Hamad's six claims for violations of customary international law, state common law, and the Geneva Conventions.

The United States argues (1) the United States has not waived its sovereign immunity based on international law and (2) Plaintiff failed to exhaust administrative remedies. The Court agrees.

   a. Westfall Act

Hamad's non-constitutional claims are filed against Secretary Gates, but the Court finds the United States is properly substituted as the Defendant.

Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, i.e., the Westfall Act. 28 U.S.C. § 2679(d)(1), the United States can substitute itself as the party defendant in a civil action against a federal official or employee. To do so, either the Attorney General must certify that the employee was acting within the scope of his employment or the employee must petition the court for such a finding. Id. There are two exceptions to the Westfall Act: when the allegations involve violations of the U.S. constitution or violations of a federal statute that itself authorizes an action against the individual. 28 U.S.C. § 2679(b)(2). If either exception applies, the individual remains the party defendant. Id.

Here, the United States properly substituted itself as the Defendant. First, neither Westfall exception applies. Hamad's six claims are brought under state common law and customary international law, not the U.S. constitution or a federal statute. While Hamad asserts claims under the Geneva Convention, the Geneva Convention is not a federal statute. See Sobitan v. Glud, 589 F.3d 379, 386 (7th Cir. 2009)(finding the Westfall exception does not include claims brought under a treaty because treaties are different from "acts of legislation"). Congress explicitly barred civil actions against federal officials brought under the Geneva Conventions. Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2631 (statutory note after 28 U.S.C. § 2241).

To the extent Hamad argues the federal statute exception applies because the claim is brought under the ATS, the Court disagrees. The ATS provides, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS is analogous to 42 U.S.C. § 1983--it does not create substantive rights, but simply provides the procedural mechanism through which a plaintiff may bring suit for violations of federal rights. See In re Iraq and Afghanistan Detainees Litigation, 479 F.Supp.2d 85, 112 (D.D.C. 2007). While Hamad relies on the legislative history of a wholly separate statute, the Torture Victims Protection Act, to argue the ATS created a new cause of action, the argument is unavailing. As the Supreme Court held, the ATS is a "jurisdictional grant . . . enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at [the time of ATS's enactment]." Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004). Since the ATS is not a federal statute that itself creates a new cause of action, the ATS is not an exception to the Westfall act.

Second, Gates's alleged decision to detain Hamad without due process was made in his capacity as Secretary of Defense. Whether a government employee was acting within the scope of employment is governed by the law of the place where the alleged tortious act or omission occurred. 28 U.S.C. § 1346(b)(1). The parties' dispute is whether the "law of the place" requires application of federal common law or D.C. law. However, the Court finds both arguments misplaced. Hamad cites no cases applying federal common law in the Westfall context and Defendants argue the law of the place is where Defendants' decision-making took place, but provide no evidence that the Department of Defense is located in Washington, D.C. Defendant's reliance on Kashin v. Kent, therefore, is unavailing. In Kashin, the Ninth Circuit

applied D.C. law in a tort action against a State Department official, but specifically observed "[Defendant's] employer, the Department of State is located within the District of Columbia." 457 F.3d 1033, 1037 (9th Cir. 2006). As this Court suggested in its order denying transfer to Washington D.C., the Court has not made a similar finding. (See Dkt. No. 74-1 at 11, noting Defendants failed to provide affidavits supporting their assertion that military officials obviously act in Washington D.C.)

In Hamad's case, the Court applies Virginia law because the Department of Defense, is located in Arlington, Virginia. See Jackson-Spells v. Rumsfeld, 457 F.Supp.2d 39 (D.D.C. 2006)(observing "the principal office of the Department of Defense is in Arlington, Virginia, not the District of Columbia")(citing Spencer v. Rumsfeld, 209 F.Supp.2d 15, 18 (D.D.C. 2002). Under Virginia law, an act is within the scope of employment if it was "fairly and naturally incident to the business" and if it was done "while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisably, ... to further the master's interests" and did not arise "wholly from some external, independent, and personal motive on the part of the servant." Sayles v. Piccadilly Cafeterias, Inc., 242 Va. 328 (1991). Even intentional torts may be within the scope of employment. See Plummer v. Center Psychiatrists, Ltd., 252 Va. 233 (Va. 1996). Virginia law does not focus on the motive of the employee who committed the tort, but instead, whether the events that led to the tort naturally could have arisen out of the employee's performance of his duties. See Commercial Business Sys., Inc. v. BellSouth Servs., Inc., 249 Va. 39 (Va. 1995).

Here, Gates's alleged decision not to release Hamad was fairly and naturally incident to his role as Secretary of Defense. In that role, Gates was responsible for Guantanamo's operations. Although Hamad argues detaining a person without due process cannot be within the

scope of employment, even mistaken and ill-advised conduct falls within the scope of employment in Virginia. Hamad's analogies to mutilating a child or burning a person to death are inapposite. Even if "egregious violations of law" are not within the scope of employment, Gates's alleged involvement is limited to Hamad's treatment and prolonged detention in his last year at Guantanamo. While Hamad argues Gates's decision not to release him was a personal adventure made for fear of political repercussions, this is not enough to show Gates had an "independent and personal motive" in keeping Hamad detained. The Court agrees with the Attorney General's certification that Gates acted within the scope of employment. (Dkt. No. 112-1, Ex. 1); see Pauly v. U.S. Dep't of Agric., 348 F.3d 1143, 1150-51 (9th Cir. 2003)(finding the Attorney General's certification is prima facie evidence that the employee acted within the scope of employment).

The Court finds the United States is properly substituted as the Defendant. The Court DENIES Hamad's request for an evidentiary hearing because Hamad fails to identify any issue of material fact. See Kashin, 457 F.3d at 1043 (finding the district court properly exercised its discretion in denying a request for an evidentiary hearing because the certification, the pleadings, and affidavits did not reveal an issue of material fact).

b. Sovereign Immunity

As the substituted Defendant, the United States is protected by sovereign immunity.

Under the Westfall Act, when the United States is substituted as Defendant, the only remedy available for the alleged negligent or wrongful act of a federal employee falls under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 2679(b)(1). The FTCA is a limited waiver of sovereign immunity and contains an exception for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k); see also United States v. Spelar, 338 U.S. 217 (1949).

1       Here, Hamad was detained in Cuba, a foreign country. Under the 1903 Lease of Lands Agreement, Cuba is the de jure sovereign over Guantanamo Bay. See Bird v. U.S., 923 F.Supp.338, 342 (D.Conn 1996). In other words, Cuba is not like Native American reservations, the Virgin Islands, Guam, or Puerto Rico, as Hamad believes. Cuba is not a United States territory. To the extent Hamad relies on Boumedienne v. Bush to argue otherwise, the argument is misplaced. 53 U.S. 723, 769 (2008). In Boumedienne, the Supreme Court recognized a detainee's right to habeas relief based on the United States' de facto sovereignty over Guantanamo. 553 U.S. 723. But the Supreme Court in Boumedinne "d[id] not question the Government's position that Cuba not the United States, maintains sovereignty, in the legal and technical sense of the term, over Guantanamo Bay." 553 U.S. 723, 754. Since Cuba is a foreign country regardless of whether the United States has de facto sovereignty and regardless of whether Guantanamo detainees have access to constitutional rights, the foreign country exception applies and Hamad's claims are barred against the United States.

      The Court finds the United States is protected by sovereign immunity because Hamad's claims occurred in a foreign country.

      c. <u>Exhaustion</u>

      Under the FTCA, a claimant cannot bring a suit against the United States unless the claimant has already presented an administrative claim to the appropriate agency and has either received a conclusive denial of that claim in writing or has waited six months without a final disposition being made. 28 U.S.C. § 2675(a). Here, Hamad filed an administrative claim in December 2009, yet filed this action less than six months later in April 2010. While Hamad argues this suit is brought under the ATS and exhaustion is not required, the United States substituted itself as defendant; therefore, the only remedy available to Hamad is under the FTCA.

Hamad must, therefore, comply with the FTCA's administrative exhaustion requirement. Since Hamad failed to exhaust administrative remedies under the FTCA before filing this action, the Court finds his claim is barred.

**Conclusion**

The Court GRANTS Defendant's motion and DISMISSES the Fifth Amendment claim due to qualified immunity. Hamad fails to allege Gates was personally involved in violating his constitutional right. The Court grants Plaintiff leave to amend. Any amended complaint must be filed within thirty (30) days of this Order.

The Court GRANTS Defendant's motion and DISMISSES the remaining claims for lack of subject matter jurisdiction. The United States is properly substituted as the party-defendant on behalf of Gates and the United States is protected by sovereign immunity.

The clerk is ordered to provide copies of this order to all counsel.

Dated this <u>8th</u> day of December, 2011.

Marsha J. Pechman
United States District Judge