THE HONORABLE MARSHA J. PECHMAN

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

8

9   ADEL HASSAN HAMAD

Plaintiff,

10

v.

11

ROBERT M. GATES, in his individual
capacity; DONALD RUMSFELD, in his
individual capacity; PAUL WOLFOWITZ, in
his individual capacity; GORDON
ENGLAND, in his individual capacity;
James M. McGARRAH, in his individual
capacity; RICHARD B. MYERS, in his
individual capacity; PETER PACE, in his
individual capacity; MICHAEL GLENN
"MIKE" MULLEN, in his individual capacity;
JAMES T. HILL, in his individual capacity;
BANTZ CRADDOCK, in his individual
capacity; GEOFFREY D. MILLER, in his
individual capacity; JAY HOOD, in his
individual capacity; HARRY B. HARRIS,
Jr., in his individual capacity; MARK H.
BUZBY, in his individual capacity;
ADOLPH MCQUEEN, in his individual
capacity; NELSON CANNON, in his
individual capacity; MICHAEL
BUMGARNER, in his individual capacity;
WADE DENNIS, in his individual capacity;
BRUCE VARGO, in his individual capacity;
ESTEBAN RODRIGUEZ, in his individual
capacity; DANIEL MCNEILL, in his
individual capacity; GREGORY J. IHDE, in
his individual capacity, JOHN DOE 1, in
his individual capacity; JOHN DOE 2, in

12

13

14

15

16

17

18

19

20

21

22

Civil Action No.

PLAINTIFF'S **SECOND AMENDED
COMPLAINT** FOR DAMAGES FOR
FORCED DISAPPEARANCE;
PROLONGED ARBITRARY
DETENTION; CRUEL, INHUMAN, OR
DEGRADING TREATMENT;
TORTURE; WAR CRIMES FOR
TARGETING A CIVILIAN; AND FOR
VIOLATION OF DUE PROCESS, ALL
IN VIOLATION OF THE LAW OF
NATIONS PURSUANT TO THE
ALIEN TORT STATUTE AND
VIOLATION OF THE FIFTH
AMENDMENT OF THE UNITED
STATES CONSTITUTION (BIVENS
CLAIM)

JURY DEMAND

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   his individual capacity; JOHN DOES 3-      )
    100, in their individual capacities,       )
2                                              )
                          Defendants.          )
3   _____

4                          **COMPLAINT**

5        Plaintiff Adel Hassan Hamad ("Mr. Hamad"), by and through his counsel,

6   respectfully alleges the following:

7                  I.   **PRELIMINARY STATEMENT**

8   1.    Plaintiff brings this action on behalf of himself.

9   2.    Mr. Hamad is a fifty-two-year-old native, citizen, and current resident of the

10  Sudan.   The United States military released him from Guantanamo Bay and

11  allowed him to return home to the Sudan in December of 2007, nearly five and one-

12  half years after unlawfully seizing him from his home in Pakistan in 2002, and two

13  years after determining he posed no threat to the United States.

14  3.    Mr. Hamad has never engaged in terrorism, acts supporting terrorism, or

15  violence against the United States or its citizens.  He did not commit any belligerent

16  act, and did not support hostilities in aid of enemy armed forces.

17  4.    Even though he was a civilian and an innocent humanitarian aid worker, he

18  was unlawfully seized from his apartment in Pakistan in July of 2002, upon

19  information and belief, at the direction of an American official.  After being

20  unlawfully held in Pakistan and at the United States Bagram Air Base in Bagram,

21  Afghanistan ("Bagram" or sometimes referred to as "Baghram") where U.S. citizens

22  subjected him to torture and cruel, inhuman, and degrading treatment, Mr. Hamad

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   was transferred to United States Guantánamo Bay Naval Base ("Guantánamo") in

2   Guantánamo Bay, Cuba, in March 2003.  U.S. officials unlawfully held him there

3   until December 2007.  During the time at Guantánamo, U.S. officials subjected him

4   to torture and to cruel, inhuman, and degrading treatment.  All of these acts were

5   done at the direction of, or by, American citizens affiliated with the United States

6   government or military.

7   5.   Defendants were acting outside the scope of their authority when they

8   committed, directed, ordered, confirmed, ratified, had command responsibility for,

9   aided and abetted, conspired to, encouraged, or condoned directly or indirectly all

10   such acts which violated customary international law and Common Article III of the

11   Geneva Conventions, as well as acts outside of those allowed in the Army Field

12   Manual.

13   6.   In addition, upon information and belief, Defendants were acting outside the

14   scope of their authority and/or employment when they engaged in all those acts

15   described herein against civilians they knew, or should have known, were innocent

16   of engaging in terrorism, acts supporting terrorism, violence against the United

17   States or its citizen, committing any belligerent act against, or supporting hostilities

18   in aid of enemy armed forces (hereinafter "innocent").  Upon information and belief,

19   the scope of Defendants' authority, *at most*, was limited to engaging in said acts

20   against those for whom a reasonable basis existed had engaged in terrorism, acts

21   supporting terrorism, violence or belligerent acts against the United States or its

22   citizen, or had supported hostilities in aid of enemy armed forces.  Upon information

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 3 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   and belief, Defendants' scope of authority did not extend to engaging in such acts

2   against those who they knew, or should have known through sufficient due process,

3   were innocent.

4   7.    Certain officials within the U.S. government, including all Defendants, knew or

5   should have known that many of the men seized and held at Guantánamo Bay and

6   Bagram were innocent.  This lawsuit alleges that Mr. Hamad was one of these

7   innocent men.

8   8.    Col. Lawrence B. Wilkerson (Ret.), a former high-level official with the United

9   States government has alleged, through a declaration in Plaintiff's counsel's

10  possession, that he has personal knowledge that certain United States officials,

11  including Defendant Rumsfeld, knew that they had seized and were holding

12  innocent men at Guantánamo Bay, and that they simply refused to release them out

13  of fear of political repercussions.  The declaration also alleges that there was no

14  meaningful way to determine who was an enemy combatant and who was not, both

15  in the field and at Guantánamo Bay.  Defendants knew or should have known of

16  this deficiency.

17  9.    Mr. Hamad is married with five living children and two deceased children.  The

18  illegal actions against Mr. Hamad resulted in loss of income to his wife and children,

19  leaving them destitute.  One of his daughters was born shortly after Mr. Hamad was

20  seized, and died while Mr. Hamad was held at Guantánamo because the family

21  could not afford proper medical care while he was detained and unable to work.

22  Because of Mr. Hamad's detention in Guantánamo, he was never able to help, see,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    hold, or provide for his daughter.

2    10.   Mr. Hamad was never properly charged nor tried for any criminal act.

3    11.   In total, Mr. Hamad was detained for approximately five and one-half years.

4    Mr. Hamad was under the exclusive control of the Defendants and other officials of

5    the United States at Bagram and Guantánamo for all but six months of that time.

6    During those six months, he was detained without charge in a Pakistani prison near

7    Islamabad by, or with assistance of, American officials who, upon information and

8    belief, were acting outside the scope of their authority.

9    12.   Mr. Hamad was not given notice of the basis for his detention until more than

10   two years after first being detained, when a Combatant Status Review Tribunal

11   (CSRT) was convened in November 2004.  Not until March 2005, nearly three full

12   years after initially being detained, was Mr. Hamad officially labeled an "enemy

13   combatant" by the flawed CSRT process.  However, this determination drew a rare

14   dissenting opinion that acknowledged his enemy combatant status determination

15   was unwarranted and as such, would have "unconscionable results."  The basis for

16   Mr. Hamad's enemy combatant determination was simply because of his

17   association as an employee of two organizations for whom he had done

18   humanitarian and charity work (one of which he had left years before), and nothing

19   more.

20   13.   In fact, a second CSRT was ordered for Mr. Hamad in November of 2007, one

21   month before he was ultimately released to the Sudan.  This was unusual, and

22   indicates that the government recognized that the initial CSRT determination of Mr.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    Hamad was not accurate.

2    14.  Flaws in the CSRT process include the following: (1) detainees are afforded

3    inadequate due process, (2) detainees are presumed guilty of being enemy

4    combatants, (3) detainees are not permitted to review classified evidence that is

5    used to justify an enemy combatant determination, (4) detainees are not afforded

6    access to counsel, and (5) detainees are not permitted to present their own

7    witnesses or evidence.

8    15.  In March of 2007, Mr. Hamad's habeas counsel, Federal Public Defender

9    Steven Wax, was notified via electronic mail that Mr. Hamad was eligible for

10   transfer back home to the Sudan.  However, the United States military had actually

11   cleared Mr. Hamad for return home to the Sudan on November 15, 2005, nearly a

12   year and a half before habeas counsel and Plaintiff were notified.  A heavily

13   censored copy of this clearance decision confirms the decision to clear Mr. Hamad

14   for return home was made immediately after the Administrative Review Board, a

15   board that is supposed to annually review the detention of those individuals U.S.

16   officials are holding at Guantanamo Bay, reviewed his case.

17   16.  Despite the email notification, U.S. officials (including some of the defendants)

18   acting upon information and belief outside the scope of their authority, continued to

19   unlawfully detained Mr. Hamad.  They did not allow him to return to the Sudan until

20   approximately December 12, 2007, following negotiations between officials of the

21   United States and Sudanese governments.

22   17.  Plaintiff seeks compensation for his unlawful forced disappearance; prolonged

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    arbitrary detention; inhuman, degrading and cruel treatment; torture; being targeted

2    during time of war as a civilian; and due process violations, all of which Plaintiff

3    suffered while under and relating to the custody of certain United States officials at

4    Bagram and Guantánamo, and to hold responsible those officials charged with the

5    unwarranted treatment, detention, and custody of Plaintiff.

6    18.   Plaintiff brings this action for compensatory and punitive damages against

7    Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace, Mullen,

8    Hill, Craddock, Miller, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis,

9    Vargo, Rodriguez, McNeill, Ihde, Doe 1, Doe 2, and Does 3-100 for their roles in the

10   harms committed against Plaintiff in violation of domestic and international law.

11   Defendants exercised command responsibility over, conspired with, aided and

12   abetted subordinates, and/or directly or indirectly participated in the commission of

13   abusive and illegal practices alleged herein, including prolonged arbitrary detention,

14   cruel, inhuman, or degrading treatment, due process violations, and torture of Mr.

15   Hamad at Bagram and Guantánamo.  Plaintiff also brings this action against Does

16   1-100, who exercised command responsibility over, conspired with, aided and

17   abetted subordinates, and/or directly or indirectly participated in the harms against

18   Mr. Hamad.  Accordingly, Defendants are liable under domestic and international

19   law for the injuries, pain, and suffering of Plaintiff in their individual capacities.

20   ## II.  JURISDICTION AND VENUE

21   19.   This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331

22   (federal question jurisdiction) and 28 U.S.C. § 1350 (Alien Tort Statute).  As an

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    alternative to federal question jurisdiction, this Court also has jurisdiction under 28

2    U.S.C. § 1332 (diversity jurisdiction) because the claims for violation of the law of

3    nations can also be brought as state common law claims.

4    20.    The Military Commissions Act (MCA) jurisdiction stripping provision, Section 7,

5    which amends 28 U.S.C. § 2241, does not prevent this Court from exercising

6    jurisdiction, for reasons including, but not limited to:

7          a.   The Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008),
                invalidated § 7 in its entirety;
8
           b.   Even if U.S.C. § 2241(e)(2) survived *Boumediene*, the provision is
9               unconstitutional on other grounds;

10         c.   The provision is an unconstitutional bill of attainder;

11         d.   The provision is not applicable to Mr. Hamad because, *inter alia*, he was
                not properly determined to be an enemy combatant.
12

13   21.   This action is brought pursuant to violations of the law of nations under the

14   Alien Tort Statute and also brought directly under the Fifth Amendment to the

15   United States Constitution.  As an alternative, the claims for violation of the law of

16   nations may also be brought under state common law.

17   22.   Venue is proper in the United States District Court of Western Washington

18   pursuant to 28 U.S.C. § 1391(b)(3) as Defendant Robert M. Gates is domiciled

19   there.

20                            III. **PARTIES**

21   23.   Adel Hassan Hamad, a fifty-two-year-old native, citizen, and current resident of

22   the Sudan, is married with five living children, one deceased son and one deceased

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   daughter.  Mr. Hamad was unlawfully taken without probable cause, upon

2   information and belief, at the direction of an unknown American official on July 18,

3   2002.  He was held as a prisoner under the exclusive control of the United States at

4   Bagram from approximately January 2003 until being transferred on approximately

5   March 15, 2003 to Guantánamo, where his illegal detention continued until he was

6   transferred to the Sudan on approximately December 12, 2007.

7   **Defendants**

8   24.  Defendant Robert M. Gates is a United States citizen domiciled in Washington

9   State.  Defendant Gates owns property in Washington State, including residences,

10   has publicly acknowledged intentions to return to Washington State after

11   employment with the United States government, and upon information and belief,

12   has at various times resided in Washington State.  Defendant Gates was the United

13   States Secretary of Defense from December 18, 2006, until July 1, 2011, including

14   the period of time in which some of the events herein described occurred. As the

15   Secretary of Defense, Defendant Gates held the highest rank in the military

16   command structure, other than the President of the United States.  At all relevant

17   times, Defendant Gates also held the highest position in the Department of

18   Defense, and in this capacity possessed and exercised command and control over

19   the United States military and the United States detention facility at Guantánamo.

20   At all relevant times, Defendant Gates was in charge of all military forces, and he

21   was responsible for overseeing detainee detention and interrogation, a large part of

22   military intelligence acquisition.  Therefore, he was ultimately in charge of Plaintiff's

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 9 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   continued unlawful detention and illegal treatment.

2   25.   Pursuant to 10 U.S.C. § 113, the Secretary of Defense has authority, direction

3   and control over the Department of Defense. The Secretary of Defense by statute

4   also exercises "authority, direction and control" over the three Secretaries of the

5   military departments (Secretary of the Army, Secretary of the Navy, and Secretary

6   of the Air Force), the Chairman of the Joint Chiefs of Staff, the other members of

7   the Joint Chiefs of Staff (Vice Chairman of the Joint Chiefs of Staff, Army Chief of

8   Staff, Commandant of the Marine Corps, Chief of Naval Operations, and Air Force

9   Chief of Staff), the Combatant Commanders of the Unified Combatant Commands,

10   the Directors of the Defense Agencies (for example the Director of the National

11   Security Agency) and of the United States Department of Defense  Field Activities.

12   The Secretary is authorized to act as convening authority in the military justice

13   system.  Moreover, the section provides that the Secretary of Defense, with the

14   approval of the President and after consultation with the Chairman of the Joint

15   Chiefs of Staff, shall provide to the Chairman written policy guidance for the

16   preparation and review of contingency plans, including plans for providing support

17   to civil authorities in an incident of national significance or a catastrophic incident,

18   for homeland defense, and for military support to civil authorities.  Such guidance is

19   required to be provided every two years or more frequently as needed and shall

20   include guidance on the specific force levels and specific supporting resource levels

21   projected to be available for the period of time for which such plans are to be

22   effective.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

26.  Plaintiff sues Defendant Gates in his individual capacity for ordering,

authorizing, condoning, creating methods and procedures for, exercising command

responsibility over, conspiring with, aiding and abetting subordinates, and/or directly

or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  He is

sued in his individual capacity, because it is alleged that in engaging in the conduct

for which Plaintiff sues him, Defendant Gates was, upon information and belief,

acting outside the scope of his authority – the scope of his authority, *at most*, being

limited to engaging in said acts against those for whom a reasonable basis existed

had engaged in terrorism, acts supporting terrorism, violence or belligerent acts

against the United States or its citizen, or had supported hostilities in aid of enemy

armed forces.  In addition, Defendant Gates was acting outside the scope of his

authority for all acts that violated customary international law and Article III of the

Geneva Conventions.

27. Defendant Donald H. Rumsfeld is a United States citizen residing in Illinois.

Defendant Rumsfeld was the United States Secretary of Defense from January 20,

2001 until December 18, 2006, including the period of time in which the events

herein described began.  As the Secretary of Defense, Defendant Rumsfeld held

the highest rank in the military command structure, other than the President of the

United States.  At all relevant times, Defendant Rumsfeld held the highest position

in the Department of Defense, and in this capacity possessed and exercised

command and control over the United States military and the United States

detention facility at Guantánamo.  At all relevant times, Defendant Rumsfeld was in

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 11 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  charge of all military forces, and he was responsible for overseeing detainee

2  interrogation, a large part of military intelligence acquisition.  Therefore, he was

3  ultimately in charge of Plaintiff's continued unlawful detention and illegal treatment.

4  Defendant Rumsfeld is sued in his individual capacity for ordering, authorizing,

5  condoning, creating methods and procedures for, exercising command

6  responsibility over, conspiring with, aiding and abetting subordinates, and/or

7  directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In

8  committing the illegal acts alleged herein, Defendant Rumsfeld, upon information

9  and belief, was acting outside the scope of his authority - the scope of his

10  authority, *at most*, being limited to engaging in said acts against those for whom a

11  reasonable basis existed had engaged in terrorism, acts supporting terrorism,

12  violence or belligerent acts against the United States or its citizen, or had

13  supported hostilities in aid of enemy armed forces.  In addition, Defendant

14  Rumsfeld was acting outside the scope of his authority for all acts that violated

15  customary international law and Article III of the Geneva Conventions.

16  28. Defendant Paul Wolfowitz is a United States citizen residing in Maryland.

17  Defendant Wolfowitz was Deputy Secretary of Defense from March 2, 2001 until

18  March 17, 2005, including the period of time in which events herein described

19  occurred.  In particular, Mr. Wolfowitz was responsible for creating and overseeing

20  the implementation of the flawed CSRTs, through memoranda which called for

21  specific treatment of detainees.  Defendant Wolfowitz is sued in his individual

22  capacity for ordering, authorizing, condoning, creating methods and procedures

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 12 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    for, exercising command responsibility over, conspiring with, aiding and abetting

2    subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

3    hereinafter alleged.  In committing the illegal acts alleged herein , Defendant

4    Wolfowitz was acting, upon information and belief, outside the scope of his

5    authority - the scope of his authority, *at most*, being limited to engaging in said acts

6    against those for whom a reasonable basis existed had engaged in terrorism, acts

7    supporting terrorism, violence or belligerent acts against the United States or its

8    citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

9    defendant was acting outside the scope of his authority for all acts that violated

10   customary international law and Article III of the Geneva Conventions.

11   29. Defendant Gordon England is a United States citizen and was Secretary of the

12   Navy from October 1, 2003 until December 28, 2005 and was simultaneously the

13   Designated Civilian Official of detainees from June 28, 2003 until May 12, 2005.

14   During this period and in this capacity, Mr. England had a large role in determining

15   whether a detainee should be released or not, based on the recommendations of a

16   CSRT or ARB.  Mr. England was also Deputy Secretary of Defense from May 13,

17   2005 until February 20, 2009, including the period of time in which events herein

18   described occurred.  During this period and in this capacity, Mr. England continued

19   to oversee the flawed CSRT and ARB processes.  Defendant England is sued in

20   his individual capacity for ordering, authorizing, condoning, creating methods and

21   procedures for, exercising command responsibility over, conspiring with, aiding

22   and abetting subordinates, and/or directly or indirectly participating in the abuses of

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 13 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    Plaintiff as hereinafter alleged.  , In committing the illegal acts alleged herein,

2    Defendant England was acting, upon information and belief, outside the scope of

3    his authority - the scope of his authority, *at most*, being limited to engaging in said

4    acts against those for whom a reasonable basis existed had engaged in terrorism,

5    acts supporting terrorism, violence or belligerent acts against the United States or

6    its citizen, or had supported hostilities in aid of enemy armed forces.  In addition,

7    the defendant was acting outside the scope of his authority for all acts that violated

8    customary international law and Article III of the Geneva Conventions, and for acts

9    beyond those authorized in the Army Field Manual.

10   30. Defendant James M. McGarrah, RADM, CEC, USN, is a United States citizen

11   and was the Director of the Office for the Administrative Review of the Detention of

12   Enemy Combatants (OARDEC) and the CSRT from July 2004 to March 2006, who

13   in this capacity, helped develop the flawed ARB process, approved the CSRT

14   recommendation that Mr. Hamad be designated an enemy combatant and that the

15   case be considered final in a determination signed March 18, 2005.  Defendant

16   McGarrah is sued in his individual capacity for ordering, authorizing, condoning,

17   creating methods and procedures for, exercising command responsibility over,

18   conspiring with, aiding and abetting subordinates, and/or directly or indirectly

19   participating in the abuses of Plaintiff as hereinafter alleged.  In committing the

20   illegal acts alleged herein, Defendant McGarrah was acting, upon information and

21   belief, outside the scope of his authority - the scope of his authority, *at most*, being

22   limited to engaging in said acts against those for whom a reasonable basis existed

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    had engaged in terrorism, acts supporting terrorism, violence or belligerent acts

2    against the United States or its citizen, or had supported hostilities in aid of enemy

3    armed forces.  In addition, the defendant was acting outside the scope of his

4    authority for all acts that violated customary international law and Article III of the

5    Geneva Conventions.

6    31. Defendant Air Force Gen. Richard B. Myers is a United States citizen.

7    Defendant Myers was the Chairman of the Joint Chiefs of Staff from October 1,

8    2001 until October 1, 2005.  As the senior uniformed military officer in the chain of

9    command during March 2003 until October 2005, Defendant Myers possessed and

10   exercised command and control over the United States military and the United

11   States detention facility at Guantánamo.  Defendant Myers is sued in his individual

12   capacity for ordering, authorizing, condoning, creating methods and procedures

13   for, exercising command responsibility over, conspiring with, aiding and abetting

14   subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

15   hereinafter alleged. In committing the illegal acts alleged herein,  Defendant Myers

16   was acting, upon information and belief, outside the scope of his authority - the

17   scope of his authority, *at most*, being limited to engaging in said acts against those

18   for whom a reasonable basis existed had engaged in terrorism, acts supporting

19   terrorism, violence or belligerent acts against the United States or its citizen, or had

20   supported hostilities in aid of enemy armed forces.  In addition, the defendant was

21   acting outside the scope of his authority for all acts that violated customary

22   international law and Article III of the Geneva Conventions.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

32. Defendant Marine Gen. Peter Pace is a United States citizen.  Defendant Pace was the Chairman of the Joint Chiefs of Staff from September 30, 2005 until October 1, 2007.  As the senior military officer in the chain of command during his tenure as the Chairman of the Joint Chiefs of Staff, Defendant Pace possessed and exercised command and control over the United States military and the United States detention facility at Guantánamo.  Defendant Pace is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. , In committing the illegal acts alleged herein, Defendant Pace was acting, upon information and belief, outside the scope of his authority - the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the defendant was acting outside the scope of his authority for all acts that violated customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

33. Defendant Admiral Michael Glenn "Mike" Mullen is a United States citizen. Defendant Mullen has been the Chairman of the Joint Chiefs of Staff since October 1, 2007.  As the senior military officer in the chain of command, Defendant Mullen possessed and exercised command and control over the United States military and

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    the United States detention facility at Guantánamo.  Defendant Mullen is sued in

2    his individual capacity for ordering, authorizing, condoning, creating methods and

3    procedures for, exercising command responsibility over, conspiring with, aiding

4    and abetting subordinates, and/or directly or indirectly participating in the abuses of

5    Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein,

6    Defendant Mullen was acting, upon information and belief, outside the scope of his

7    authority - the scope of his authority, *at most*, being limited to engaging in said acts

8    against those for whom a reasonable basis existed had engaged in terrorism, acts

9    supporting terrorism, violence or belligerent acts against the United States or its

10   citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

11   defendant was acting outside the scope of his authority for all acts that violated

12   customary international law and Article III of the Geneva Conventions, as well as

13   those that went beyond those authorized by the Army Field Manual.

14   34.   Defendant Army Gen. James T. Hill is a United States citizen.  Defendant Hill

15   was the Commanding General of the United States Southern Command

16   (USSOUTHCOM) from August 18, 2002 until November 9, 2004.  During his tenure

17   as the senior commander with authority over the United States detention facility at

18   Guantánamo, Defendant Hill possessed and exercised command and control over

19   subordinates at Guantánamo.  Defendant Hill is sued in his individual capacity for

20   ordering, authorizing, condoning, creating methods and procedures for, exercising

21   command responsibility over, conspiring with, aiding and abetting subordinates,

22   and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 17 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    alleged.  In committing the illegal acts alleged herein, Defendant Hill was acting,

2    upon information and belief, outside the scope of his authority - the scope of his

3    authority, *at most*, being limited to engaging in said acts against those for whom a

4    reasonable basis existed had engaged in terrorism, acts supporting terrorism,

5    violence or belligerent acts against the United States or its citizen, or had supported

6    hostilities in aid of enemy armed forces.  In addition, the defendant was acting

7    outside the scope of his authority for all acts that violated customary international

8    law and Article III of the Geneva Conventions, as well as acts that went beyond the

9    Army Field Manual.

10   35. Defendant Army Gen. Bantz Craddock is a United States citizen.  Defendant

11   Craddock was the Commander of the United States Southern Command from

12   November 9, 2004 until October 18, 2006.  During his tenure as the senior

13   commander with authority over the United States detention facility at Guantánamo,

14   Defendant Craddock possessed and exercised command and control over

15   subordinates at Guantánamo.  Defendant Craddock is sued in his individual

16   capacity for ordering, authorizing, condoning, creating methods and procedures

17   for, exercising command responsibility over, conspiring with, aiding and abetting

18   subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

19   hereinafter alleged.  In committing the illegal acts alleged herein, Defendant

20   Craddock was acting, upon information and belief, outside the scope of his

21   authority - the scope of his authority, *at most*, being limited to engaging in said acts

22   against those for whom a reasonable basis existed had engaged in terrorism, acts

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 18 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  supporting terrorism, violence or belligerent acts against the United States or its

2  citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

3  defendant was acting outside the scope of his authority for all acts that violated

4  customary international law and Article III of the Geneva Conventions, as well as

5  those that went beyond those authorized by the Army Field Manual.

6  36. Defendant Army Maj. Gen. Geoffrey D. Miller is a United States citizen.

7  Defendant Miller was the Commander of Joint Task Force-Guantánamo,

8  responsible for all operations at the detention facility at Guantánamo including the

9  conduct of all interrogations from October 2002 until March 2004.  During his

10  tenure, Defendant Miller possessed and exercised command and control over

11  subordinates at Guantánamo.  Defendant Miller is sued in his individual capacity

12  for ordering, authorizing, condoning, creating methods and procedures for,

13  exercising command responsibility over, conspiring with, aiding and abetting

14  subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

15  hereinafter alleged.  In committing the illegal acts alleged herein, Defendant Miller

16  was acting, upon information and belief, outside the scope of his authority - the

17  scope of his authority, *at most*, being limited to engaging in said acts against those

18  for whom a reasonable basis existed had engaged in terrorism, acts supporting

19  terrorism, violence or belligerent acts against the United States or its citizen, or had

20  supported hostilities in aid of enemy armed forces.  In addition, the defendant was

21  acting outside the scope of his authority for all acts that violated customary

22  international law and Article III of the Geneva Conventions, as well as those that

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 19 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   went beyond those authorized by the Army Field Manual.

2   37. Defendant Army Brig. Gen. Jay Hood is a United States citizen.  Defendant

3   Hood was the Commander of Joint Task Force-Guantánamo, responsible for all

4   operations at the detention facility at Guantánamo including the conduct of all

5   interrogations from March 2004 until March 2006.  During his tenure, Defendant

6   Hood possessed and exercised command and control over subordinates at

7   Guantánamo.  Defendant Hood is sued in his individual capacity for ordering,

8   authorizing, condoning, creating methods and procedures for, exercising command

9   responsibility over, conspiring with, aiding and abetting subordinates, and/or

10  directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In

11  the acts illegal alleged herein, Defendant Hood was acting, upon information and

12  belief, outside the scope of his authority - the scope of his authority, *at most*, being

13  limited to engaging in said acts against those for whom a reasonable basis existed

14  had engaged in terrorism, acts supporting terrorism, violence or belligerent acts

15  against the United States or its citizen, or had supported hostilities in aid of enemy

16  armed forces.  In addition, the defendant was acting outside the scope of his

17  authority for all acts that violated customary international law and Article III of the

18  Geneva Conventions, as well as those that went beyond those authorized by the

19  Army Field Manual.

20  38.  Defendant Navy Rear Adm. Harry B. Harris, Jr. is a United States citizen.

21  Defendant Harris was the Commander of Joint Task Force-Guantánamo (JTF-

22  GTMO) during 2006 and 2007, for over a year during the time in which Plaintiff was

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  detained.  As Commander of JTF-GTMO, Defendant Harris had responsibilities for

2  issuing, implementing and enforcing policies that touched every aspect of

3  detainees' daily existence, including Plaintiff's.  In fact, Defendant Harris was

4  responsible for all interrogation and operations in Guantanamo during this time.  In

5  2007, before Plaintiff was released, Defendant Harris was promoted to Director of

6  Operations for the United States Southern Command (USSOUTHCOM). In both

7  positions, Defendant Harris oversaw all detainee operations at Guantanamo Bay.

8  Defendant Harris is sued in his individual capacity for ordering, authorizing,

9  condoning, creating methods and procedures for, exercising command

10  responsibility over, conspiring with, aiding and abetting subordinates, and/or directly

11  or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In

12  committing the illegal acts alleged herein, Defendant Harris was acting, upon

13  information and belief, outside the scope of his authority - the scope of his authority,

14  *at most*, being limited to engaging in said acts against those for whom a reasonable

15  basis existed had engaged in terrorism, acts supporting terrorism, violence or

16  belligerent acts against the United States or its citizen, or had supported hostilities

17  in aid of enemy armed forces.  In addition, the defendant was acting outside the

18  scope of his authority for all acts that violated customary international law and

19  Article III of the Geneva Conventions, as well as those that went beyond those

20  authorized by the Army Field Manual.

21  39. Defendant Rear Adm. Mark H. Buzby is a United States citizen.  Defendant

22  Buzby was the Commander of Joint Task Force-Guantánamo, responsible for all

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 21 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   operations at the detention facility at Guantánamo including the conduct of all

2   interrogations from May 2007 until January 2008.  During his tenure, Defendant

3   Buzby possessed and exercised command and control over subordinates at

4   Guantánamo.  Defendant Buzby is sued in his individual capacity for ordering,

5   authorizing, condoning, creating methods and procedures for, exercising command

6   responsibility over, conspiring with, aiding and abetting subordinates, and/or

7   directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In

8   committing the illegal acts alleged herein, Defendant Buzby was acting, upon

9   information and belief, outside the scope of his authority - the scope of his

10  authority, *at most*, being limited to engaging in said acts against those for whom a

11  reasonable basis existed had engaged in terrorism, acts supporting terrorism,

12  violence or belligerent acts against the United States or its citizen, or had

13  supported hostilities in aid of enemy armed forces.  In addition, the defendant was

14  acting outside the scope of his authority for all acts that violated customary

15  international law and Article III of the Geneva Conventions, as well as those that

16  went beyond those authorized by the Army Field Manual.

17  40. Defendant Army Col. Adolph McQueen is a United States citizen.  Defendant

18  McQueen was the Commander of Joint Detention Operations Group at the United

19  States detention facility at Guantánamo, responsible for guarding the detainees

20  and providing security from November 2002 until August 2003.  During his tenure,

21  Defendant McQueen possessed and exercised command and control over

22  subordinates at Guantánamo.  Defendant McQueen is sued in his individual

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    capacity for ordering, authorizing, condoning, creating methods and procedures

2    for, exercising command responsibility over, conspiring with, aiding and abetting

3    subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

4    hereinafter alleged.  In committing the illegal acts alleged herein, Defendant

5    McQueen was acting, upon information and belief, outside the scope of his

6    authority - the scope of his authority, *at most*, being limited to engaging in said acts

7    against those for whom a reasonable basis existed had engaged in terrorism, acts

8    supporting terrorism, violence or belligerent acts against the United States or its

9    citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

10   defendant was acting outside the scope of his authority for all acts that violated

11   customary international law and Article III of the Geneva Conventions, as well as

12   those that went beyond those authorized by the Army Field Manual.

13   41. Defendant Army Brig. Gen. Nelson Cannon is a United States citizen.

14   Defendant Cannon was the Commander of Joint Detention Operations Group at

15   the United States detention facility at Guantánamo, responsible for guarding the

16   detainees and providing security from August 2003 until September 2004.  During

17   his tenure, Defendant Cannon possessed and exercised command and control

18   over subordinates at Guantánamo.  Defendant Cannon is sued in his individual

19   capacity for ordering, authorizing, condoning, creating methods and procedures

20   for, exercising command responsibility over, conspiring with, aiding and abetting

21   subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

22   hereinafter alleged.  In committing the illegal acts alleged herein, Defendant

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    Cannon was acting, upon information and belief, outside the scope of his authority

2    - the scope of his authority, *at most*, being limited to engaging in said acts against

3    those for whom a reasonable basis existed had engaged in terrorism, acts

4    supporting terrorism, violence or belligerent acts against the United States or its

5    citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

6    defendant was acting outside the scope of his authority for all acts that violated

7    customary international law and Article III of the Geneva Conventions, as well as

8    those that went beyond those authorized by the Army Field Manual.

9    42.   Defendant Army Col. Michael "Mike" Bumgarner is a United States citizen.

10   Defendant Bumgarner was the Commander of Joint Detention Operations Group at

11   the United States detention facility at Guantánamo, responsible for guarding the

12   detainees and providing security from April 2005 until March 2006.  During his

13   tenure, Defendant Bumgarner possessed and exercised command and control

14   over subordinates at Guantánamo.  Defendant Bumgarner is sued in his individual

15   capacity for ordering, authorizing, condoning, creating methods and procedures

16   for, exercising command responsibility over, conspiring with, aiding and abetting

17   subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as

18   hereinafter alleged. In committing the illegal acts alleged herein, Defendant

19   Bumgarner was acting, upon information and belief, outside the scope of his

20   authority - the scope of his authority, *at most*, being limited to engaging in said acts

21   against those for whom a reasonable basis existed had engaged in terrorism, acts

22   supporting terrorism, violence or belligerent acts against the United States or its

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

2    defendant was acting outside the scope of his authority for all acts that violated

3    customary international law and Article III of the Geneva Conventions, as well as

4    those that went beyond those authorized by the Army Field Manual.

5    43. Defendant Army Col. Wade Dennis is a United States citizen.  Defendant

6    Dennis was the Commander of Joint Detention Operations Group at the U.S.

7    detention facility at Guantánamo, responsible for guarding the detainees and

8    providing security from March 2006 until June 2007.  During his tenure, Defendant

9    Dennis possessed and exercised command and control over subordinates at

10   Guantánamo.  Defendant Dennis is sued in his individual capacity for ordering,

11   authorizing, condoning, creating methods and procedures for, exercising command

12   responsibility over, conspiring with, aiding and abetting subordinates, and/or

13   directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.  In

14   committing the illegal acts alleged herein, Defendant Dennis was acting, upon

15   information and belief, outside the scope of his authority - the scope of his

16   authority, *at most*, being limited to engaging in said acts against those for whom a

17   reasonable basis existed had engaged in terrorism, acts supporting terrorism,

18   violence or belligerent acts against the United States or its citizen, or had

19   supported hostilities in aid of enemy armed forces.  In addition, the defendant was

20   acting outside the scope of his authority for all acts that violated customary

21   international law and Article III of the Geneva Conventions, as well as those that

22   went beyond those authorized by the Army Field Manual.

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 25 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

44. Defendant Army Col. Bruce Vargo is a United States citizen.  Defendant Vargo

was the Commander of Joint Detention Operations Group at the United States

detention facility at Guantánamo, responsible for guarding the detainees and

providing security from July 2007 until Mr. Hamad's release in December 2007.

During his tenure, Defendant Vargo possessed and exercised command and

control over subordinates at Guantánamo.  Defendant Vargo is sued in his

individual capacity for ordering, authorizing, condoning, creating methods and

procedures for, exercising command responsibility over, conspiring with, aiding

and abetting subordinates, and/or directly or indirectly participating in the abuses of

Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein,

Defendant Vargo was acting, upon information and belief, outside the scope of his

authority - the scope of his authority, *at most*, being limited to engaging in said acts

against those for whom a reasonable basis existed had engaged in terrorism, acts

supporting terrorism, violence or belligerent acts against the United States or its

citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

defendant was acting outside the scope of his authority for all acts that violated

customary international law and Article III of the Geneva Conventions, as well as

those that went beyond those authorized by the Army Field Manual.

45. Defendant Esteban (aka Steven, aka Stephen) Rodriguez is a United States

citizen.  Defendant Rodriguez was the civilian Director of the Joint Intelligence

Group responsible for managing intelligence-gathering operations at Guantánamo

and reporting to the Commander of the Joint Task Force at Guantánamo from July

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

2003 to October 2005. During his tenure, Defendant Rodriguez possessed and exercised command and control over subordinates at Guantánamo. Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged. In committing the illegal acts alleged herein, Defendant Rodriquez was acting, upon information and belief, outside the scope of his authority - the scope of his authority, *at most*, being limited to engaging in said acts against those for whom a reasonable basis existed had engaged in terrorism, acts supporting terrorism, violence or belligerent acts against the United States or its citizen, or had supported hostilities in aid of enemy armed forces. In addition, the defendant was acting outside the scope of his authority for all acts that violated customary international law and Article III of the Geneva Conventions, as well as those that went beyond those authorized by the Army Field Manual.

46. Defendant Lt. General Daniel McNeill is a United States citizen. Defendant McNeill was Commander of the Combined Forces Command of Afghanistan for the entire duration of Plaintiff's detention at Bagram Air Base. Defendant McNeill was responsible for all forces, intelligence activity, and treatment of prisoners in Afghanistan during his tenure. During his tenure, Defendant McNeill possessed and exercised command and control over subordinates in Afghanistan. Defendant McNeill is sued in his individual capacity for ordering, authorizing, condoning,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   creating methods and procedures for, exercising command responsibility over,

2   conspiring with, aiding and abetting subordinates, and/or directly or indirectly

3   participating in the abuses of Plaintiff as hereinafter alleged.  In committing the

4   illegal acts alleged herein, Defendant McNeill was acting, upon information and

5   belief, outside the scope of his authority - the scope of his authority, *at most*, being

6   limited to engaging in said acts against those for whom a reasonable basis existed

7   had engaged in terrorism, acts supporting terrorism, violence or belligerent acts

8   against the United States or its citizen, or had supported hostilities in aid of enemy

9   armed forces.  In addition, the defendant was acting outside the scope of his

10  authority for all acts that violated customary international law and Article III of the

11  Geneva Conventions, as well as those that went beyond those authorized by the

12  Army Field Manual.

13  47.   Defendant Brigadier General Gregory J. Ihde, a United States citizen, was the

14  Commander of the United States air base in Bagram, Afghanistan during the time

15  Mr. Hamad was detained there from January 2003 to March 2003.  Defendant Ihde

16  exercised command responsibility over, conspired with, aided and abetted

17  subordinates, and/or directly or indirectly participated in Mr. Hamad's prolonged

18  arbitrary detention, cruel, inhuman, or degrading treatment, torture, forced

19  disappearance and due process violations at Bagram as hereinafter alleged.  In

20  committing the illegal acts alleged herein, Defendant Ihde was acting, upon

21  information and belief, outside the scope of his authority - the scope of his authority,

22  *at most*, being limited to engaging in said acts against those for whom a reasonable

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    basis existed had engaged in terrorism, acts supporting terrorism, violence or

2    belligerent acts against the United States or its citizen, or had supported hostilities

3    in aid of enemy armed forces.  In addition, the defendant was acting outside the

4    scope of his authority for all acts that violated customary international law and

5    Article III of the Geneva Conventions, as well as those that went beyond those

6    authorized by the Army Field Manual.

7    48.   Defendant John Doe 1, Colonel, United States Army Tribunal President is a

8    United States citizen and presided over the flawed CSRT that recommended Mr.

9    Hamad be designated an enemy combatant, despite a strong dissenting opinion

10   which concluded that Mr. Hamad's enemy combatant status determination was

11   unwarranted and as such, the result would be "unconscionable."  Defendant John

12   Doe 1 is sued in his individual capacity for ordering, authorizing, condoning,

13   creating methods and procedures for, exercising command responsibility over,

14   conspiring with, aiding and abetting subordinates, and/or directly or indirectly

15   participating in the abuses of Plaintiff as hereinafter alleged.  In committing the

16   illegal acts alleged herein, Defendant Doe was acting, upon information and belief,

17   outside the scope of his authority - the scope of his authority, *at most*, being limited

18   to engaging in said acts against those for whom a reasonable basis existed had

19   engaged in terrorism, acts supporting terrorism, violence or belligerent acts against

20   the United States or its citizen, or had supported hostilities in aid of enemy armed

21   forces.  In addition, the defendant was acting outside the scope of his authority for

22   all acts that violated customary international law and Article III of the Geneva

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   Conventions, as well as those that went beyond those authorized by the Army Field

2   Manual.

3   49.   Defendant John Doe 2, Captain, USN, is a United States citizen and was

4   Presiding Officer of the flawed ARB, which determined that Mr. Hamad be

5   recommended for transfer back to the Sudan.  Despite this recommendation,

6   Defendant Doe 2 failed to provide or ensure proper notification to Mr. Hamad and/or

7   Mr. Hamad's habeas counsel of the ARB's decision.  Defendant John Doe 2 is sued

8   in his individual capacity for ordering, authorizing, condoning, creating methods and

9   procedures for, exercising command responsibility over, conspiring with, aiding and

10   abetting subordinates, and/or directly or indirectly participating in the abuses of

11   Plaintiff as hereinafter alleged.  In committing the illegal acts alleged herein,

12   Defendant Doe 2 was acting, upon information and belief, outside the scope of his

13   authority - the scope of his authority, *at most*, being limited to engaging in said acts

14   against those for whom a reasonable basis existed had engaged in terrorism, acts

15   supporting terrorism, violence or belligerent acts against the United States or its

16   citizen, or had supported hostilities in aid of enemy armed forces.  In addition, the

17   defendant was acting outside the scope of his authority for all acts that violated

18   customary international law and Article III of the Geneva Conventions, as well as

19   those that went beyond those authorized by the Army Field Manual.

20   50.   Plaintiff does not know the true names and capacities of Defendants sued

21   herein as John Does 3-100, and therefore sues these Defendants by fictitious

22   names. John Does 3-100 are sued in their individual capacity, and are the military,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  intelligence, and civilian personnel who exercised command responsibility over,

2  conspired with, aided and abetted subordinates, and/or directly or indirectly

3  participated in Mr. Hamad's prolonged arbitrary detention, cruel, inhuman, or

4  degrading treatment, torture, targeting of a civilian, forced disappearance and due

5  process violations as hereinafter alleged.

6  51.   All Defendants named herein are sued in their individual capacity and are

7  alleged to have acted, upon information and belief, outside the scope of their

8  employment and/or authority, especially with regard to men such as Mr. Hamad, a

9  civilian, who was not apprehended on a battlefield and for whom there was

10  insufficient evidence to warrant his taking, detention or treatment.

11  **FTCA and Exhaustion**

12  52.   Plaintiff reserves the right to proceed under the Federal Tort Claims Act

13  (FTCA) in the event individual defendants are found to have acted within the scope

14  of their employment and the United States is allowed to substitute itself under the

15  Westfall Act.  A FTCA claim was filed on December 3, 2009, to preserve Plaintiff's

16  right to proceed under the FTCA if such occurs.

17  **IV. <u>STATEMENT OF FACTS</u>**

18  **Background**

19  53.   From the outset of the War on Terror following the September 11, 2001

20  attacks, Pakistan has been a key front-line ally to the United States.  As

21  documented in the recent State Department Report on Pakistan issued in March

22  2009, "The United States-Pakistan relationship changed significantly once Pakistan

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 31 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   agreed to support the United States' campaign to eliminate the Taliban in

2   Afghanistan and to join the United States in the Global War on Terror.  Since

3   September 2001, Pakistan has provided extensive assistance in the war on terror

4   by capturing more than 600 al-Qaida members and their allies.  The United States

5   has stepped up its economic assistance to Pakistan, providing debt relief and

6   support for a major effort for education reform."

7   54.   As part of this relationship change, the United States and Pakistan established

8   the Working Group on Counterterrorism and Law Enforcement Cooperation in

9   2002, with the first meeting held in May of that year.  Around this time, United

10  States involvement, particularly the Federal Bureau of Investigation (FBI), with local

11  Pakistani police increased.  It has been reported that FBI agents actively took part

12  in raids with local police, carrying weapons and directing local police in nighttime

13  arrests.

14  55.   The United States military has maintained continuous control and jurisdiction

15  over Bagram since December 2001, following the invasion of Afghanistan. This

16  control is evidenced by the Lease Agreement and the Status of Forces Agreement

17  (SOFA) between the United States and Afghanistan. The base has served as a

18  primary staging center for the military during Operation: Enduring Freedom.  It has

19  also served as the primary known detention centers, interrogation points, and

20  transfer centers for detainees arrested in the region, including Pakistan.  Numerous

21  media reports and human rights organizations have documented the harsh

22  conditions and treatment administered to detainees at Bagram, which were

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 32 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    particularly harsh during the initial years of its operation under United States

2    control.

3    56.   The United States has maintained exclusive and continuous control and

4    jurisdiction over Guantánamo pursuant to a 1903 Lease Agreement with Cuba.

5    Beginning in early 2002, the United States began to transfer detainees seized

6    throughout the world to Guantánamo.  Numerous media reports and human rights

7    organizations have documented harsh conditions and treatment administered to

8    detainees at Guantánamo.

9    57.   At Guantánamo, detainees have been held indefinitely without charges ever

10   being filed against them.  Under the auspices of the United States Department of

11   Defense , the Office for the Administrative Review of the Detention of Enemy

12   Combatants (OARDEC) was created in 2004 to establish military tribunals to

13   determine the status of the individuals detained at Guantánamo.  The two

14   procedures established by OARDEC were the Combatant Status Review Tribunals

15   (CSRT) and Administrative Review Boards (ARB).

16   58.   Detainees' statuses have been determined by a flawed CSRT procedure.  The

17   process fails to provide for adequate due process on numerous aspects because

18   detainees are presumed guilty of being enemy combatants, not permitted to review

19   classified evidence that is used to justify an enemy combatant determination, not

20   afforded access to counsel, and not permitted to present their own witnesses or

21   evidence.

22   59.   Following an enemy combatant determination by a CSRT, a detainee's status

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 33 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   is to be reviewed annually by an ARB.  The ARB is to recommend, based on

2   current evidence at the time, whether the detainee should be released, transferred,

3   or continue to be detained.  At its core, the ARB was designed to "ensure no one is

4   detained any longer than is warranted . . ."

5   **Facts Specific to Plaintiff**

6   60.  Mr. Hamad was in the exclusive custody, care, and control of Defendants at

7   Bagram and Guantánamo from January 2003 until being released and transferred

8   to the Sudan in December 2007.  He was originally detained under the name

9   Hassan Adel Hussein with ISN Number 940.

10  61.  Mr. Hamad was seized on July 18, 2002 during a middle of the night raid by

11  Pakistani authorities, upon information and belief, at the direction of an unknown

12  American official.  The private building in Peshawar that Mr. Hamad was living in

13  was raided by six to eight heavily armed men.  The men raided Mr. Hamad's

14  upstairs apartment, as well as the apartment of his downstairs neighbor, an

15  Algerian refugee.  After being held in a local jail overnight, Mr. Hamad was

16  transferred on July 19, 2002 to a jail in Islamabad, Pakistan, where he was

17  interrogated and held for two days with no water, food, or outside contact.

18  62.  On July 22, 2002, Mr. Hamad was hooded, chained with heavy metal links and

19  old-fashioned padlocks, and transferred to another Pakistani prison.  It is possible

20  this location was in Islamabad; it is also possible this location was at a

21  site controlled/operated at least partly by the United States military.  During the six

22  months that Mr. Hamad was detained at this location, his health deteriorated

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   dramatically as a consequence of the prison conditions.  He was given dirty water

2   to drink, rotten food to eat, and only one set of clothes to use throughout the

3   summer heat and winter cold that spanned the time he spent there.  He lost

4   approximately 65 pounds (dropping from 200 pounds in July to 135 pounds in

5   December) after being denied medical care for dysentery.

6   63.  During his detainment at this Pakistani prison, Mr. Hamad was never permitted

7   to have outside contact, including with the International Committee of the Red

8   Cross (ICRC), his family, consulate, or an attorney.  Mr. Hamad was never charged

9   with a crime or interrogated.  His family did not know what had happened to him or

10  where he was.

11  64.  In approximately January 2003, Mr. Hamad was hooded, chained, and driven

12  in a van to be transferred once again.  Upon arrival at a tarmac, Mr. Hamad was

13  thrown to the ground, roughly kicked, and retrussed in plastic cuffs by, upon

14  information and belief, American officials.  Mr. Hamad was then put onto a non-

15  commercial flight to Bagram that lasted approximately two hours.

16  65.  Mr. Hamad was a prisoner under the exclusive control of the United States at

17  the detention center at Bagram from approximately January 2003 until

18  approximately March 15, 2003.  Upon arrival at Bagram, American officials pushed

19  and dragged Mr. Hamad outside, kicked him, cut his clothes off with a knife, and left

20  him naked outside in the freezing cold.  They set dogs upon Mr. Hamad while

21  watching United States military personnel laughed and mocked him.

22  66.  Eventually, Mr. Hamad was taken into an empty prison cell in a hangar and

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    given abrasive clothing to wear.  He was forced to stand there for three straight

2    days without sleep or food.  He was then taken into another room where for the

3    next three days he was interrogated numerous times and continued to be deprived

4    of food and sleep.  Every time he was moved for interrogation, Mr. Hamad was

5    jerked, pushed, and insulted.

6    67.  As a result of the prison in Pakistan, lack of sleep, lack of food, and the cold in

7    the prison in Afghanistan, Mr. Hamad collapsed from malnourishment and

8    dehydration, needing two full weeks to recover at the prison hospital.  After being

9    discharged from the hospital, he was taken to a new cell.

10   68.  In early March 2003, finally, for the first time since being seized on July 18,

11   2002, Mr. Hamad had contact with outsiders, the ICRC.  In addition, for the first

12   time, he was permitted to write a letter to his wife, which was screened by United

13   States military officers.

14   69.  During his detention at Bagram, Mr. Hamad was subjected to prolonged

15   arbitrary detention, cruel, inhuman, or degrading treatment, torture, due process

16   violations, repeatedly interrogation, and deprived of appropriate care to the point of

17   requiring hospitalization.  He was deprived of all outside contact until early March

18   2003, shortly before his transfer to Guantánamo.

19   70.  During his detention at Bagram, Mr. Hamad did not receive any notice of the

20   reasons why the government apprehended and detained him.  Mr. Hamad was not

21   charged with any crime or offense, and he was deprived of any proceeding in which

22   he could challenge the basis for his detention.  No evidence was presented against

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   him.  Rather, he was simply imprisoned without cause and routinely subjected to

2   harsh interrogations.  Given his role at Bagram, Defendant McNeill personally

3   participated in violating Mr. Hamad's rights through his command authority.

4   71.  On approximately March 15, 2003, Mr. Hamad was shackled and blindfolded,

5   had muffs placed on his ears, and strapped down with a full-face muzzle for the

6   entire thirty-hour flight to Guantánamo.  Bathroom use during the flight was

7   restricted.

8   72.   Mr. Hamad was a prisoner under the exclusive control of the United States at

9   Guantánamo from approximately March 15, 2003, until his release and subsequent

10   transfer back to the Sudan on approximately December 12, 2007.  During this time,

11   Mr. Hamad continued to be interrogated and detained, despite no reasonable basis

12   for such treatment.

13   73.   For the first few weeks at Guantánamo, Mr. Hamad was held in isolation and

14   interrogated daily.  Interrogations tapered off and Mr. Hamad was eventually moved

15   to Camp 4 in Camp Delta.  However, during one month of his stay, Mr. Hamad was

16   held in Camp 1.  There, Mr. Hamad was isolated for twenty-two or twenty-three

17   hours a day without a mattress, blanket, regular showers, or toilet paper.

18   74.  Mr. Hamad was not given notice of the basis for his detention until more than

19   two years after first being detained, after the CSRT was convened in November

20   2004.

21   **CSRT Determination and ARB Review**

22   75.   It was not until March 2005 that Mr. Hamad was officially labeled as an

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    "enemy combatant" by the flawed CSRT process, nearly three full years since

2    initially being detained.  The CSRT itself did not afford Mr. Hamad elementary due

3    process.

4    76.  A divided panel, which is rare for these military tribunals, determined that Mr.

5    Hamad was an enemy combatant simply because of his association as an

6    employee of two organizations for whom he had done humanitarian and charity

7    work (one of which he had left years before), and nothing more.

8    77.   The dissenting member of the panel found that Hamad's designation as an

9    enemy combatant was unwarranted and would have "unconscionable results."  The

10   decision took into account both classified and unclassified information.

11   78.    A second CSRT was ordered for Mr. Hamad one month before he was

12   ultimately transferred to the Sudan in December of 2007.  A second CSRT is

13   unusual, and indicates that the first CSRT determination was either not accurate or

14   that exculpatory evidence was not considered.

15   79.  The CSRT's determination of Mr. Hamad as an enemy combatant was

16   reviewed only one time by a military ARB, which was convened between June 28,

17   2005 and August 2005.  The purpose of the ARB is to provide for annual review in

18   light of the flawed CSRT procedures.  In November 2005, the ARB determined,

19   upon information and belief, that Mr. Hamad was eligible to be released from

20   Guantánamo and sent home to the Sudan.  Neither Mr. Hamad nor his habeas

21   counsel received notification of the Board's findings; nor did they receive an answer

22   to his counsel's inquiries.

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 38 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    80.  No ARB was convened for Mr. Hamad in 2006, despite the requirement that an

2    ARB be held annually.  However, on February 22, 2007, Mr. Hamad's habeas

3    counsel received an email from OARDEC, notifying them that Mr. Hamad, based on

4    either the ARB process or the process the Department of Defense had in place

5    prior to ARBs, had in fact been "approved to leave Guantánamo."  This notification

6    via email came fifteen months after the ARB had determined that Mr. Hamad was

7    eligible for transfer.

8    81.  Despite the ARB determination and email notification, Mr. Hamad was not

9    transferred to the Sudan until approximately December 12, 2007, following

10   negotiations between officials of the United States and Sudanese governments.

11   82.  Certain officials within the U.S. government, including all Defendants, knew or

12   should have known, or believed that many of the men seized in Pakistan and

13   Afghanistan and held at Guantánamo Bay and Bagram were innocent.  Mr. Hamad

14   was one of these innocent men.

15   83.  Col. Lawrence B. Wilkerson (Ret.), a former high-level official with the United

16   States government has alleged, through a declaration in plaintiff's counsel's

17   possession, that he has personal knowledge that certain United States officials,

18   including Defendant Rumsfeld, knew that they had seized and were holding

19   innocent men at Guantánamo Bay, and that they simply refused to release them out

20   of fear of political repercussions.  The declaration also alleges that there was no

21   meaningful way to determine who was an enemy combatant and who was not, both

22   in the field and at Guantánamo Bay.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   84.  Upon information and belief, only 5-7% of the men held at Guantanamo Bay

2   were actually apprehended during military engagement or "on the battlefield."

3   Nearly 93-95% of the men were not.  Many of these men were taken by Pakistanis

4   and Afghans who received a bounty, or did it for retribution or revenge.  Upon

5   information and belief, there was no credible effort to determine whether there was

6   reasonable suspicion or belief – let alone any suspicion or belief – that men

7   apprehended had been engaged in or supported hostilities toward or against the

8   United States.

9   85.  As officers of the U.S. military, military official defendants' authority is limited by

10  numerous legal authorities, including the Army Field Manual and the Geneva

11  Conventions.  All actions taken, or inaction, with regard to Plaintiff, who was a

12  civilian, that resulted in prolonged arbitrary detention, torture, cruel, inhuman and

13  degrading treatment, violations of due process, forced disappearance, were outside

14  such authority, and all defendants knew or should have known such actions were

15  outside their legal authority, and were illegal.

16  **Additional Information on the Role of Individual Defendants**

17  86.  Throughout the period when Defendant Rumsfeld was Secretary of Defense

18  and exercised command authority over Guantanamo, he and his subordinates

19  including Defendants Miller, Hood, Harris, Hill, McQueen, Cannon, Bumgarner, and

20  Dennis, oversaw a system of detention, coercive interrogations and harsh and

21  humiliating conditions in contravention of the Geneva Conventions, customary

22  international law, and the Army Field Manual.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

87.  Specifically, in October 2002, Defendant Rumsfeld ordered an overhaul of the operation at Guantanamo resulting in new interrogation techniques that did not conform to the Geneva Conventions of 1949 or customary international law and went beyond those approved in the U.S. Army Field Manual.  All Defendants knew or should have known that such techniques were unlawful.

88.  In a memo dated October 25, 2002, Defendant Hill requested in writing permission to use enhanced interrogation techniques, later used against Plaintiff, that constitute torture and cruel, inhuman and degrading treatment, in direct contradiction to the Geneva Conventions, customary international law, and the Army Field Manual. Defendant Hill justified violations of the Geneva Convention in the use of such "counter-resistance techniques" by noting detainees' tenacious resistance against the more humane interrogation methods lawfully employed at the time.  He expressed reservations about the legality of the most severe types of methods (such as the implied or explicit use of threats of death to detainee and/or his family), but asked for authorization to use them nonetheless.

89.  In addition, during Defendant Hill's leadership, the ICRC reported that the military was intentionally using psychological and physical coercion "tantamount to torture" on prisoners, and that their treatment was increasingly "refined and repressive."

90.  Beginning November 8, 2002, Defendant Miller commanded JTF-GTMO (a unit that combined the detention and security operations (JTF-160) and interrogators and intelligence gathering function (JRF-170).  In that position he oversaw both

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 41 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   military intelligence and military police functions.  Defendant Miller was in regular

2   contact with Defendant Rumsfeld during his time as commander at Guantanamo.

3   91.   Defendant Wolfowitz discussed the use of aggressive interrogation techniques

4   at Guantanamo with others in the Department of Defense leadership, and

5   concurred with the November 27, 2002, recommendation to Defendant Rumsfeld

6   that the majority of the aggressive techniques be approved, including stress

7   positions, removal of clothing, use of phobias, and deprivation of light and auditory

8   stimuli.  Defendant Wolfowitz encouraged others to use even more aggressive

9   interrogation techniques and expressed dissatisfaction with the level of intelligence

10   gathering taking place at Guantanamo.  Defendant Wolfowitz was well informed of

11   the day-to-day operations at Guantanamo, as he was briefed on an at-least-weekly

12   basis by Defendant Miller during the latter's time as Commander of Guantanamo.

13   92.   On December 2, 2002, Defendant Rumsfeld authorized aggressive

14   interrogation techniques.  On that date, Defendant Rumsfeld signed a

15   memorandum approving numerous illegal interrogation methods, including putting

16   detainees in "stress positions" for up to four hours; forcing detainees to strip naked,

17   intimidating detainees with dogs, interrogating them for 20 hours at a time, forcing

18   them to wear hoods, shaving their heads and beards, keeping them in total

19   darkness and silence, and using what was euphemistically called "mild, non-

20   injurious physical contact" techniques.  Defendant Rumsfeld and all Defendants

21   knew or should have known that these techniques were unlawful, and in

22   contravention of the Geneva Conventions and customary international law.  Upon

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 42 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    information and belief, they also knew or should have known that they were not

2    authorized to use them against those who were innocent and/or for whom there

3    was not a sufficient basis to hold in custody.

4    93.  Defendant Miller unified the command over military intelligence units and

5    military police units, and had them work together to weaken detainees for

6    interrogation.  After the approval of the harsh interrogation techniques in the

7    December 2, 2002, memorandum by Defendant Rumsfeld, Defendant Miller

8    implemented the techniques, which were designed to 'soften up' detainees.  These

9    included sleep deprivation, extended isolation, forcing detainees to stand or crouch

10   in 'stress positions,' stripping detainees and exposure to extremes of heat and cold.

11   Plaintiff suffered from these techniques.  Defendant Miller and the other defendants

12   knew or should have known that such techniques were in contravention of the

13   Geneva Conventions, and international law and thus not legal, and that he was not

14   authorized use them against innocent civilians.

15   94.  On January 15, 2003, Secretary Rumsfeld rescinded permission for the more

16   controversial techniques, although upon information and belief, under Defendant

17   Miller's command at Guantánamo, these techniques continued to be used.  The

18   defendants responsible for Guantanamo Bay and Bagram, upon information and

19   belief, continued to use some of the techniques.  They were not authorized to do so

20   by the United States, nor by international law.

21   95.  On March 21, 2003, Defendant Hill again sent a memorandum to Defendant

22   Myers regarding the interrogation techniques that had been temporarily rescinded

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   by Defendant Rumsfeld in January of that year. Defendant Hill's March 21, 2003

2   memo stated that both he and Defendant Miller felt that approval of *all* of the

3   previously authorized techniques (all of which had been previously placed in

4   categories - Categories I, II and III – depending on their level of severity) was

5   "essential." Defendant Hill stated that "both Geoff Miller and I believe that we need

6   as many appropriate tools as possible" and called Category II and the one

7   previously authorized Category III technique "critical to maximizing our ability to

8   accomplish the mission, now and in the future."  The "critical" techniques referred to

9   by Defendant Hill included stress positions, deprivation of light and auditory stimuli,

10  removal of clothing, use of detainee phobias such as dogs, and the one Category III

11  technique the Secretary had authorized, which included grabbing, poking, and light

12  pushing.  In a prior communication, Defendant Hill had been made aware that those

13  in Category III were likely not lawful and could expose interrogators to possible

14  federal prosecution.

15  96.  On April 16, 2003, Defendant Rumsfeld issued the "Memorandum for the

16  Commander, US Southern Command: Counter-Resistance Techniques in the War

17  on Terrorism," which contains 24 interrogation techniques, with the proviso that

18  "use of these techniques is limited to interrogations of unlawful combatants held at

19  Guantanamo Bay, Cuba."  These techniques, however, were inconsistent with the

20  United States' obligations under international law.  He and the other defendants

21  knew or should have known such were illegal, and also that they were not

22  authorized to use them on innocent civilians.  In addition, they were not authorized

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   to use them against those who had not been properly determined to be unlawful

2   combatants.

3   97.   Defendant Miller supported and approved these techniques and oversaw their

4   implementation at a time when Plaintiff was detained at Guantanamo, even though

5   he knew they were illegal under international law.

6   98.   Serious mistreatment of detainees was a constant, unrelenting theme under

7   Defendant Miller's command.  In July 2003, Defendant Miller sought approval for an

8   interrogation plan that included previously banned interrogation techniques.

9   Moreover, upon information and belief, others held continued to suffer "fear up

10  harsh" techniques such as threats against themselves and threats against their

11  families, even though, information and belief, these techniques had been ordered

12  not to be used.

13  99.   Plaintiff was subjected to many of these techniques that were illegal under the

14  Geneva Conventions and customary international law.

15  100. On October 10, 2003, the ICRC conducted more than 500 interviews at

16  Guantanamo before meeting with Defendant Miller and his top aides.  The ICRC

17  voiced its concerns over the treatment of detainees, particularly with regard to the

18  lack of a legal system for the detainees, the continued use of steel cages, the

19  "excessive use of isolation" and the lack of repatriation for the detainees.

20  Defendant Miller objected to the conclusions and told the ICRC that interrogation

21  techniques were none of their concern.

22  101. Defendant Hood, commander of the Joint Task Force-Guantanamo, had

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   knowledge of abuse amounting to torture but failed to address it while in a position

2   to do so.  In confidential reports to Defendant Hood and other government officials

3   in July 2004, the ICRC charged that the military was intentionally using

4   psychological and physical coercion "tantamount to torture" on prisoners at

5   Guantanamo.  Defendant Hood conceded the futility of indefinite and arbitrary

6   detention of detainees at Guantanamo.  More than two years after the first

7   prisoners were brought to Guantanamo, Defendant Hood acknowledged that

8   "[t]here are significant numbers of men here, who once their cases are heard will

9   probably be given over to their government or released."  However, Plaintiff

10  remained in detention without charge.

11  102. On July 29, 2004, Defendant England, then Secretary of the Navy and the

12  Designated Civilian Official of detainees, signed a memorandum implementing the

13  CSRT procedures used at Guantanamo.  By Defendant England's own admission,

14  the CSRT procedures were not designed as legal proceedings.  The procedures

15  implemented ensured that panels would "rubber-stamp decisions already made

16  rather than applying independent judgment as to whether those decisions were

17  correct," according to a written statement of Lt. Col. Stephen Abrahams, who

18  served on a CSRT panel in the Office for the Administrative Review of the

19  Detention of Enemy Combatants, presented to the House Armed Services

20  Committee, July 26, 2007.  The implementation of the CSRT procedures deprived

21  Plaintiff of due process and condemned him to prolonged arbitrary detention.

22  103. In his role as director of OARDEC, Defendant England appointed Defendant

SECOND AMENDED COMPLAINT
2:10-cv-00591
PAGE 46 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   McGarrah the "convening authority" to review all CSRT decisions, including that

2   Plaintiff be designated an "enemy combatant" and that the case be considered final

3   in a determination signed October 27, 2004.  In that capacity Defendant McGarrah

4   presided over the system that deprived Plaintiff of due process, condemned Plaintiff

5   to prolonged arbitrary detention, and exposed him to continued abusive treatment.

6   104. As Joint Detention Operation Group ("JDOG") Commander at Guantanamo

7   with the responsibility for guarding the detainees and providing security, Defendant

8   Bumgarner played an integral role in implementing torture from April 2005 until

9   March 2006.  With his attitude toward detainees being that "we can't trust them any

10  farther than we can throw them[,]" Defendant Bumgarner attempted to justify the

11  mistreatment of detainees at Guantanamo by demonizing them through various

12  public statements, including "they hate us" and "they will cut your throat in a

13  heartbeat."

14  105. Defendant Bumgarner demonstrated that he was unwilling and/or unable to

15  bring the detention facility into compliance with the universal standards of humane

16  treatment mandated by the Geneva Conventions of 1949.  Defendant Bumgarner

17  tolerated and failed to exercise adequate command responsibility over the

18  treatment of detainees by his officers.

19  106. While responsible for guarding and securing detainees, Defendant Bumgarner

20  was aware, or should have been aware, that torture and cruel, inhuman, or

21  degrading treatment of detainees at Guantanamo was occurring.  Defendant

22  Bumgarner ignored the manifest illegality of the treatment he authorized,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   implemented, and/or otherwise condoned during his tenure.  Plaintiff suffered

2   serious mistreatment and abuse under the tenure of Defendant Bumgarner.

3   107. Defendant Cannon, as commander of the Joint Detention Operation Group

4   failed to exercise sufficient command responsibility in response to incidents of

5   detainee abuse committed at Guantanamo.  Defendant Cannon failed to take action

6   to investigate or punish his subordinates for abuses committed against Plaintiff.

7   108.   Defendant McNeill, in his role, was, upon information and belief, aware of

8   abuses taking place in Bagram.  In fact, an April 2003 memorandum to General

9   Pace noted that Defendant McNeill had specifically endorsed aggressive

10  interrogation techniques that would be illegal under international law. Moreover,

11  upon information and belief, he had been questioned by media about such abuses

12  taking place there.  Moreover, he did not give sufficient guidance to his

13  subordinates regarding which interrogation measures were appropriate and which

14  were not.  At most, he condoned the abuses taking place there; at the very least, he

15  failed to end them.

16  109.   Defendant Gates, during the time he was Secretary of Defense, oversaw the

17  detention of detainees, their treatment, and their interrogation.  He affirmatively

18  continued the policies regarding prolonged arbitrary detention of detainees,

19  including Plaintiff, even though he knew, upon information and belief, that there

20  were innocent men being held at Guantanamo Bay, such as Plaintiff.  Upon

21  information and belief, he also knew there were significant due process problems in

22  the way the CSRT were operating, but even with this knowledge, he continued

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    policies to unlawfully detain men at Guantanamo Bay.

2    110.  Defendant Gates specifically knew of Plaintiff's complaints and allegations

3    regarding being held unlawfully, because Plaintiff had pending habeas claims

4    against several defendants, which later included Defendant Gates, in federal court

5    in the District of Columbia.  (Defendant Gates was substituted as a Defendant as

6    soon as he became Secretary of Defense in December 2006 (see Fed.R.Civ.Pr.

7    25(d)), which was also reflected in the caption in subsequent pleadings.)  In fact, as

8    part of their summary judgment motion in September 2006, Plaintiff's habeas

9    counsel submitted a substantial amount of evidence to the court that they had

10   uncovered over the summer which established his innocence and that he was not

11   and never had been a member or supporter of Al Qaeda or the Taliban or

12   associated forces engaged in hostilities against the United States or its allies. This

13   information was part of the court record when Defendant Gates was substituted as

14   a defendant in 2006.

15   111.  In February 2007, Defendant Gates appointed Susan J. Crawford as

16   convening authority of the Guantanamo Military Commissions.  When she came in

17   as Convening Authority, she publicly stated that "the prosecution was unprepared"

18   to bring cases to trial and that the implementation of such commissions was flawed.

19   Upon information and belief, she reported this to Defendant Gates, putting him on

20   notice of the flawed systems at Guantanamo Bay.  Yet, Defendant Gates continued

21   policies to unlawfully detain men held at Guantanamo Bay, including Plaintiff.

22   112. In June 2007, 141 members of Congress sent a letter to then President Bush,

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 49 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  which was copied to Secretary Gates, wherein they indicated that innocent men

2  were being unlawfully held at Guantanamo Bay and that indefinitely holding men at

3  Guantanamo Bay without charging them with a crime was a violation of our

4  country's commitment to the rule of law.  They also indicated that they thought it

5  was critical to restore habeas rights to these men, indicating they believed these

6  men had the constitutional right to be free from indefinite detention at the hands of

7  American officials.

8  On October 10, 2007, Morris D. Davis, the Chief Prosecutor for the Office of Military

9  Commissions at Guantanamo Bay, Cuba, resigned in protest, concluding that full

10  and fair trials were not possible, and that the system at Guantanamo Bay had

11  become deeply politicized.  Based on the foregoing, it is reasonable to conclude

12  that Defendant Gates knew of these problems and concerns throughout the time he

13  served as Secretary of Defense.

14  **Habeas Petition**

15  113. Mr. Hamad submitted a handwritten petition for a writ of habeas corpus which

16  was officially filed on May 19, 2005.  Counsel was finally appointed on October 14,

17  2005, and an amended petition for the writ of habeas corpus was filed by his

18  habeas counsel on December 12, 2005.  The habeas process was delayed on

19  numerous occasions due to the acts of the government.

20  114. As a consequence of this and Mr. Hamad's eventual transfer to the Sudan, no

21  court opinion on the merits of Hamad's habeas petition was ever issued.  Mr.

22  Hamad's case was consolidated with other former prisoners who asked for the right

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1 to proceed once released or transferred based on the existence of collateral

2 consequences.  The consolidated case was dismissed on April 1, 2010 by a federal

3 district judge in the District of Columbia.

## V. INJURIES

5 115. Because of the wrongful acts of Defendants, as set forth above and herein, Mr.

6 Hamad was caused the following injuries, among others:

7       a.  Ongoing physical injuries;

8       b.  Ongoing emotional and psychological injuries;

9       c.  Loss of earnings and earning capacity;

10       d.  Loss of interfamilial relations;

11       e.  Loss of reputation; and

12       f.   Medical expenses, past and future.

## VI. CLAIMS FOR RELIEF

14 116. Plaintiff's causes of action arise under and violate domestic and international

15 law, agreements, declarations, conventions, resolutions and treaties, including the

16 following:

17       a.  Customary international law and treaties of the United States;

18       b.  Statutes and common law of the United States;

19       c.  Common law of numerous states, including Washington;

20       d.  Other applicable laws, domestic, foreign, or international.

## VII.    FIRST CLAIM FOR RELIEF

22 **Prolonged Arbitrary Detention as a Violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against All Defendants in Their Individual**

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

**Capacities**

117. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

118. The acts described herein constitute prolonged arbitrary detention of Mr. Hamad in violation of customary international law and the Geneva Conventions, Common Article III, and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated both customary international law and Common Article III prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

119. All Defendants are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about the prolonged arbitrary detention of Mr. Hamad.  Defendants intended and/or knew or should have known, that prolonged arbitrary detention was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

120. All Defendants practiced, encouraged, and/or condoned prolonged arbitrary detention of Mr. Hamad for over five years until he was released.

121. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

## VIII.   SECOND CLAIM FOR RELIEF

**Cruel, Inhuman, or Degrading Treatment as a Violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against Certain Defendants in Their Individual Capacities**

122. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

123. The acts described herein constitute cruel, inhuman, or degrading treatment of Mr. Hamad in violation of customary international law and Common Article III of the Geneva Conventions and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated both customary international law and Article III prohibiting cruel, inhuman, or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

124. Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller, Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez, McNeill, Ihde, and Does 3-100 are liable for said conduct in that they, under color of law, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about the cruel, inhuman, or degrading treatment of Mr. Hamad.  Defendants intended and/or knew or should have known, that cruel, inhuman, or degrading treatment was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   125. Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller,

2   Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez,

3   McNeill, Ihde, and Does 3-100 practiced, encouraged, and/or condoned cruel,

4   inhuman, or degrading treatment of Mr. Hamad for over five years until he was

5   released.

6   126. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered

7   physical harm, emotional harm, and financial loss.

8   ### IX. <u>THIRD CLAIM FOR RELIEF</u>

9
10   **Torture as a violation of Customary International Law and the Geneva Conventions under the ATS and State Common Law, Brought Against Certain Defendants in Their Individual Capacities**

11
12   127. Plaintiff repeats and re-alleges the allegations contained in the preceding

     paragraphs of this Complaint as if fully set forth herein.
13
14   128. The acts described herein constitute torture of Mr. Hamad in violation of

15   customary international law and Common Article III of the Geneva Conventions and

16   are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts

     violated both customary international law and Common Article III prohibition against
17
18   torture as reflected, expressed, and defined in multilateral treaties and other

19   international treaties, domestic and international judicial decisions, and other

20   authorities.

21   129. Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller,

     Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez,
22
     McNeill, Ihde, and Does 3-100 are liable for said conduct in that they, under color of

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1  law, committed, directed, ordered, confirmed, ratified, had command responsibility

2  for, aided and abetted, conspired to, and/or directly or indirectly participated in

3  bringing about the torture of Mr. Hamad.  Defendants intended and/or knew or

4  should have known, that torture was being enforced by their subordinates and failed

5  to prevent those abuses or punish those responsible.

6  130. Defendants Gates, Rumsfeld, Myers, Pace, Mullen, Hill, Craddock, Miller,

7  Hood, Harris, Buzby, McQueen, Cannon, Bumgarner, Dennis, Vargo, Rodriguez,

8  McNeill and Ihde, Does 3-100 practiced, encouraged, and/or condoned torture of

9  Mr. Hamad.

10  131. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered

11  physical harm, emotional harm, and financial loss.

12  ## X. FOURTH CLAIM FOR RELIEF

13  **Targeting of a Civilian as a Violation of Customary International Law and the
Geneva Conventions under the ATS and State Common Law, Brought Against
14  All Defendants in Their Individual Capacities**

15  132. Plaintiff repeats and re-alleges the allegations contained in the preceding

16  paragraphs of this Complaint as if fully set forth herein.

17  133. The acts described herein constitute war crimes as acts against a private

18  civilian, in violation of the Fourth Geneva Convention and Customary International

19  Law, which strictly prohibit intentional acts upon a civilian.

20  134. All Defendants are liable for said conduct in that they, acting under color of law,

21  committed, directed, ordered, confirmed, ratified, had command responsibility for,

22  aided and abetted, conspired to, and/or directly or indirectly participated in the

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    bringing about the war crimes as acts against Mr. Hamad, a private civilian.

2    135.  All Defendants intended and/or knew or should have known, that war crimes

3    were being committed and enforced by their subordinates and failed to prevent

4    those abuses or punish those responsible.  In accordance with the Army Field

5    Manual, military commanders may be responsible for war crimes committed by

6    subordinate members of the armed forces, as in the instant case.

7    136. All Defendants practiced, encouraged, and/or condoned war crimes against

8    Mr. Hamad for over five years until he was finally released, by targeting him as a

9    civilian who was never actively engaged in combat or directly supported hostilities.

10   137. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered

11   physical harm, emotional harm, and financial loss.

12                          **XI. FIFTH CLAIM FOR RELIEF**

13   **Violation of Due Process as a Violation of Customary International Law under the
     ATS and State Common Law, Brought Against all Defendants in Their Individual
14                              Capacities**

15
16   138. Plaintiff repeats and re-alleges the allegations contained in the preceding

     paragraphs of this Complaint as if fully set forth herein.
17
18   139. The acts described herein constitute violations of the life and liberty interests of

     Mr. Hamad in violation of the laws of nations and are actionable under the Alien
19
20   Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law

21   requiring due process as reflected, expressed, and defined in multilateral treaties

22   and other international treaties, domestic and international judicial decisions, and

     other authorities.

**SECOND AMENDED COMPLAINT
2:10-cv-00591**
PAGE 56 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

140. All Defendants are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about violations of due process of Mr. Hamad.  Defendants intended and/or knew or should have known, that due process violations were being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

141. All Defendants practiced, encouraged, and/or condoned due process violations of Mr. Hamad for over five years until he was released.  Mr. Hamad was detained for more than two years before his status was reviewed by a flawed CSRT.

142. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss.

## XII. SIXTH CLAIM FOR RELIEF

**Forced Disappearance, as a Violation of Customary International Law under the ATS and State Common Law, Brought Against Certain Defendants in Their Individual Capacities**

143. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

144. The acts described herein constitute the forced disappearance of Mr. Hamad in violation of the law of nations and are actionable under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting forced disappearance as reflected, expressed, and defined in multilateral treaties and other international treaties, domestic and international judicial decisions, and other authorities.

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

145. Defendants Rumsfeld, Myers, McNeill, Ihde, and Does 3-100 are liable for said conduct in that they, acting under color of law, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in the forced disappearance of Mr. Hamad.

146. Defendants Rumsfeld, Myers, McNeill, Ihde, and Does 3-100 intended and/or knew or should have known, that Mr. Hamad's disappearance was forced by their subordinates and failed to prevent those abuses or punish those responsible.

147. Defendants Rumsfeld, Myers, McNeill, Ihde, and Does 3-100 practiced, encouraged, and/or condoned the forced disappearance of Mr. Hamad for eight months until he was finally allowed to write a  letter to his wife in March of 2003.

148. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional harm, and financial loss.

## XIII. SEVENTH CLAIM FOR RELIEF

### United States Constitution, Fifth Amendment: Violation of Due Process, against Certain Defendants in Their Individual Capacities

149. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

150. The acts described herein constitute violations of the life and liberty interests of Mr. Hamad in violation of the Fifth Amendment of the United States Constitution, which prohibits cruel and inhumane treatment constituting punishment.

151. Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace,

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon,

2   Bumgarner, Dennis, Vargo, Rodriguez, and Does 1 and 2 are liable for said conduct

3   in that they, acting under color of law, committed, directed, ordered, confirmed,

4   ratified, had command responsibility for, aided and abetted, conspired to, and/or

5   directly or indirectly participated in the bringing about of due process violations of

6   Mr. Hamad.

7   152. Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace,

8   Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon,

9   Bumgarner, Dennis, Vargo, Rodriguez, and Does 1 and 2 intended and/or knew or

10   should have known, that due process violations were being enforced by their

11   subordinates and failed to prevent those abuses or punish those responsible.

12   153. Defendants Gates, Rumsfeld, Wolfowitz, England, McGarrah, Myers, Pace,

13   Mullen, Hill, Craddock, Miller, McNeill, Hood, Harris, Buzby, McQueen, Cannon,

14   Bumgarner, Dennis, Vargo, Rodriguez, and Does 1, 2, and 3-100 practiced,

15   encouraged, and/or condoned due process violations of Mr. Hamad for over five

16   years until he was finally released.

17   154. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered

18   physical harm, emotional harm, and financial loss.

19   ## XIV.  PRAYER FOR RELIEF

20   WHEREFORE Plaintiff respectfully requests the Court enter a judgment against

21   Defendants:

22   155. Awarding compensatory damages in an amount that is fair, just, and

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 59 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    reasonable in an amount to be proven at trial;

2    156. Awarding exemplary and punitive damages;

3    157. Awarding reasonable attorneys' fees and costs of suit;

4    158. Ordering such further relief as the Court may deem just and proper.

5
     DATED this  6th day of January, 2012

6                                      WILLAMETTE UNIVERSITY SCHOOL OF LAW
                                       INTERNATIONAL HUMAN RIGHTS CLINIC
7

8                                           /s/ GWYNNE L. SKINNER
                                       Gwynne L. Skinner, OSB No. 022235
9                                      Attorney for Plaintiff

10

11                                     PUBLIC INTEREST LAW GROUP, PLLC
                                       705 Second Avenue, Suite 1000
                                       Seattle, WA  98104
12                                     (206) 838-1800

13                                          /s/  Nancy S. Chupp
                                       Hank Balson, WSBA No. 29250
14                                     Nancy S. Chupp, WSBA No. 33740
                                       Attorneys for Plaintiff

15

16

17

18

19

20

21

22

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1

2                             CERTIFICATE OF SERVICE

3          I hereby certify that on January 6, 2012, I electronically filed the foregoing with the

4    Clerk of Court using the CM/ECF system, which will send notification of this filing, and a copy

5    of the Second Amended Complaint, to:

6
     Paul E. Werner
7    Trial Attorney
     United States Department of Justice
8    Torts Branch, Civil Division
     P.O  Box 7146
     Ben Franklin Station
9    Washington, D.C. 20044

10
     WILLAMETTE UNIVERSITY SCHOOL OF LAW
11   INTERNATIONAL HUMAN RIGHTS CLINIC

12          /S/ GWYNNE L. SKINNER                                    

13   Gwynne L. Skinner, OSB No. 022235
     Attorney for Plaintiff

14

15

16

17

18

19

20

21

22

**SECOND AMENDED COMPLAINT**
**2:10-cv-00591**
PAGE 61 OF 61

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433