THE HONORABLE MARSHA J. PECHMAN

1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF WASHINGTON**
7                           **AT SEATTLE**

8

ADEL HASSAN HAMAD                         )
9                            Plaintiff,   )
                                          )  Civil Action No.  **2:10-cv-00591 MJP**
10      v.                                )
                                          )
11  ROBERT M. GATES,                      )  **PLAINTIFF'S BRIEF IN OPPOSITION**
                             Defendant.   )  **TO DEFENDANT ROBERT GATES'**
                                          )  **MOTION TO DISMISS PLAINTIFF'S**
12                                        )  **FIFTH AMENDMENT CLAIM IN HIS**
                                          )  **SECOND AMENDED COMPLAINT**
13                                        )
                                          )  **Noted for February 17, 2012**
14

15             **I.  INTRODUCTION AND RELEVANT FACTS**

16         Adel Hamad, a fifty-three year old husband and father, was an innocent humanitarian aid

17  worker when he was unlawfully seized from his apartment in Pakistan in July of 2002.  Sec. Am.

18  Compl. ("SAC") (Dkt. 122) ¶ 4.  After being held at a Pakistani prison, Mr. Hamad was

19  transferred to Bagram Air Base and then, ultimately, to the U.S. Guantánamo Bay Naval Base in

20  March of 2003.  *Id.*  However, no process was in place to properly determine whether there were

21  any grounds – let alone any reasonable grounds – for taking Mr. Hamad from his apartment, for

22  transferring him and holding him at Bagram Air Base, or transferring and holding him at

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 1 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    Guantánamo Bay.  *Id.* at ¶¶ 8, 72, 84.  Defendant Gates knew this.  *Id.* at ¶¶ 8, 82, 83, 109.

2          Mr. Hamad was never properly charged nor tried for any criminal act.  *Id*. at ¶ 10.  In

3    addition, his Combatant Status Review Tribunal (CSRT) determination contained a rare dissent

4    that acknowledged that his enemy combatant status determination was unwarranted and would

5    have "unconscionable results."  *Id.* at ¶ 12.  The Administrative Review Board cleared Mr.

6    Hamad for return home on November 15, 2005.  *Id.* at ¶ 15.  (Mr. Hamad's habeas counsel was

7    not notified of this until March, 2007.)  *Id*. at ¶ 15.  Despite this, Mr. Hamad continued to be held

8    and subjected to cruel, inhuman, and degrading treatment for another two years.  *Id.* at ¶ 16.

9    This included being held for a year under Defendant Gates' tenure as Secretary of Defense.  *Id.* ¶

10   24.

11         Only five to seven percent of the men held at Guantánamo Bay were apprehended during

12   actual military engagement or "on the battlefield"; many were taken by Pakistanis and Afghans

13   who received a bounty, or acted for reasons of revenge or retribution.  *Id.* ¶ 82.  Yet, there was no

14   credible effort to determine whether there was any suspicion or belief – let alone reasonable

15   suspicion or belief – that the apprehended men had actually engaged in or supported hostilities

16   toward or against the United States.  *Id.* ¶ 82.  Many U.S. officials, including Defendant Gates,

17   knew this.  *Id.* ¶¶ 80-81.  One reason Defendant Gates and others refused to acknowledge these

18   things publicly and hold adequate hearings and release the men was out of fear of political

19   repercussions.  *Id.* ¶¶ 7, 8, 81.

20         Defendant Gates became Secretary of Defense on December 18, 2006.  *Id*. at ¶ 24.

21   Defendant Gates knew or should have known that many of the men seized and held at

22   Guantánamo Bay were innocent.  *Id.* at ¶¶ 7, 83.  This is because he knew or should have known

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 2 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    that there was no adequate process in place to determine who should have been seized in the first

2    place (especially individuals who were not seized from the battlefield) or held.  *Id.* at ¶¶ 8, 72,

3    83, 84.

4          From December 2006 until after Plaintiff was finally released, Defendant Gates held the

5    highest position in the Department of Defense, and in this capacity possessed and exercised

6    command and control over the United States military and the United States detention facility at

7    Guantánamo.  *Id.* at ¶ 25.  As the Secretary of Defense, Defendant Gates held the highest rank in

8    the military command structure, other than the President of the United States.  *Id.*  Pursuant to 10

9    U.S.C. § 113, the Secretary of Defense has authority, direction and control over the Department

10   of Defense, including its field activities.  *Id.*  The Secretary is also authorized to act as convening

11   authority in the military justice system.  *Id.*  In addition, the Detainee Treatment Act, §

12   1005(e)(2)(C) (119 Stat. 2742) provides that the Secretary of Defense is responsible for the

13   standards and procedures of the CRSTs.   In that capacity, Defendant Gates was responsible for

14   overseeing detainee detention, treatment, and interrogation.  *Id.* at 24.   Defendant Gates had a

15   duty to implement the policies regarding the CSRTs, approve authority to transfer, and control

16   homeland security.  *Id.*  ¶¶ 24-25, 57-59, 109.[1]

17         Once he became Secretary of Defense, Defendant Gates affirmatively continued the

18   practice of prolonged arbitrary detention of detainees, including Plaintiff, even though he knew,

19

20   ─────────────────────
     [1] See attached, Exhibit A, Department of Defense Administrative Review Board procedures.  Incorporation by
21   reference doctrine permitted for 12(b)(6) Motion to Dismiss. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d
     977, 980 (9th Cir. 2002).  Plaintiff references the Administrative Review Board procedures within the Complaint,
     which were established and revised through the attached memorandum.  The Secretary of Defense could have
22   suspended or amended procedures at his complete discretion.  Exhibit A, pg. 2.  Moreover, notification of ARB
     recommendations was required to be forwarded to Department of Defense ("DoD").  Exhibit A, pg. 3.  The
     Designated Civilian Official notified the Secretary of Defense if the decision was to transfer a detainee and
     coordinate with DoD to implement transfer.  Exhibit A, p. 5, p. 15.

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim
2:10-cv-00591**          PAGE 3 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   upon information and belief, that there were innocent men, such as Plaintiff, being held at

2   Guantánamo Bay.  *Id.* at 109.  Upon information and belief, he also knew that there were

3   significant due process problems with the operation of CRSTs, yet even with this knowledge, he

4   did not end but continued policies to unlawfully detain men at Guantánamo Bay.  *Id.* at 109.

5           In June 2007, 141 members of Congress sent a letter to then-President Bush, which was

6   copied to Secretary Gates, wherein they indicated that innocent men were being unlawfully held

7   at Guantánamo Bay and that indefinitely detaining them without charging them with a crime was

8   a violation of the United States' commitment to the rule of law.  *Id.* at ¶ 112. They also stated

9   that these men had the constitutional right to be free from indefinite detention at the hands of

10  American officials.  *Id.*

11          On October 10, 2007, Morris D. Davis, the Chief Prosecutor for the Office of Military

12  Commissions at Guantánamo Bay, Cuba, resigned in protest, concluding that full and fair trials

13  were not possible, and that the system at Guantánamo Bay had become deeply politicized.  *Id.*

14  Based on the foregoing, it is reasonable to conclude that Defendant Gates knew of these

15  problems and concerns throughout the time he served as Secretary of Defense. *Id.*

16          In addition, Defendant Gates knew or should have known of Plaintiff's specific

17  complaints and allegations of unlawful detention because Plaintiff had pending habeas claims

18  against several defendants, which included Defendant Gates beginning in December 2006, in

19  federal court in the District of Columbia.  *Id.* at ¶ 110.  In fact, as part of his summary judgment

20  motion in September 2006, Plaintiff's habeas counsel submitted a substantial amount of evidence

21  to the court which established his innocence and that he was not and never had been a member or

22  supporter of Al Qaeda or the Taliban or associated forces engaged in hostilities against the

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**       PAGE 4 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   United States or its allies.  *Id.*  This information was part of the court record when Defendant

2   Gates was substituted as a defendant in 2006. *Id.*

3   ## II. <u>ARGUMENT AND AUTHORITY</u>

4        Defendant Gates is not entitled to qualified immunity.  First, Plaintiff has adequately pled

5   Defendant Gates' personal participation and supervisor liability for the constitutional deprivation

6   that Plaintiff suffered.  He was aware that individuals, including Plaintiff, were being held

7   without a reasonable basis and in violation of due process, and yet he affirmatively continued the

8   policies of unlawful detention.  Moreover, he was or should have been aware of the facts in

9   Plaintiff's case that established his innocence, given he was a defendant in Plaintiff's habeas

10  case.  As Secretary of Defense, he could have ordered Mr. Hamad's immediate release, but he

11  did not do so.

12       Second, Plaintiff has alleged the violation of a clearly established right for those detained

13  in an area effectively under indefinite U.S. jurisdiction and control, to be free from prolonged

14  arbitrary detention, as well as cruel, inhuman, and degrading treatment ("CIDT") under the Fifth

15  Amendment to the United States Constitution. By the time Defendant Gates took office, the

16  Supreme Court had already recognized in *Rasul v. Bush*, 542 U.S. 466 (2004), that Guantánamo

17  Bay was within the "territorial jurisdiction" of the United States for purposes, at a minimum, of

18  the right to not be arbitrarily detained for a prolonged length of time or subjected to CIDT.

19  Moreover, there existed numerous other cases that established the contours of the rights that

20  individuals, taken by U.S. officials, had in areas where the United States had territorial

21  jurisdiction.

22

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**   PAGE 5 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1

2      A. **PLAINTIFF SUFFICIENTLY ALLEGES PERSONAL PARTICIPATION OF DEFENDANT GATES THROUGH SUPERVISORY LIABILITY.**

3

4      Plaintiff sufficiently alleges personal participation by Defendant Gates through

5 supervisory liability to meet the requirements of both *Bell Atl. Corp. v. Twombly,* 550 U.S. 544,

6 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). In

7 ruling on this issue, it is important to be mindful of the fact that the requirements for supervisory

8 liability differ from the more common personal participation requirements of liability, and the

9 fact that Plaintiff has not had the occasion for discovery in this case. Moreover, although

10 Plaintiff acknowledges that his complaint does not have the same extensive factual detail

11 regarding Defendant Gates as did the complaint in *Vance v. Rumsfeld*, 694 F.Supp.2d 957

12 (N.D.Ill. 2010), neither was that case analyzed under the same supervisory liability test available

13 in this circuit. *Id.* at 962-63 (the court considered only whether Rumsfeld had issued an order to

14 engage in unlawful conduct). Similarly, in *Padilla v. Yoo*, 633 F. Supp.2d 1005, 1032-1033

15 (N.D. Cal. 2009), the plaintiff does not rely on supervisory liability as a theory.

16      A complaint must contain a "short and plain statement of the claim showing that the

17 pleader is entitled to relief" to survive a motion to dismiss. Fed. R. Civ. P. 8(a)(2). A complaint

18 must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a

19 cause of action," but it need not provide "detailed factual allegations." *Twombly*, 550 U.S. at

20 555. A complaint must proffer "enough facts to state a claim for relief that is plausible on its

21 face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads

22 factual content that allows the court to draw the reasonable inference that the defendant is liable

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim
2:10-cv-00591**      PAGE 6 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949, citing *Twombly*, 550 U.S. at

2    556.  Although the plausibility standard asks for more than a sheer possibility that a defendant

3    has acted unlawfully, it is not akin to a "probability requirement."  *Id.*

4          Of course, *Bivens* liability may not be imposed on the basis of *respondeat superior*

5    liability, where a person is liable for a subordinate's acts over which they had no knowledge or

6    control.  *See e.g., Iqbal*, 129 S.Ct. at 1949.  However, when a defendant has authorized facially

7    unconstitutional action, he does not avoid responsibility for the foreseeable consequences of his

8    conduct.  *Doe v. Rumsfeld*, 800 F.Supp.2d 94 at 113, *citing Barham v. Ramsey,* 434 F.3d 565,

9    578 (D.C.Cir.2006) (supervisor can be liable for subordinate's misconduct if he knows of,

10   facilitates, approves, or willingly turns a blind eye to the conduct).

11                    **SUPERVISORY LIABILITY**

12         Supervisor liability is proven when the supervisor "was personally involved in the

13   constitutional deprivation or a sufficient causal connection exists between the supervisor's

14   unlawful conduct and the constitutional violation."  *Edgerly v. City & County of San Francisco*,

15   599 F.3d 946, 961 (9th Cir. 2010) (internal citations omitted).  Taking the facts in the light most

16   favorable to the Plaintiff, supervisor liability can be demonstrated through: 1) a supervisor's own

17   culpable action *or inaction* in the training, *supervision, or control* of subordinates; 2) his

18   *acquiescence* in the constitutional deprivation of which a complaint is made; or 3) for conduct

19   that showed a *reckless or callous indifference* to the rights of others.  *Edgerly*, 599 F.3d at 961,

20   *citing Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir.2000) (emphasis added).  *See also*

21   *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir.1987) (analyzing supervisory liability for culpable

22   inaction or action in the training, supervision, or control of subordinates); *Larez v. City of Los*

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**       PAGE 7 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   *Angeles*, 946 F.2d 630, 646 (9th Cir.1991) (supervisory liability is imposed against a supervisory

2   official in his individual capacity for 1) his "own culpable action or inaction in the training,

3   supervision, or control of his subordinates," *citing Clay v. Conlee*, 815 F.2d 1164, 1170 (8th

4   Cir.1987); 2) for his "acquiesce [nce] in the constitutional deprivations of which [the] complaint

5   is made," *citing Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir.1988) (internal citation

6   omitted); or 3) for conduct that showed a "'reckless or callous indifference to the rights of

7   others,'" *citing Bordanaro v. McLeod*, 871 F.2d 1151, 1163 (1st Cir. 1989)).

8       Plaintiff's complaint alleges facts, that taken in the light most favorable to Plaintiff,

9   sufficiently and plausibly demonstrate Defendant Gates' liability through supervisory liability.

10   The complaint alleges that Defendant Gates' responsibilities included implementing the policies

11   regarding detention, the CSRTs, and approving authority to transfer to, as well as the treatment

12   and interrogation of detainees, at Guantánamo Bay.  SAC (Dkt. 122), at ¶¶ 24-25, 57-59, 109.

13   The complaint also outlines concerns raised by others about unlawful detention, inadequate due

14   process, and treatment of detainees at Guantánamo Bay.  *Id.* at ¶¶ 111, 112.

15       The complaint further alleges that once he became Secretary of Defense, Defendant Gates

16   affirmatively continued the policies regarding prolonged arbitrary detention of detainees,

17   including Plaintiff, even though he knew that there were innocent men being held at Guantánamo

18   Bay.  *Id.* at ¶ 109.  The complaint also alleges that Defendant Gates knew, or should have

19   known, that there was no adequate process in place to determine who should have been taken

20   into custody by U.S. officials in the first place.  *Id.* at ¶¶ 8, 82, 83. The complaint alleges that

21   Defendant Gates knew that there were significant due process problems with CRSTs' operations,

22   but even with this knowledge, he continued policies to unlawfully detain men at Guantánamo

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**       PAGE 8 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   Bay.  *Id.* at ¶ 109.  He did not end the practice of unlawfully detaining men, including Plaintiff,

2   for whom he knew there had not been adequate due process in place.  In addition, it is plausible

3   Defendant Gates knew that Plaintiff specifically had been determined by the ARB to be released,

4   given his role as Secretary of Defense and the fact that ARB determinations were sent to him.

5   *See* Exhibit A.  Additionally, Defendant Gates was aware of Plaintiff's unlawful detention at

6   Guantánamo Bay and the ARB determination through Plaintiff's habeas corpus case, in which

7   Defendant Gates became a defendant in December 2006, a year before Plaintiff was released.  *Id.*

8   at ¶ 110.  Plaintiff's habeas case included a substantial amount of evidence Plaintiff's habeas

9   counsel had uncovered over the summer of 2006 which established his innocence and that he

10  was not and never had been a member or supporter of Al Qaeda or the Taliban or associated

11  forces engaged in hostilities against the United State or its allies.  *Id.* This information was part

12  of the record when Defendant Gates became a defendant in the habeas case in 2006.  *Id.*

13      Although Defendant Gates asserts that the habeas cases do not demonstrate his personal

14  involvement, this argument is not persuasive.  Motion to Dismiss Fifth Amendment Claim in

15  Second Amended Complaint ("MTD") (Dkt. 123), at 9.  Given the national attention being paid

16  to the detainees at Guantánamo Bay, it is implausible that Defendant Gates, as Secretary of

17  Defense, was unaware of these cases or did not pay attention to them.  Although Defendant

18  Gates had the Department of Justice to defend him in these suits, this did not alleviate him of the

19  duty to remain informed of the status of those cases, especially those in which he controlled the

20  policies and practices for the detention and transfers of detainees.  This is especially true given

21  that it is his duty to oversee these activities and ensure that they are in accordance with all

22  applicable laws, including the Constitution.  *See* Detainee Treatment Act of 2005, 10 U.S.C. §

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**        PAGE 9 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   801.  Defendant Gates had the authority to determine if Plaintiff was cleared for transfer, and if

2   so, why Plaintiff had not been transferred over a year after he was cleared. SAC, (Dkt. 122), at

3   ¶¶ 24-25, 57-59, 109.   Defendant Gates had the authority to approve transfer of Guantánamo

4   Bay detainees back to their home country, but he took no such action for Plaintiff until he had

5   been Secretary for a year.  *Id*. at ¶ 109.

6         Defendant Gates' argument regarding his lack of involvement in Plaintiff's habeas

7   petition only supports his deliberate indifference and approval of the widespread practices of the

8   constitutional violations to which the Plaintiff was subjected.  The practice was to hold detainees

9   indefinitely without adequate due process to determine whether it was reasonable to detain them

10  at all, to ostensibly determine detainees' status by a flawed CSRT procedure, and to continue to

11  hold detainees for unreasonable lengths of time after they were cleared for transfer.  *Id.* at ¶¶ 57,

12  58, 79-81.  Defendant Gates' arguments regarding his connection to Guantánamo Bay ignores

13  that his inaction, as well as his action, demonstrate his personal involvement for purposes of

14  qualified immunity.  Plaintiff has established that Defendant Gates was aware that Plaintiff and

15  other detainees were subjected to a widespread practice violating their rights.  *Id.* at ¶¶ 57, 58,

16  79-81. Defendant Gates had ample opportunity to investigate and rectify the situation, but

17  instead affirmatively continued the practice of unlawful detention.  *Id.* at ¶ 109.

18        In addition, the complaint alleges that Defendant Gates was on notice of the illegal

19  detention of innocent men, and that such action was likely a violation of the U.S. Constitution,

20  through a letter from members of Congress.  *Id.* at ¶ 112.  As the *Vance* court recognized, "In

21  cases like this one in which much of the decision-making at issue took place behind closed

22  doors, courts have shown a willingness to accept outside documentation of abuse as a factor

Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim
2:10-cv-00591        PAGE 10 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

The Honorable Marsha J. Pechman

1    supporting the plausibility of a plaintiff's allegations," 694 F.Supp.2d at 964, *citing al-Kidd v.*

2    *Ashcroft*, 580 F.3d 949, 976 (9th Cir.2009), *rev'd on other grounds,* 131 S.Ct. 2074 (2011)

3    (holding that the "abuses occurring under the material witness statute after September 11, 2001

4    were highly publicized in the media, congressional testimony and correspondence, and in various

5    reports by governmental and non-governmental entities, which could have given Ashcroft

6    sufficient notice to require affirmative acts to supervise and correct the actions of his

7    subordinates").  Moreover, Plaintiff's allegations are not limited to "a single letter or media

8    report" for purposes of demonstrated personal liability.  MTD (Dkt. 123), p. 9.  This is one

9    allegation among many demonstrating Defendant Gates' supervisory liability.

10           In the present case, the Plaintiff has met the requirements of *Twombly* and *Iqbal* in

11   alleging personal participation by Defendant Gates.  The allegations contained in Plaintiff's

12   complaint are not mere "formulaic recitation of the elements" of a constitutional claim,

13   *Twombly*, 550 U.S. at 555, or even threadbare recitals of the elements of a cause of action,

14   supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949.  Rather, Plaintiff's factual

15   allegations have "nudged [his] claims . . . across the line from conceivable to plausible."

16   *Twombly* at 570.  Based on the allegations, Plaintiff has established that Defendant Gates'

17   personal participation through supervisory liability is "more than a sheer possibility that a

18   defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949.

19      B.  **DEFENDANT GATES VIOLATED CONSTITUTIONAL RIGHTS OF WHICH A**
          **REASONABLE PERSON WOULD HAVE KNOWN WERE CLEARLY ESTABLISHED.**

20              1.    The Contours of the Right to Be from Prolonged Arbitrary Detention and

21                    CIDT were Clearly Established at Guantanamo Bay.

22   Qualified immunity shields government officials from liability for civil damages as long

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**        PAGE 11 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   as their "conduct does not violate clearly established statutory or constitutional rights of which a

2   reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

3   Qualified immunity balances the importance of the ability to seek damages as a remedy for the

4   violation of rights against the need to protect officials who should be given discretion in

5   performing their responsibilities. *Id.* at 807. It provides protection to all officers except those

6   who are plainly incompetent or who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335,

7   341 (1985). However, qualified immunity is not "a license for lawless conduct and its purpose

8   is to force officials to hesitate in situations where they should know that certain conduct will

9   violate clearly established statutory or constitutional rights." *Harlow,* 457 U.S. at 819.

10          In addition, it is not required that the action in question has been previously determined

11   to be unlawful; "officials can still be on notice that their conduct violates established law even in

12   novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 739, 741. *See also Anderson v.

13   Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by

14   qualified immunity unless the very action in question has previously been held unlawful…but it

15   is to say that in the light of pre-existing law the unlawfulness must be apparent) (internal

16   citations omitted). Further, "[g]eneral statements of the law are capable of giving clear and fair

17   warning to officers for qualified immunity purposes, even where the very action in question has

18   not previously been held unlawful." *Walker v. Davis*, 649 F.3d 502, 504 (6th Cir. 2011). For a

19   right to be clearly established, it is enough that the "contours of the right" are "sufficiently clear

20   that a reasonable official would understand that what he is doing violates that right." *Anderson*,

21   483 U.S. at 640.

22          Here, a reasonable person in Defendant Gates' position should have been aware both that

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 12 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    the Naval Base at Guantánamo Bay was within the legal jurisdiction and control of the United

2    States - at least for purposes of the constitutional right to be free from prolonged arbitrary

3    detention - and that prolonged arbitrary detention, torture, and CIDT were wrongful in that

4    location under both the United States Constitution and international law, even as applied to

5    aliens.

6         Defendant Gates caused Plaintiff to be held for over a year at the military base at

7    Guantánamo Bay, Cuba.  In 2004, the U.S. Supreme Court confirmed that Guantánamo Bay is

8    within the "territorial jurisdiction" of the United States and under its exclusive "jurisdiction and

9    control." *Rasul v. Bush*, 542 U.S. 466, 480-81 (applying 28 U.S.C. § 2241, the habeas statute, to

10   Guantánamo Bay detainees).  In his concurrence in *Rasul*, Justice Kennedy stated that

11   Guantánamo is in "every practical respect a United States territory." *Rasul*, 542 U.S. 466, 487

12   (Kennedy, J., concurring).  He highlighted the "unchallenged and indefinite control over

13   Guantánamo Bay.  From a practical perspective, the indefinite lease of Guantánamo Bay has

14   produced a place that belongs to the United States, extending the implied protection of the

15   United States to it." *Id.* (*quoting Eisentrager*, 339 U.S. at 777-778).  Moreover, in *Rasul*, the

16   Supreme Court clearly distinguished the situation of individuals, like Plaintiff, from persons

17   subjected to the holding of the Supreme Court in *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct.

18   936, 94 L.Ed. 1255 (1950).  *Rasul*, 542 U.S. at 475-76.

19        In addition, in *Rasul*, the Court noted that the right to habeas – and thus, the right to be

20   free from prolonged arbitrary detention – applied throughout U.S. and English history not only to

21   "the claims of aliens detained within sovereign territory of the realm"(citations omitted), but also

22   to "the claims of persons detained in the so-called 'exempt jurisdictions,' where ordinary writs

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1   did not run, and all other dominions under the sovereign's control." *Id.* at 481-82 (internal

2   citations omitted).  The Court cited Lord Mansfied, who wrote in 1759 that even if a territory

3   was "no part of the realm," there was "no doubt" as to the court's power to issue writs of habeas

4   corpus if the territory was "under the subjection of the Crown." *Id.* at 482 (internal citations

5   omitted).  The Court continued that, "Later cases confirmed that the reach of the writ depended

6   not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact

7   extent and nature of the jurisdiction or dominion exercised in fact by the Crown.'"  *Id.* (internal

8   citations omitted).  Although *Rasul* addressed the writ of habeas statutorily, the case and its

9   reasoning and recitation of history should have put a reasonable person in Defendant Gates'

10   position on notice that at least some constitutional rights – such as the right to be free from

11   prolonged arbitrary detention – were likely to exist at Guantánamo Bay, given the United States'

12   exclusive jurisdiction over the base.

13          Also in 2004, the Ninth Circuit specifically considered whether detainees had the right to

14   challenge their unlawful detention at Guantánamo Bay in U.S. courts, and found that they did.

15   *Gherebi v. Bush*, 374 F.3d 727, 736 (9th Cir. 2004) ("[w]here a nation exercises 'exclusive

16   jurisdiction' over a territory, territorial jurisdiction lies."); *see also U.S. v. Corey*, 232 F.3d 1166,

17   1172-76 (9th Cir.2000) (analyzing Congressional Act that defined territorial jurisdiction to

18   include territory within the "exclusive jurisdiction" of the United States).  Importantly, in 2004,

19   the Ninth Circuit appears to have held not only that the habeas statute applied to Guantánamo

20   Bay, but that the Constitution's right to be free from arbitrary detention did as well.  *Gherebi*,

21   374 F.3d at 730-31, 738.   The court rejected the government's argument that *Eisentrager*

22   applied to Guantánamo Bay, as well as the government's position that rights to be free from

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**         PAGE 14 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1    prolonged arbitrary detention are tied to sovereignty rather than territorial jurisdiction. *Id.* at

2    733-34.

3        Even as early as 1993, Guantánamo Bay was recognized to be "under the complete

4    control and jurisdiction of the United States government," for purposes of certain constitutional

5    rights, such as rights under the First Amendment and Fifth Amendment. *Haitian Centers*

6    *Council, Inc. v. Sale*, 823 F. Supp. 1028, 1040 (E.D.N.Y. 1993) (citations omitted).[2] In so

7    holding, the *Haitian Centers* court cited several supportive cases, including *Flower v. United*

8    *States,* 407 U.S. 197, 198–99, 92 S.Ct. 1842, 1843–44, 32 L.Ed.2d 653 (1972) (First Amendment

9    applicable to U.S. conduct on a military base); *Lamont v. Woods,* 948 F.2d 825, 835 (2d

10   Cir.1991) (Establishment Clause of the First Amendment applies extraterritorially). *Id.* at 1041.

11   The court further stated, "The courts have protected the fundamental constitutional rights of

12   noncitizens in other territories subject to exclusive U.S. jurisdiction and control, including the

13   former American Sector of Berlin, the Canal Zone, and the Pacific Trust Territories," *citing*

14   *United States v. Tiede*, 86 F.R.D. 227, 249–53 (U.S.Ct. Berlin 1979), *Government of Canal Zone*

15   *v. Scott*, 502 F.2d 566, 568 (5th Cir.1974), *Ralpho v. Bell*, 569 F.2d 607, 618–19 (D.C.Cir.1977),

16   *Nitol v. United States*, 7 Cl.Ct. 405 (1985). *Id.* The court also held that "[c]onstitutional and

17   other fundamental rights apply to citizens and noncitizens outside the United States who

18   encounter official U.S. action," such as is the case here, *citing Asahi Metal Indus. Co.,* 480 U.S.

19   102, 107 S.Ct. 1026; *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *United*

20

---

21    [2] There were numerous other cases related to the Haitian detainees, but those were based on statutory interpretations
of Title II of the Immigration and Nationality Act. The Supreme Court found that the statute "within the United

22    States" presumed the alien's actual presence in the United States, and thus it had more to do with an alien's legal
status than with his location." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 175, 113 S. Ct. 2549, 2561,
125 L. Ed. 2d 128 (1993).

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**      PAGE 15 OF 24

**WILLAMETTE UNIVERSITY**
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   *States v. Streifel*, 665 F.2d 414 (2d Cir.1981); *United States v. Toscanino,* 500 F.2d 267 (2d

2   Cir.1974).  It should also be noted that in 1957, the Supreme Court held that a U.S. citizen had

3   constitutional rights, such as the right to a trial, on a military base in a foreign country. *Reid v.*

4   *Covert*, 354 U.S. 1, 55-56, 77 S. Ct. 1222, 1251, 1 L. Ed. 2d 1148 (1957) (citations omitted).

5         In fact, the case Defendant Gates relies on, *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43

6   F.3d 1412, 1428 (11th Cir. 1995), proposing that Cuban and Haitian migrants held at

7   Guantánamo Bay had no First or Fifth Amendment Rights, seems to be a minority view.  In any

8   event, after *Rasul*, any reasonable person would have understood that the holding of *Cuban Am.*

9   *Bar Ass'n*, which relied on the finding that Guantánamo Bay should be treated like any other

10  sovereign area outside of the United States (*Id.* at 1425), was suspect.

11        Given that it was well-recognized that Guantánamo Bay is within the territorial

12  jurisdiction of the United States before *Boumediene*, a reasonable person in Defendant Gates'

13  position – one of the highest officials in the land - should have recognized that some

14  constitutional protections (at a minimum, the right to be free from prolonged, arbitrary detention

15  and CIDT prohibitions of the Fifth Amendment) applied there.  As early as 1886, the Supreme

16  Court in the "pioneer case," *Yick Woo v. Hopkins*, 118 U.S. 356, 369 (1886), asserted that the

17  Fourteenth Amendment provisions "are universal in their application, to all persons within the

18  *territorial jurisdiction*, without regard to any differences of race, of color, or of nationality."

19        In 2001, the Supreme Court acknowledged that a statute permitting indefinite detention

20  of an alien, even when an individual was not officially admitted into the United States, would

21  raise "serious constitutional problems."  *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001) (Supreme

22  Court held that the Due Process Clause applied to unlawful aliens within the United States).

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim
2:10-cv-00591**        PAGE 16 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1       Well before 2006, the Ninth and Sixth Circuits extended *Zadvydas* even to inadmissible

2   aliens – aliens whom the United States treats legally as though they never entered the geographic

3   borders of the United States.   See *Xi v. U.S. I.N.S.*, 298 F.3d 832, 834 (9th Cir. 2002); *Rosales-*

4   *Garcia v. Holland*, 322 F.3d 386, 412 (6th Cir. 2003).  Moreover, in *Rosales-Garcia*, the court

5   held that even if *Zadvydas* did not apply to inadmissible aliens, their continued detention raises

6   independent constitutional concerns and therefore requires reasonable time limitations. *See*

7   *Rosales-Garcia*, 322 F.3d at 414. The court noted, "[W]e conclude that government treatment of

8   excludable aliens *must* implicate the Due Process Clause of the Fifth Amendment." *Id.* at 410.

9   *See also Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 396 (3d Cir. 1999) (excludable "aliens are

10   'persons' for purposes of the Fifth Amendment and is thus entitled to substantive due process.").

11   This line of cases is significant because the courts – including the Ninth Circuit – held that even

12   those aliens who should not be treated legally as having entered U.S. geographic territory are still

13   afforded constitutional rights – at least the right to be free from prolonged arbitrary detention –

14   vis-à-vis United States officials.  In addition, the Supreme Court, as early as 1946, found that

15   defendants in military tribunals in foreign countries within U.S. jurisdiction were entitled to

16   habeas relief, including the constitutional right to habeas.  *See Application of Yamashita*, 327

17   U.S. 1, 9, 66 S. Ct. 340, 345, 90 L. Ed. 499 (1946).

18       Although *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008),

19   was not decided until 2008, the Court's reasoning for its holding in that case demonstrates that a

20   reasonable person in Defendant Gates' position should have understood that the contours of the

21   constitutional right to be free from prolonged arbitrary detention and CIDT existed at the Naval

22   Base at Guantánamo Bay well before 2008.  For purposes of whether the constitutional right to

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 17 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   habeas existed at Guantánamo Bay, the Court accepted the notion that Cuba maintained *de jure*

2   sovereignty and that the United States had *de facto* sovereignty.  *Id.* at 755.  First, the Court

3   found that the "Government's premise that de jure sovereignty is the touchstone of habeas corpus

4   jurisdiction" was unfounded.  *Id.*  In fact, the Court used strong language, indicating that its

5   precedent on such matters was clear:  "For the reasons indicated above, the history of common-

6   law habeas corpus provides scant support for this proposition; and, for the reasons indicated

7   below, that position would be inconsistent with our precedents and contrary to fundamental

8   separation-of-powers principles."  *Id.*  The Court went further, stating, "The Court has discussed

9   the issue of the Constitution's extraterritorial application on many occasions. These decisions

10  undermine the Government's argument that, at least as applied to noncitizens, the Constitution

11  necessarily stops where de jure sovereignty ends."  *Id.* at 755.  The Court then discussed its

12  precedent and decisions, such as the Insular Cases,[3] where it found that the Constitution applied

13  in U.S. territories that were not states.  *Id.* at 756-764.  Rather than include this discussion in this

14  brief, Plaintiff points to the *Boumediene* Court's discussion of these cases.  In addition, the Court

15  distinguished *Eisentrager v. Johnson*, 339 U.S. 763 (1950), finding that the government was

16  attempting to make the case stand for a strict, formalistic proposition, which it did not.

17  *Boumediene*, 553 U.S. at 764.  In fact, the Court noted that *Eisentrager* adopted the historical

18  functional approach to determine the reach of the Constitution, and insinuated that the

19  government should have understood that based on the functional approach, the constitutional

20

---

21  [3] From 1901 to 1905, the U.S. Supreme Court in a series of opinions known as the Insular Cases held that the
    Constitution extended *ex proprio vigore* to the territories. The Court in these cases also established the doctrine of
    territorial incorporation. Under the same, the Constitution applied fully only in incorporated territories such as

22  Alaska and Hawaii, and it partially applied in the new unincorporated territories of Puerto Rico, Guam and the
    Philippines. The cases were: *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Goetze v. United States*, 182 U.S. 221 (1901);
    *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); *Downes v.
    Bidwell*, 182 U.S. 244 (1901); and *Huus v. New York and Porto Rico Steamship Co.*, 182 U.S. 392 (1901).

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 18 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1    right of habeas – and thus the right to be free from arbitrary detention – applied at Guantánamo

2    Bay.  *Id.*   The Court stated,

3                Third, if the Government's reading of *Eisentrager* were correct, the
             opinion would have marked not only a change in, but a complete
4                repudiation of, the Insular Cases' (and later Reid's) functional
             approach to questions of extraterritoriality.  We cannot accept the
5                Government's view.  Nothing in *Eisentrager* says that de jure
             sovereignty is or has ever been the only relevant consideration in
6                determining the geographic reach of the Constitution or of habeas
             corpus.  Were that the case, there would be considerable tension
7                between *Eisentrager*, on the one hand, and the Insular Cases and
             *Reid*, on the other.  Our cases need not be read to conflict in this
8                manner.  A constricted reading of *Eisentrager* overlooks what we
             see as a common thread uniting the Insular Cases, *Eisentrager*, and
9                *Reid*: the idea that questions of extraterritoriality turn on objective
             factors and practical concerns, not formalism.

10

11           *Id.* at 764.  In fact, *Boumediene's* holding is rooted in the Court's extra-territorial

12    application of the Constitution over one hundred years ago.  *Id.* at 756-59.[4]  In *Boumediene*,

13    Justice Kennedy determined that the idea of extraterritorial rights should be based on objective

14    factors and practical concerns of which should have been clear to government officials holding

15    men at Guantánamo Bay.  *Id.* at 764.

16           Defendant Gates also relies on the Supreme Court cases of *Boumediene*, *U.S. v. Verdugo-*

17    *Urquidez*, and *Zadvydas*, discussed above, to support his argument that Supreme Court had been

18    clear that aliens outside of the United States had no clearly established due process rights.  MTD

19    (Dkt. 123), p. 13.  First, as discussed above, *Boumediene*'s discussion supports the opposite

20    conclusion – that the government should have known that certain constitutional rights, at least

21    the right to be free from prolonged arbitrary detention – applied at Guantánamo Bay.  Second,

22

---

[4] *See generally* Marc D. Falkoff & Robert Knowles, *Bagram, Boumediene, and Limited Government*, 59 DePaul L.
Rev. 851 (2010).

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**          PAGE 19 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1  *Zadvydas*, also discussed above, stands for the proposition that an alien in the territorial

2  jurisdiction of the United States indeed has the constitutional right to be free from prolonged,

3  arbitrary detention.  533 U.S. 692-93. The dicta Defendant cites – "It is well established that

4  certain constitutional protections available to persons inside the United States are unavailable to

5  aliens outside of our geographic borders" – is followed in *Zadvydas* by citations to *Verdugo-*

6  *Urquidez* and *Eisentrager*.  *Id.* at 693.  Of course, neither of those cases concerned potential

7  rights within an area, like Guantánamo Bay, that was subjected to the territorial jurisdiction of

8  the United States.  And for the reasons outlined in *Boumediene*, Defendant should have been

9  aware that the functional test in *Eisentrager* actually supported the argument that Plaintiff had

10  the constitutional right to be free from prolonged arbitrary detention in Guantánamo (not to

11  mention that after *Eisentrager*, Guantánamo Bay had been repeatedly determined to be different

12  from the base in Germany discussed in *Eisentrager*).  Moreover, the *Zadvydas* court was careful

13  to note "*certain* constitutional protections," not all constitutional protections, were potentially

14  unavailable.  In fact, *Verdugo-Urquidez* concerned not Fifth Amendment due process rights, but

15  Fourth Amendment rights of a Mexican citizen in Mexico.  *United States v. Verdugo-Urquidez*,

16  494 U.S. 259, 261, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990).  In so holding, the Court

17  contrasted, *inter alia*, the textual usage of "persons" in the Fifth Amendment with the use of

18  "people" in the Fourth Amendment.  *Id.* at 265-66.

19      In addition to the constitutional right to be free from prolonged arbitrary detention,

20  courts have consistently held that substantive due process rights, including the right to be free

21  from CIDT, apply in numerous contexts that would demonstrate to a reasonable person that the

22  CIDT treatment and detention of Guantánamo Bay detainees violated the Constitution.  *See, e.g.,*

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

1  *Wong Wing v. United States*, 163 U.S. 228, 237-38, 16 S. Ct. 977, 981, 41 L. Ed. 140 (1896)

2  ("slavery or involuntary servitude shall not exist within the United States or *any place subject to*

3  *their jurisdiction*, except as a punishment for crime whereof the party shall have been duly

4  convicted")(emphasis added.); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987)

5  (excludable aliens detained within United States territory have a right to humane treatment);

6  *Mathews v. Diaz,* 426 U.S. 67, 78 (1976) (equal protection of the Fifth Amendment's Due

7  Process Clause extends to non-admitted aliens); *Alvarez-Mendez v. Stock,* 941 F.2d 956, 962 &

8  n. 6 (9th Cir.1991) (noting that Fifth and Sixth Amendments apply to excludable aliens).

9          2.        Government Officials Created A Special Relationship with Plaintiff For Which the Constitution Imposes Additional Constitutional

10                         Responsibilities.

11       In addition to the above, a reasonable person in Defendant Gates' position would have

12 known that where, as here, the government takes a person into its custody and holds him against

13 his will, a "special relationship" is created, and the Constitution imposes some responsibility for

14 the detainee's safety and general well-being. *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996)

15 ("[T]he government creates a special relationship with a person by placing him in a vulnerable

16 situation, the substantive component of the Due Process Clause obligates the government to

17 provide for that person's basic needs and to protect him from deprivations of liberty"), *citing*

18 *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 199-200 (1989).

19 *See also Youngberg v. Romeo,* 457 U.S. 307, 314-325, 102 S.Ct. 2452, 2457-2463, 73 L.Ed.2d

20 28 (1982); *Estelle v. Gamble,* 429 U.S. 97, 103-104, 97 S.Ct. 285, 290-291, 50  L.Ed.2d 251

21 (1976).  The United States created a special relationship with Plaintiff when U.S. officials seized

22 Plaintiff from his home, and detained him at Bagram Air Base and then at Guantánamo Bay.

**Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**      PAGE 21 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1

2          3.        Defendant Gates Acted Unlawfully and Thus Cannot Invoke Qualified
                     Immunity.

3

4          Even if there are questions concerning exactly what rights Guantánamo Bay detainees

5   possess, Defendant Gates is not entitled to immunity.  Rather, the inquiry should be whether the

6   official knew the act causing the harm was wrong and unlawful.  "The relevant, dispositive

7   inquiry is whether it would be clear to a reasonable [officer] that his conduct was unlawful."

8   *Saucier v. Katz*, 553 U.S. 194, 202 (2001).  Considering that "some policies of prolonged

9   arbitrary detentions are so bad that those who enforce them become enemies of the human race,"

10  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 737, 124 S. Ct. 2739, 2769, 159 L. Ed. 2d 718 (2004),

11  detaining an innocent man for over five years while withholding basic human rights would likely

12  be conduct that Defendant Gates knew was wrong.

13         Additionally, Defendant Gates should have known that U.S. law specifically prohibited

14  the CIDT of detainees, even those held at Guantánamo Bay.  The Detainee Treatment Act of

15  2005 §1003(a), codified at 42 U.S.C. § 2000dd(a), emphasized that no one who is in the

16  "custody or under the physical control of the United States government, regardless of …physical

17  location, shall be subject to cruel, inhuman, or degrading treatment or punishment." Section

18  1003(a) specifically states that physical location is not a factor to consider.  Thus, even if

19  Defendant claims that he did not know detainees had constitutional rights in Guantánamo, no one

20  should be subjected to CIDT and arbitrary detention of which Plaintiff had to endure.   A

21  reasonable U.S. government official in Defendant's shoes would have known that keeping a

22  human being detained without due process, no matter the location of detention or the accused's

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**        PAGE 22 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1   status, is fundamentally wrong and in direct conflict with basic notions of democratic justice.

2   Similarly, such a reasonable official should have known that the conditions to which Plaintiff

3   was subjected constituted CIDT.

4   ### III.  CONCLUSION

5      For the foregoing reasons, the Defendant's motion to dismiss Plaintiff's Fifth

6   Amendment claims should be denied.

7        Respectfully submitted this 13th of February, 2012.

8   WILLAMETTE UNIVERSITY SCHOOL OF LAW
  INTERNATIONAL HUMAN RIGHTS CLINIC

9

10      /s/ GWYNNE L. SKINNER
  Gwynne L. Skinner, WSBA No. 23490,
11   OSB No. 022235
  Attorney for Plaintiff

12

13   PUBLIC INTEREST LAW GROUP, PLLC
  705 Second Avenue, Suite 1000
14   Seattle, WA  98104
  (206) 838-1800

15

    /s/  Nancy Chupp
16   Hank Balson, WSBA No. 29250
  Nancy S. Chupp, WSBA No. 33740

17   Attorneys for Plaintiff

18

19

20

21

22

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**    PAGE 23 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433

THE HONORABLE MARSHA J. PECHMAN

1             **CERTIFICATE OF SERVICE**

2         I hereby certify that on February 13, 2012, I electronically filed the foregoing with the

3    Clerk of Court using the CM/ECF system, which will send notification of this filing, and a copy

4    of the brief, to:

5

6    Paul E. Werner
      Trial Attorney
7    United States Department of Justice
      Torts Branch, Civil Division
8    P.O Box 7146
      Ben Franklin Station
9    Washington, D.C. 20044

10
        _____/S/ GWYNNE L. SKINNER_____
11   Gwynne L. Skinner, WSBA No. 23490, OSB No. 022235
      Attorney for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

**Plaintiff's Brief in Opposition to Defendant's Motion
to Dismiss Fifth Amendment Claim**
**2:10-cv-00591**         PAGE 24 OF 24

WILLAMETTE UNIVERSITY
LAW CLINIC
245 Winter St. SE
Salem, OR 97301
TELEPHONE: (503) 370-6140
FACSIMILE: (503) 375-5433