UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ADEL HASSAN HAMAD, | CASE NO. C10-591 MJP |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| v. | |
| ROBERT M. GATES, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion to dismiss Plaintiff's Fifth Amendment Claim in the Second Amended Complaint (Dkt. No. 123). Having reviewed the motion, the response (Dkt. No. 125), and the reply (Dkt. No. 126), the Court GRANTS Defendant's motion to dismiss.

**Factual Background**

Plaintiff Adel Hassan Hamad ("Hamad") alleges Defendant Robert Gates ("Gates") violated his Fifth Amendment rights. Hamad is a fifty-two year old Sudanese citizen. Gates is a United States citizen who owns property in Washington state and has been the United States Secretary of Defense since December 2006.

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS- 1

As alleged in the Second Amended Complaint, Hamad was first seized in July 2002 while working as a humanitarian worker in Pakistan. Several men raided Hamad's apartment in Peshawar, Pakistan and took him to a local jail. Hamad was interrogated and later transported, hooded and chained, to several detention facilities in Pakistan. In January 2003, Hamad was transferred to the United States Air Force Base in Bagram, Afghanistan and, in March 2003, Hamad was transferred once more, shackled, blind-folded, to Guantanamo Bay. In Guantanamo Bay, Hamad was in part held in isolation and again interrogated by U.S. military officials. In November 2004, a year and a half after Hamad's arrival in Guantanamo, a Combatant Status Review Tribunal ("CSRT") was convened and, in March 2005, a divided CSRT determined Hamad was an enemy combatant. (Id. at ¶¶ 72-74.) The panel's decision was based on Hamad's employment with two humanitarian organizations for which he had done charity work.

Three to five months later, the military's Administrative Review Board ("ARB") considered Hamad's enemy combatant status, as part of its function to review CSRT procedures annually. In November 2005, the ARB reversed the CSRT's determination and held Hamad was eligible for release back to the Sudan. But the ARB did not notify Hamad of its decision about fifteen months later in February 2007. After he was notified, Hamad remained detained for ten more months until the United States and the Sudan completed negotiations regarding his release. Hamad was released to the Sudan on December 12, 2007, five and a half years after his initial capture in Pakistan without ever having been charged with a crime.

Hamad alleges Gates violated his Fifth Amendment rights based on his five and a half year detention. As Secretary of Defense beginning December 18, 2006, Gates's tenure overlapped with Hamad's detention in Guantanamo for one year, including the time Hamad was detained despite the ARB's determination that there was no basis for his detention. Hamad

alleges Gates ordered, authorized, condoned, created methods and procedures for the abuses he suffered from the date of his seizure until his release in December 2007.

**Procedural Background**

In his First Amended Complaint, Hamad alleged Gates violated the Fifth Amendment as the Secretary of Defense, which is the highest rank in the military command structure. Specifically, Hamad alleged Gates "exercised command control over . . . the United States detention facility at Guantánamo" and sued Gates for "ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff." ." (First Am. Compl. ¶ 24.)

The Court dismissed Hamad's First Amended Complaint because Hamad failed to allege Gates was personally involved in violating Hamad's constitutional rights. (See Dkt. No. 121 at 13-14.) The Court reasoned Hamad's complaint made conclusory statements rather than raised factual allegations. Hamad's allegations did not raise a reasonable expectation that discovery would show Gates personally authorized or was deliberately indifferent to Hamad's enemy combatant hearings in Guantanamo. The Court granted leave to amend so that Hamad could plead more than Gates exercised control over the United States military. (Id.)

In his Second Amended Complaint, Hamad added the following allegations:
1. By statute, Gates provides the Joint Chiefs of Staff with written policy guidance regarding plans for homeland defense and military support to civil authorities. (Second Am. Compl. ¶ 25.)
2. Several officials informed Gates that the military commissions in Guantanamo were problematic. Specifically, in February 2007, Susan Crawford reviewed the military

1  commissions in Guantanamo and reported to Gates that the implementation of the
2  commissions was flawed. (Second Am. Compl. ¶ 111.) In addition, the Chief Prosecutor
3  for the Guantanamo military commissions sent Gates his resignation in October 2007,
4  concluding that full and fair trials were not possible. (Second Am. Compl. ¶ 112.)

5  3. In June 2007, one hundred and forty-one members of Congress copied Gates on a letter to
6  then-President George W. Bush alerting Bush that innocent men were being unlawfully
7  held at Guantanamo Bay. (Second Am. Compl. ¶ 112.)

8  4. Hamad's habeas petition was pending in federal court in the District of Columbia when
9  Gates became the Secretary of Defense and was substituted as the Defendant. (Second
10  Am. Compl. ¶ 110.)

**Analysis**

1. Motion to Dismiss

Defendant seeks to dismiss Hamad's Second Amended Complaint, arguing (1) Gates is entitled to qualified immunity and/or (2) Hamad still fails to adequately plead Gates's personal involvement in the constitutional violation. The Court finds qualified immunity does not apply, but agrees Hamad's complaint is inadequately plead.

   a. Qualified Immunity

Gates argues he is protected by qualified immunity. The Court disagrees.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, the Court has discretion in applying one or both steps of a two-step

1 | inquiry set out in Saucier v. Katz, 533 U.S. 194, 201 (2001).  Pearson, 129 S. Ct. at 818.  The two-step inquiry considers whether the plaintiff has alleged a violation of a constitutional right and/or whether the right at issue was "clearly established" at the time of the alleged misconduct. Id. at 815-16.  To be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, the proper inquiry focuses on whether "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted' . . . or whether the state of the law [at the time] gave 'fair warning' to the officials that their conduct was unconstitutional."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002).

Gates argues qualified immunity applies because there was a "lack of case law" establishing the Due Process rights of Guantanamo detainees at the time Hamad was detained. The Court finds Gates's argument unpersuasive.  First, to the extent Gates argues Boumediene only recognized Guantanamo detainees' habeas right and not their other constitutional claims, the Court already rejected Gates's argument in its earlier order.  (See Dkt. No. 121 at 3-6.)  In the previous motion to dismiss, the Court found Boumediene struck down § 7 of the Military Commissions Act in its entirety—both the MCA's attempt to strip federal jurisdiction over habeas petitions and the subsection that stripped federal jurisdiction over Bivens actions.  (Id.) As Boumediene held, the United States has de jure jurisdiction over Guantanamo.  In other words, the government cannot circumvent the Constitution by choosing to detain individuals in Guantanmo Bay instead of within the United States.  Since Boumediene recognizes constitutional protections extend to Guantanamo detainees and Hamad's detention was a clear violation of a constitutional right, the Court finds qualified immunity does not apply.

1    Second, it would be clear to a reasonable official that Hamad's prolonged detention
2    violated the Constitution. While Gates argues federal officials would not have known
3    constitutional protections apply in Guantanmo Bay, the argument misplaced. Gates's argument
4    improperly focuses on the location of Hamad's detention and ignores the fact that federal
5    officials themselves determined Hamad was eligible for release. Even if the legal framework
6    regarding enemy combatants in Guantanamo Bay was developing at the time, it is widely-
7    recognized that there is a constitutional right to be free from continued detention after it is or
8    should be known that a detainee is entitled to release. See Sivard v. Pulaski County, 959 F.2d
9    662 (7th Cir. 1992)(continued detention where sheriff knew it was wrongful states claim under §
10   1983 for due process violation); Cannon v. Macon County, 1 F.3d 1557 (11th Cir. 1993) (failure
11   to release after officer knew plaintiff had been misidentified gives rise to a § 1983 suit); Sanders
12   v. English, 950 F.2d 1152 (5th Cir. 1992)(same). It is fundamental to our legal system that an
13   individual "has a liberty interest in being free from incarceration absent a criminal conviction."
14   Lee v. City of Los Angeles, 250 F.3d 668, 683 (9th Cir. 2001). The fact that the government
15   chooses to detain someone in Guantanamo Bay and not in the United States does not eviscerate
16   this basic constitutional limit on government conduct. See, e.g., Hamdi v. Rumsfeld, 542 U.S.
17   507 (recognizing a citizen's constitutional right to contest his "enemy combatant" status).
18      Here, not only was Hamad never charged with a crime, the ARB itself found Hamad was
19   eligible for release in November 2005. Yet, no one told Hamad of the ARB decision until more
20   than a year later in February 2007 and Hamad remained detained until December 12, 2007. In
21   effect, Hamad was detained for two years after the military's own review board determined there
22   was no basis for his detention. In conducting an ARB review, military officials were not only on
23   notice that their conduct was unconstitutional but apparently recognized Hamad had a liberty
24

interest in being free. This is not surprising given that "federal officials [are] cognizant of the basic fundamental civil rights afforded to detainees under the United States Constitution." Padilla v. Yoo, 633 F.Supp.2d 1005, 1037 (N.D.Cal. 2009). The Court finds qualified immunity does not apply because a reasonable official would have known, and it is likely military officials here did know, that they were violating Hamad's clearly established right by continuing to detain Hamad well-after it was determined he was eligible for release.

Third, Hamad is not required to show the military officials' conduct was previously declared unconstitutional to survive a qualified immunity analysis. See Anderson, 483 U.S. at 640; Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001)(holding that a right can be clearly established based on common sense in the absence of precedent directly on point). In fact, the Supreme Court case Gates relies on stated a clearly established right "do[es] not require a case directly on point." Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2083 (2011). Indeed, some violations are so obvious that a defendant need not have a factually identical case to know that their conduct violates the Constitution. See, e.g., Hope v. Pelzer, 536 U.S. 730, 741 (2002)(reversing grant of qualified immunity for prison officials who chained a prisoner to a post for seven hours). The Court finds detaining an individual for years after having determined there was no basis for his detention is surely a clear violation of an established right.

Finally, the Court finds D.C. case law on the issue of qualified immunity flawed. In Rasul v. Myers (Rasul I), former Guantanamo Bay detainees sued the Secretary of Defense for constitutional violations related to their detention. Rasul v. Myers (Rasul I), 414 F.Supp.2d 26 (D.D.C. 2006). When both parties appealed the D.C. court's partial dismissal of Plaintiff's claims, the Supreme Court vacated the opinion and remanded "for further consideration in light of [Boumediene]." Rasul v. Myers, 555 U.S. 1083 (2008). On remand, however, the D.C.

Circuit determined qualified immunity still applied after <u>Boumediene</u> because the Fifth Amendment rights of detainees in Guantanamo were not clearly established at the time of Rasul's detention, i.e., pre-<u>Boumediene</u>. <u>Rasul v. Myers (Rasul II)</u>, 563 F.3d 527 (D.C. Cir. 2009).

While the D.C. circuit has routinely applied <u>Rasul II</u>'s reasoning on qualified immunity to preclude other constitutional claims by Guantanamo detainees, <u>see, e.g.</u>, <u>Ali v. Rumsfeld</u>, 649 F.3d 762, 770 (D.C.Cir. 2011); <u>Al-Janko v. Gates</u>, 2011 WL 6440906 at *4 n.13 (D.D.C. Dec. 22, 2011), the Court declines to follow it. The Court finds <u>Rasul II</u>'s application of qualified immunity is in tension with the Supreme Court's directive in <u>Boumediene</u>. In vacating <u>Rasul I</u>, the Supreme Court suggested <u>Boumediene</u> affected the analysis as to whether or not detainees held in Guantanamo could assert constitutional rights. In fact, the Supreme Court specifically recognized a Guantanamo detainee's right to constitutional protections as early as 2004. See <u>Rasul v. Bush</u>, 542 U.S. 466, 481 (2004)(finding jurisdiction existed over a Guantanamo detainee's habeas petition even though he was not a U.S. citizen). Since the Court finds the D.C. Circuit's adoption of <u>Rasul II</u> unpersuasive, the Court will not adopt it to preclude Hamad from asserting his clearly established Fifth Amendment rights.

The Court finds Gates is not entitled to qualified immunity. Although Defendant argues case law regarding Guantanamo detainees was unsettled at the time, it is indisputable that a reasonable federal official would know that detaining a person, after determining he is eligible for release, violates a clearly established constitutional right.

\\

\\

\\

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS- 8

b.  Personal Involvement

Gates argues Plaintiff's Second Amended Complaint still fails to allege Gates was personally involved in violating Hamad's constitutional rights. In this limited respect, the Court agrees.

To proceed with his Bivens claim, Hamad must allege facts indicating that Secretary Gates was personally involved in and responsible for the alleged constitutional violations. Iqbal v. Ashcroft, 129 S.Ct. 1937, 1948-49 (2009). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead a plausible claim that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S.Ct. at 1948. The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully but is not akin to a "probability requirement." Iqbal, 129 S.Ct. at 1949, quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Hamad's allegation that Gates "knew" that there were innocent men being held at Guantanamo Bay yet continued the policies of his predecessor is not a fact-based allegation; rather, it is still a bald legal conclusion. While "legal conclusions can provide the framework of a complaint," to survive a motion to dismiss "they must be supported by factual allegations." Iqbal, 129 S.Ct. at 1950. The Court finds Hamad's four added factual allegations are not enough to meet Iqbal's plausibility standard.

First, Hamad's reliance on a statute setting forth the Secretary of Defense's responsibilities is weak. It is undisputed the Secretary of Defense provides policy guidance to the Joint Chiefs of Staff regarding military operations. However, the general obligation to provide policy guidance on military operations does not link Gates to the alleged constitutional violation Hamad suffered. In other words, Hamad fails to allege any policy guidance that Gates

himself set regarding Guantanamo Bay let alone policy guidance that Gates set related to Hamad's unlawful detention.

Second, Hamad's allegation that various officials evaluated and identified problems with Guantanamo Bay's military commissions is inapposite. Hamad was never charged with a crime and, therefore, never prosecuted by the military commissions. Assuming Gates was aware of these criticisms, Hamad's reliance on Susan Crawford's evaluation of Guantanamo in February 2007 and the Chief Prosecutor's resignation, is misplaced. There is no factual allegation that Gates knew military officials were holding detainees whom the military itself determined should be freed.

Third, a letter from 145 Congressmen to then-President Bush does not plausibly suggest Gates was personally involved in Hamad's unlawful detention. Even though Gates was carbon copied, the letter was not a Congressional mandate and was focused on Guantanamo's closure, not on issues of prolonged detention. To the extent it refers to "the indefinite detention of innocent men," it is only to argue the allegations "hurt [the U.S.'s] credibility as the beacon for freedom and justice." See Congress letter to Bush: Close Guantanamo, McClatchy, available at www.mcclatchydc.com/2007/06/29/17486/congress-letter-tobrush-close.html (last visited March 23, 2012). While it is certainly possible that the letter put Gates on notice of constitutional violations in Guantanamo Bay, the Court does not find the letter suggests it was plausible. See, e.g., al-Kidd v. Ashcroft, 580 F.3d 949, 978-79 (9th Cir. 2009)(finding media reports and court decisions did not plausibly put Ashcroft on notice of systemic problems at the Department of Justice with respect to treatment of material witnesses).

Fourth, Hamad's pending habeas petition does not create a reasonable expectation that Gates was aware of Hamad's unlawful detention and/or Gates personally violated Hamad's

constitutional rights. Hamad's habeas petition was first filed when Rumsfeld was Secretary of Defense. Gates was automatically substituted as the Respondent when he took office in 2006 and Gates was sued in his official capacity. Under the Federal Rules, a Plaintiff suing an officer sued in their official capacity need only serve the United States and mail a copy of the summons and complaint to the official. Fed. R. Civ. P. 4(i)(2). The Court does not find it plausible that Gates was aware of Hamad's habeas petition since Gates was substituted as a Defendant and was never personally served.

At most, Hamad's factual allegations suggest Gates was aware Guantanamo Bay was under scrutiny when he took office in September 2006. However, Hamad's allegations do not nudge his claim that Gates personally participated in his unlawful detention "across the line from conceivable to plausible." Iqbal, 129 S. Ct. at 1951. This point is more clear when comparing Hamad's claim to those alleged in Vance v. Rumsfeld, 694 F. Supp. 2d 957, 963 (N.D. Ill. 2010). In Vance, the Plaintiff claimed Defendant Rumsfeld similarly "knew" torturous interrogation techniques were used in Iraq but also alleged: (1) Rumsfeld personally approved the list of interrogation techniques challenged, (2) convened a working group to establish interrogation techniques, and (3) sent a subordinate to Iraq to review military detention procedures.

Here, there is no factual allegation that Gates implemented actual policies resulting in Hamad's prolonged detention. To the extent Hamad presents a memorandum from the Secretary of Defense to the Joint Chiefs of Staff regarding the ARB process, Hamad's reliance on the memo is faulty. (Dkt. No. 125-1.) The memo is dated July 2006—i.e., several months before Gates took office. In addition, the memo only suggests Gates's predecessor, Rumsfeld, was notified of the ARB decision ordering Hamad's transfer in 2005. While Hamad argues Gates must have received the memo, there is no allegation Gates was notified of all prior ARB

decisions under Rumsfeld--in fact, Hamad's complaint does not refer to the memo at all—raising other issues as to whether it is properly considered on a motion to dismiss. In any event, the Court finds the memo does not suggest Gates's personal involvement in Hamad's constitutional deprivation.

To the extent Hamad argues Gates is subject to supervisory liability, the Court finds Hamad's argument is weak. In the Ninth Circuit, a supervisor may be liable for the actions of subordinates only if the supervisor is personally involved in the constitutional deprivation, or if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional deprivation. Hansen v. Black, 885 F.2d 642 (9th Cir. 1989). While "wrongful conduct" may include a supervisor's inaction or acquiescence in the constitutional deprivation, the supervisor must still be aware of the unconstitutional conduct; otherwise, supervisory liability would melt into vicarious liability—which is not recognized in Bivens actions. See Iqbal, 129 S.Ct. at 1948; see also Hydrick v. Hunter (Hydrick II), 2012 WL 89157 (9th Cir. Jan. 12, 2012)(finding, even under a "deliberate indifference" theory of supervisory liability, a plaintiff must allege sufficient facts to plausibly establish the defendant's "knowledge of" and "acquiescence in" the unconstitutional conduct of his subordinates). As discussed, there is minimal factual allegation that Gates knew detainees were being unconstitutionally held in Guantanamo Bay let alone Gates implemented policies resulting in Hamad's constitutional deprivation. While Gates may have known he inherited a flawed detention system, Hamad has not alleged enough facts to suggest Gates knew detainees were being held in violation of the Fifth Amendment and therefore is not liable under supervisory liability.

In sum, it is possible Gates knew Hamad was unlawfully detained, but it is not plausible based on the facts alleged. Unfortunately, this is not enough to survive dismissal under Iqbal.

**Conclusion**

The Court GRANTS Defendant's motion and DISMISSES Hamad's Fifth Amendment claim. While the Court finds there is a clearly-established, constitutional right not to be detained and qualified immunity does not apply, Gates's personal involvement in Hamad's detention is not adequately plead. Hamad fails to allege facts that would plausibly suggest Gates was personally liable for violations of his Fifth Amendment rights. The clerk is ordered to provide copies of this order to all counsel.

Dated this 13th day of April, 2012.

Marsha J. Pechman
United States District Judge